**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

THE UNITED STATES OF AMERICA, and

THE STATES OF CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, VIRGINIA, and WASHINGTON; THE DISTRICT OF COLUMBIA; THE COUNTY OF ALLEGHENY; and THE CITIES OF CHICAGO, NEW YORK, and PHILADELPHIA,

*ex rel.* DOES 1-2,

Plaintiffs-Relators,

v.

REGENERON PHARMACEUTICALS, INC., AMERISOURCEBERGEN and BESSE MEDICAL,

Defendants.

CIVIL ACTION NO. 1:20-cv-11401-GAO

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS


**I. INTRODUCTION** .......... 1

**II. JURISDICTION AND VENUE** .......... 3

**III. PARTIES** .......... 3

**A. *Qui Tam* Relators** .......... 3

**B. Defendants** .......... 4

**IV. STATUTORY AND REGULATORY BACKGROUND** .......... 4

**A. Government Reimbursement of the Products at Issue** .......... 4

**1. Medicare** .......... 4

***a. Medicare Part B*** .......... 5

***b. Medicare Advantage*** .......... 8

***c. Medicare Part D*** .......... 8

**2. Medicaid** .......... 9

**3. Other Government-Funded Health Programs** .......... 10

**B. The Anti-Kickback Statute** .......... 10

**C. OIG/HHS AKS Regulations, Guidance and Caselaw** .......... 13

**1. Marketing the Spread** .......... 15

**2. Manipulation of Average Sales Price** .......... 16

**3. AKS Safe Harbors Implicating Defendants' Discounting Arrangements** 16

***a. Discount Safe Harbor*** .......... 16

***b. Personal Services Safe Harbor*** .......... 19

***c. Bona Fide Services Fee Safe Harbor*** .......... 20

**D. The False Claims Act** .......... 22

**V. SUBSTANTIVE ALLEGATIONS** .......... 24

**A. Regeneron Promotes Eylea's Financial Rewards Rather Than Its Clinical Benefits to Providers** .......... 24

**1. Neovascular Age-Related Macular Degeneration ("wet AMD") and Its Treatment** .......... 24

**2. Eylea and Competitors in the Wet AMD Market ........................................ 25**

**3. Regeneron's Strategy to Convert Lucentis and Avastin Prescribers to Eylea… ........................................ 27**

**B. Regeneron and Besse Medical's Distribution Channel Scheme Violated the Anti-Kickback Statute and the False Claims Act ........................................ 29**

**1. Regeneron Paid Kickbacks to Physicians and Retina Practices Indirectly Through Besse Medical's Distribution Channel ........................................ 30**

***a. Regeneron Incentivized Providers to Prescribe Eylea Over Its Competitors by Funneling Eylea Discounts Through Defendant Besse Medical ........................................ 30***

***b. Besse Medical Supplied Free Inventory Management and Refrigeration Products Subsidized by Regeneron to Customers to Induce Them to Select Besse Medical as Their Preferred Provider ........................................ 34***

**2. Regeneron Manipulated Eylea's Average Sales Price in Order to Convert and Maximize Medicare Reimbursement to Eylea Customers ................ 37**

***a. Regeneron Marketed the Spread Between Eylea Purchases as Discounted by the Besse Medical Inducements and Purchases of Competing Products ........................................ 37***

***b. Regeneron Failed to Include Besse Medical Discounts in Eylea's Reported ASP ........................................ 46***

**3. Regeneron Closely Monitored the Progress and ROI of Defendants' Distribution Channel Arrangement ........................................ 51**

**4. Defendants' Besse Medical Distribution Channel Scheme Steered Business Away from Besse Medical's Competitors Who Did Not Offer Illicit Inducements ........................................ 54**

**C. Regeneron and Besse Medical Caused False Claims to be Submitted to the Government ........................................ 55**

**VI. CAUSES OF ACTION ........................................ 58**

**VII. PRAYER FOR RELIEF ........................................ 97**

**VIII. DEMAND FOR JURY TRIAL ........................................ 98**

Plaintiffs and *qui tam* Relators DOES 1-2, by and through their attorneys, Brooks LLC and Drohan Tocchio & Morgan P.C., allege for their Complaint as follows.

## I. INTRODUCTION

1. Relators bring this action on behalf of the United States of America and certain Plaintiff States and Localities seeking damages and penalties against Defendants Regeneron Pharmaceuticals, Inc. ("Regeneron"), AmerisourceBergen ("Amerisource") and Besse Medical ("Besse Medical") (collectively "Defendants") pursuant to the federal False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "False Claims Act" or "FCA"), and analogous state, municipal, and county false claims acts, to recover government funds paid as a result of Defendants' illegal kickback scheme as alleged herein.

2. From at least 2014 to the present (the "Relevant Period"), Defendants have engaged in a nationwide, interconnected and ongoing fraudulent pharmaceutical drug discounting scheme that violated the federal Anti-Kickback Statute and caused false claims for payment to be submitted to and paid for by federal and state government healthcare programs.

3. Defendants' illegal discounts induced sales of Regeneron's ophthalmology drug Eylea to ophthalmologists and retina practices when made through one of its product distributors, Defendant Besse Medical. The sales resulted and continue to result today in the submission of false claims to the government when those providers subsequently receive reimbursement from Medicare, Medicaid and other government healthcare programs.

4. Since 2014, the Medicare Part B program has spent over $10 billion on Eylea, with other government healthcare programs spending several billion more. From Eylea's 2011 launch through to the present, Defendant Regeneron has utilized Defendant Besse Medical as a distribution channel through which both Defendant companies provided ophthalmologists and

their retina practices with various illegal discounts and free products that were designed to induce purchases of Eylea.

5. The illegal discount scheme developed and implemented by Defendants Regeneron and Besse Medical induced providers nationwide to purchase Eylea through Medicare Part B's buy-and-bill regime over competing products such as Genentech, Inc.'s comparable drug Lucentis.

6. Defendants also induced providers nationwide to favor and use Defendant Besse Medical as their exclusive pharmaceutical drug distributor for the vast majority of their Eylea purchases reimbursed by Medicare and Medicaid.

7. The ophthalmologists and retina practices that converted to Eylea and to Besse Medical submitted thousands of claims for Eylea injections to Medicare and Medicaid that were tainted and rendered false by Defendants' inducements.

8. The illegal discount scheme also resulted in the conversion of providers to Besse Medical for use as their exclusive specialty drug distributor over other distributors that did not offer illicit incentives. The scheme rendered false these claims submitted by the converted providers, including Medicare, Medicaid and other government healthcare program claims for the administration of Eylea and other injectable drugs channeled through Besse Medical, as well.

9. Defendants carried out the schemes described herein with actual knowledge, deliberate indifference, and/or in reckless disregard of the truth or falsity that such actions and conduct violated applicable federal and state laws and regulations.

10. As a result of the schemes described herein, Defendants' wrongful conduct resulted in the submission of billions of dollars in false claims to the Government, to the detriment of taxpayers.

11. Pursuant to the FCA, Relators seek to recover damages and civil penalties arising from the false or fraudulent claims that Defendants submitted or caused to be submitted to Medicare, Medicaid and other government healthcare programs.

## II. JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), which specifically confers jurisdiction to this Court for actions brought under the False Claims Act, 31 U.S.C. §§ 3729 and 3730. This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345.

13. Under 31 U.S.C. §3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint, and Relators otherwise qualify as "original sources" even had such public disclosure occurred.

14. Venue is appropriate as to the Defendants in that they may be found, reside and/or transact business in the District of Massachusetts, and/or acts proscribed by 31 U.S.C. § 3729 have been committed by the Defendants in this judicial district. Therefore, venue is proper within the meaning of 28 U.S.C. § 1391(b) and (c), and 31 U.S.C. § 3732(a).

## III. PARTIES

### A. *Qui Tam* Relators

15. Relator DOE 1 is a citizen and resident of the United States of America. Relator DOE 1 worked as part of Regeneron's commercial sales management team within the Relevant Period. Relator DOE 1 was responsible for managing a team of sales representatives to meet Eylea sales objectives set by corporate management, analyzing sales and customer data to inform resource allocation in the region, and for managing and overseeing relationships with both current and prospective customers.

16. Relator DOE 2 is a citizen and resident of the United States of America. Relator DOE 2 worked with Regeneron's Analytics division as part of the management team within the Relevant Period. Relator DOE 2 was responsible for helping to implement advanced data analytics methods to measure, monitor, and inform corporate management regarding Eylea's performance.

**B. Defendants**

17. Defendant Regeneron has its principal place of business at 777 Old Saw Mill River Road, Tarrytown, New York 10591. Regeneron is a developer, manufacturer, and seller of pharmaceutical products, including Eylea. Regeneron conducts business nationwide, including in the District of Massachusetts.

18. Defendant Amerisource has its principal place of business at 1300 Morris Drive, Chesterbrook, Pennsylvania 19087. Amerisource is a drug wholesale company that provides drug distribution and related services. Amerisource conducts business nationwide, including in the District of Massachusetts.

19. Defendant Besse Medical, a subsidiary of Defendant Amerisource, has its principal place of business at 9075 Centre Pointe Drive, Suite 140, West Chester, Ohio 45069. Besse Medical is a nationwide distributor of pharmaceuticals, vaccines, and other biological products to physicians. Besse Medical conducts business nationwide, including in the District of Massachusetts.

## IV. STATUTORY AND REGULATORY BACKGROUND

### A. Government Reimbursement of the Products at Issue

#### 1. Medicare

20. The Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, is a taxpayer-funded Federal health insurance program that pays for covered medical care

provided to persons over sixty-five (65) years of age, and to certain others that qualify under the terms and conditions of the Medicare Program. 42 U.S.C. §§ 426, 426-1. Medicare is administered by the United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS").

21. Medicare operates by authorizing payments in accordance with government-established conditions and rates for in-patient and out-patient healthcare services to "providers," such as hospitals, skilled nursing facilities, outpatient rehabilitation facilities, and home health agencies. 42 U.S.C. §§ 1395cc(a), 1395x(u).

### ***a. Medicare Part B***

22. Medicare Part B pays for certain medical treatments and products, including designated injectable drugs administered in physicians' offices and hospital outpatient clinics. *See* 42 U.S.C. §§ 1395k, 1395m, 1395x.

23. Medicare Part B reimburses prescription drug claims through CMS, which contracts with private insurance carriers to administer and pay the claims from the Medicare Trust Fund. 42 U.S.C. § 1395u. In this capacity, the carriers act on behalf of CMS.

24. In order to participate in the Medicare program, a healthcare provider must enter into an agreement ("Provider Agreement") with the Secretary of HHS. 42 U.S.C. § 1395. After entering into a Provider Agreement, Medicare directly pays the provider a pre-determined rate for care provided to covered patients.

25. Under Federal health care programs such as Medicare and Medicaid, CMS assigns each drug that qualifies for reimbursement a specific reimbursement code established under the Healthcare Common Procedure Coding Systems ("HCPCS"). During the Relevant Period, Eylea's permanent HCPCS code was C9291.

26. Medicare currently has a "buy-and-bill" outpatient prescription drugs reimbursement regime whereby physicians typically purchase the drug through distributors and later submit reimbursement claims to Medicare Part B. In addition to buying and billing for the drug, physicians also prescribe and administer the drug, manage and store their practices' drug inventories, and collect the patient's share of reimbursement in the form of copayments or coinsurance.

27. Under this regime, physician practices and hospital outpatient departments earn a profit margin on the use of drugs they administer, incentivizing physicians to purchase and then provide the drug with the highest net reimbursement rate in situations where there is more than one drug indicated for treatment.

28. Under the Medicare program, "no payment may be made under Part A or Part B for any expenses incurred for items or services which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of the malformed body member." 42 U.S.C. § 1395y(a)(1)(A). To satisfy this standard, providers must provide, among other things, economical medical services, along with evidence that the service will be of a quality that meets professionally recognized standards of healthcare and will be supported by evidence of medical necessity and quality. 42 U.S.C. § 1320c-5(a) (1-3).

29. In order to qualify for payments by Medicare for services provided, providers must enter into Provider Agreements with CMS. As part of those agreements, without which the hospitals and physicians may not seek reimbursement from Federal Health Care Programs, the provider must sign the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me]. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying

> with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and 12 the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

Form CMS-855A at 48; *see also* Form CMS-855I at 23 (effective 2001). In addition, the claims themselves as submitted contain a similar certification. *See, e.g.*, Form CMS-1500.

30. Since January 2005, Medicare Part B has paid for most covered drugs using the Average Sales Price reimbursement methodology, or "ASP." The ASP is defined as a manufacturer's sales of a drug to all purchasers in the United States during each quarter of a calendar year, divided by the total number of units sold by the manufacturer in that same quarter. Social Security Act § 1847A(c), as added by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173.

31. CMS sets a single national payment amount for most Part B-covered prescription drugs at 106% of the volume-weighted ASP. Social Security Act § 1847A(b). Medicare beneficiaries are generally responsible for a 20% co-pay.

32. The ASP is net of any price concessions, such as volume discounts, prompt pay discounts, cash discounts, free goods contingent on purchase requirements, chargebacks, and rebates other than those obtained through the Medicare drug rebate program. Sales that are nominal in amount are exempted from the ASP calculation, as are sales excluded from the determination of "best price" in the Medicaid drug rebate program.

33. Manufacturers report ASPs by national drug codes ("NDC"), which are 11-digit identifiers that indicate the manufacturer, product dosage form, and package size of the drug. Manufacturers must provide CMS with the ASP and volume of each sale for each NDC on a quarterly basis, with submissions due 30 days after the close of each quarter.

34. When a manufacturer or repackager submits its quarterly ASP-required information to CMS, the manufacturer's CEO, CFO, or Authorizing Official must certify that:

> [T]he reported Average Sales Prices were calculated accurately and that all information and statements made in this submission are true, complete, and current to the best of my knowledge and belief and are made in good faith. I understand that the information contained in this submission may be used for Medicare reimbursement purposes.

CMS, Average Sales Price Data, Addendum B, https://www.cms.gov.McrPartBDrugAvgSalesPrice/Downloads/aspdata_addendum.pdf; *see also* 42 C.F.R. § 414.904.

***b. Medicare Advantage***

35. Medicare Part C ("Medicare Advantage") is a federal program that contracts with private insurance companies called Medicare Advantage Organizations ("MAOs" or "MA organization") to provide Medicare Part A and B benefits to Medicare beneficiaries. The plans must at a minimum cover all services covered by Medicare Part A and B, with the exception of hospice care. The federal government compensates the private insurance companies for their delivery of these services at a capitated rate.

***c. Medicare Part D***

36. Part D of the Medicare Program offers prescription drug coverage to beneficiaries through use of private managed health companies referred to as "Part D Sponsors." Part D Sponsors administer the program through the creation of drug formularies—a preferred list of drugs that may be reimbursed under the program. Part D sponsors reduce the cost of the program by negotiating rebates from drug manufacturers, which are then passed on to the Government and program beneficiaries. Part D sponsors submit a Prescription Drug Event ("PDE") to CMS, which is a claim for payment for the sale of drugs under the plan. Many insurance companies combine

their Medicare Advantage plans with Part D plans to offer Medicare Advantage Prescription Drug plans.

### 2. Medicaid

37. Medicaid is a federal and state funded health program, benefiting "categorically eligible" people, who are mostly low-income individuals and families. Like Medicare, it was created in 1965 pursuant to Title XIX of the Social Security Act. Under Medicaid, participating states administer state Medicaid programs that subsidize healthcare coverage for eligible residents. The individual state programs reimburse medical providers and hospitals for services rendered to program participants. The states receive federal funds to pay for Medicaid services.

38. Each state's Medicaid program must cover hospital services, 42 U.S.C. §§ 1396(a)(10)(A), 1396d(a)(12), and use a cost reporting method similar to that used under Medicare.

39. Each physician who participates in the Medicaid program must sign a Medicaid provider agreement with his or her state. Although there are variations in the agreements among the states, all states require the prospective Medicaid provider to agree that he or she will comply with all Medicaid requirements, including the fraud and abuse provisions.

40. Similar to Medicare coverage requirements, medical services must be reasonable and medically necessary in order to be subsidized by Medicaid. Claims for reimbursement presented by a provider to a state Medicaid program are subject to terms of certification. These terms require that the medical services for which the claims are sought were provided in accordance with applicable federal and state laws.

**3. Other Government-Funded Health Programs**

41. In addition to Medicare, the federal government reimburses a portion of the cost of drugs under several other federal healthcare programs, including, without limitation, programs administered by the Department of Defense (the "DOD"), the Department of Veteran's Affairs (the "VA"), and the Office of Personnel Management (the "OPM").

42. The DOD administers TRICARE (formerly CHAMPUS), a health care program covering individuals and dependents affiliated with the armed forces. The VA administers its own health program, along with CHAMPVA (a shared cost program), covering families of veterans. OPM administers the Federal Employee Health Benefit Program, a health insurance program covering federal employees, retirees, and survivors.

43. Reimbursement for medical supplies under these programs may occur either through direct purchase of drugs later administered at government facilities or through coverage of medical supplies administered by other providers to individuals eligible for benefits under these programs.

**B. The Anti-Kickback Statute**

44. The Medicare and Medicaid Patient Protection Act, also known as the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, arose out of congressional concern that the renumeration and gifts given to those who can influence health care decisions corrupts medical decision-making and can result in the provision of goods and services that are more expensive. The Anti-Kickback Statute makes it a crime to knowingly and willingly offer, pay, solicit, or receive any remuneration to induce the referral of or "to purchase, lease, order, arrange for or recommend" any good or service reimbursable under a federal health benefits program. 42 U.S.C. §§ 1320a-7b(b)(1) (referral prohibition) & (2) (purchase, lease, prohibition, etc.).

45. "Any remuneration" means any kickback, bribe, or rebate, direct or indirect, overt or covert, cash or in kind. *Id.* § 1320a-7b(b)(1).

46. AKS violations are felonies punishable by a maximum fine of $25,000, imprisonment up to five years, or both, and exclusion from federal health care programs for at least five years. *See* 42 U.S.C. § 1320a-7b. In addition to the statute's criminal penalties, the HHS Secretary has power to impose administrative penalties including exclusion and sanctions of $10,000 per kickback violation. *Id.* § 1320a-7a.

47. As such, the Anti-Kickback Statute prohibits any person or entity from knowingly and willfully offering to pay or paying any remuneration to another person to induce that person to purchase, order, or recommend any good or item for which payment may be made in whole or in part by a federal health care program, which includes any state health program or health program funded in part by the Federal Government. *See* 42 U.S.C. §1320a-7b(b), (f).

48. The statute provides, in pertinent part:

> (b) Illegal remunerations
>
> * * *
>
> (2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person-
>
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under Federal health care program, or
>
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony

> and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both. 42 U.S.C. § 1320a-7b(b)(2).

49. In addition to criminal penalties, a violation of the Anti-Kickback Statute can also subject the perpetrator to exclusion from participation in federal health care programs, 42 U.S.C. § 1320a-7b(b)(7), civil monetary penalties of $100,000 per violation, 42 U.S.C. § 1320a-7a(a), and three times the amount of remuneration paid, regardless of whether any part of the remuneration is for a legitimate purpose. *Id.*

50. A 2010 clarifying amendment of the AKS provides that "a claim [to a Federal healthcare program] that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of" the False Claims Act. Patient Protection and Affordable Care Act, Pub. L. 111–148, § 6402, 124 Stat. 468, 759 (2010), codified at 42 U.S.C. § 1320a-7b(g).

51. Medicare requires every provider who seeks payment from the program to promise and ensure compliance with the provisions of the Anti-Kickback Statute (discussed *infra*) and with other federal laws governing the provision of health care services in the United States. In other words, if a provider tells CMS or its agent that it provided services in violation of the Anti-Kickback Statute or another relevant law, CMS will not pay the claim. *See, e.g.*, CMS Form 855A at 48; Form 855I at 12 (effective 2001).

52. The Anti-Kickback's prohibition against knowing and willful conduct in disregard of the law extends to any arrangement where one purpose of the remuneration is to induce referrals. *U.S. ex rel. Westmorland v. Amgen, Inc.*, 812 F. Supp. 2d 39, 47 (D. Mass. 2011) (collecting cases).

53. When a provider submits a claim for payment, he or she does so subject to and under the terms of certification to the United States that the services for which payment is sought

were delivered in accordance with federal law, to include without limitation the Anti-Kickback Statue.

54. Compliance with the AKS is a material condition of payment under federal insurance programs such that violating the AKS gives rise to a false claim. *See Westmoreland*, 812 F. Supp. 2d at 54 (collecting cases). In other words, a claim for payment made pursuant to an illegal kickback is presumptively false under the FCA. *U.S. ex rel. Quinn v. Omnicare, Inc.*, 382 F.3d 432, 439 (3d Cir. 2004).

**C. OIG/HHS AKS Regulations, Guidance and Caselaw**

55. In 1991, the HHS Office of Inspector General ("HHS OIG") promulgated regulations under the AKS. *See* Medicare and State Health Care Programs: Fraud & Abuse; OIG Anti-Kickback Provisions, 56 Fed. Reg. 35,952, 35,958 (July 29, 1991) ("HHS OIG Anti-Kickback Provisions").

56. The Anti-Kickback Statute not only prohibits outright bribes and rebate schemes, but also prohibits any payment or other remuneration to a physician or other person which has as one of its purposes the inducement to purchase, administer and/or write prescriptions for one manufacturer's pharmaceutical products or the inducement to influence or recommend the prescribing of the product. The AKS remuneration provision is very broad in plain language and in purpose: It prohibits "offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. § 1320a7b(b)(2). The AKS further defines "remuneration" to include "transfers of items or services for free or for other than fair market value." *Id*. § 1320a-7a(i)(6).

57. Underscoring the breadth of the statutory definition, the HHS OIG Anti-Kickback Provisions, 56 Fed. Reg 35,952, 35,958 (July 29, 1991), broadly define the term "remuneration"

as "anything of value in any form . . . whatsoever." *See also* OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg 23,731, 23,734 (May 5, 2003) (the "OIG Guidelines") (AKS addresses the offer or payment of "anything of value").

58. The HHS Secretary promulgates regulations defining safe harbor practices not subject to AKS liability where the excluded practices are unlikely to result in fraud or abuse. *See* 42 C.F.R. § 1001.952; *see also Zimmer, Inc. v. Nu Tech Med., Inc.*, 54 F. Supp. 2d 850, 855 (N.D. Ind. 1999) (§ 1320a-7d(b) authorizes the HHS Secretary to issue advisory opinions on what constitutes prohibited remuneration and whether an activity could result in sanctions or exclusion from federal health care programs).

59. The twenty-two AKS safe harbors, enumerated at 42 C.F.R. § 1001.952(a)-(x), set conditions that, if met, will not give rise to criminal or administrative action even if a culpable mental state is proven.

60. A litigant seeking to avail itself of AKS safe-harbor protection bears the burden of proving it satisfies one of the safe harbors. *See U.S. ex rel. Kosenske v. Carlisle HMA, Inc.*, 544 F.3d 88, 98 (3d Cir. 2009).

61. Concern about improper drug marketing practices further prompted the HHS OIG to issue a Special Fraud Alert in 1994 concerning prescription drug marketing practices that violated the Anti-Kickback Statute. *See* Publication of OIG Special Fraud Alerts, 59 Fed. Reg. 65,372, 65,376 (Dec. 19, 1994) ("Special Fraud Alert: Prescription Drug Marketing Schemes").

62. Then, on June 11, 2001, the HHS OIG published a solicitation notice seeking information and recommendations for developing compliance program guidance for the pharmaceutical industry. *See* Solicitation of Information and Recommendations for Developing a Compliance Program Guidance for the Pharmaceutical Industry, 66 Fed. Reg. 31,246 (June 11,

2001). The HHS OIG's resulting draft guidance was published for notice and comment in October 2002. *See* Draft OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 67 Fed. Reg. 62,057 (Oct. 3, 2002). In May 2003, the HHS OIG published further guidance on marketing practices which may constitute kickbacks and other illegal remuneration affecting federal health care programs. OIG Guidelines, 68 Fed. Reg. 23,731 (May 5, 2003).

**1. Marketing the Spread**

63. Among other things, the OIG's Guidance cautions against engaging in "marketing the spread": "[t]o the extent that a manufacturer controls the 'spread,' it controls a customer's profit." It further observes that "[t]he conjunction of manipulation of the AWP to induce customers to purchase a product with active marketing of the spread is strong evidence of the unlawful intent necessary to trigger the anti-kickback statute." OIG Guidelines, 68 Fed. Reg. 23,731, 23,736-37 (May 5, 2003).

64. The "spread" refers to the difference in value between what a provider pays for a drug and the reimbursement that the provider receives (usually from government or private health insurance) for a drug to be administered to a beneficiary. The greater the difference between provider cost and program reimbursement, the greater the "spread"—and the greater the provider profit.

65. In 2003, when the OIG Guidance was published, under the Medicare Program and other federal and state health care programs, prescription drug reimbursement amounts generally used the AWP as a benchmark price to determine reimbursement. The AWP for a prescription drug is a self-reported price, *i.e.*, it is not independently and objectively determined. Rather, manufacturers provide AWP data to publications such as First Data Bank, which publish the information without scrutiny.

66. After the OIG Guidelines were issued, CMS replaced AWP with ASP plus 6% (adjusted for sequestration), effective January 1, 2005, as the basis for Medicare drug reimbursement. State Medicaid Programs use varying reimbursement methodologies, including AWP, ASP, Best Price, Average Manufacturer Price, and Wholesale Acquisition Cost.

67. Regardless of what methodology is used, marketing the spread constitutes illegal remuneration and violates the AKS.

68. Compliance with the Anti-Kickback Statute is a precondition to participation as a health care provider under a Government Health Care Program, including Medicare and the state Medicaid programs. Moreover, compliance with the Anti-Kickback Statute is a condition of payment for drug claims administered by physicians for which Medicare or Medicaid or other Government Health Care Program reimbursement is sought.

**2. Manipulation of Average Sales Price**

69. An FCA violation results when a defendant has "intentionally failed to report . . . 'off-invoice' rebates in order to keep secret the 'profit spread' between the actual acquisition cost to the Provider and the Medicare reimbursement rate so that the Providers could benefit from the spread." *U.S. Duxbury v. Ortho Biotech Pro*, 579 F.3d 13, 31 (1st Cir. 2009).

70. Marketing the spread combined with false ASP reporting establishes "unlawful intent" under the AKS. *Amgen*, 812 F. Supp. 2d at 70 (citing OIG Guidelines, 68 Fed. Reg. 23,731, 23,736 (May 5, 2003)).

**3. AKS Safe Harbors Implicating Defendants' Discounting Arrangements**

***a. Discount Safe Harbor***

71. The HHS Secretary has exempted certain types of discounts from the definition of "remuneration" under the AKS so long as the seller "complies with the applicable standards in

paragraph (h)(2) of this section." *Id.* § 1001.952(h). The discount safe harbor applies to sellers when "[t]he seller is an individual or entity that supplies an item or service for which payment may be made, in whole or in part, under Medicare, Medicaid, or other Federal health care programs to the buyer and who permits a discount to be taken off the buyer's purchase price." *Id.* § 1001.952(h)(2).

72. The discount safe harbor protects "a discount or other reduction in price obtained by a provider of services or other entity under a Federal health care program if the reduction in price is properly disclosed and appropriately reflected in the costs claimed or charges made by the provider or entity under a Federal health care program." 42 U.S.C. § 1320a7b(b)(3)(A).

73. To avail itself of the safe harbor's protection, the seller must meet *all* of the standards within one of three categories. *See id.* §§ 1001.952(h)(2)(i)-(iii) (imposing certain disclosure and reporting obligations).

74. "[T]he term discount means a reduction in the amount a buyer (who buys either directly or through a wholesaler or a group purchasing organization) is charged for an item or service based on an arms-length transaction." *Id.* 1001.952(h)(5).

75. "The term discount does *not* include—

> (ii) Supplying one good or service without charge or at a reduced charge to induce the purchase of a different good or service, unless the goods and services are reimbursed by the same Federal health care program using the same methodology and the reduced charge is fully disclosed to the Federal health care program and accurately reflected where appropriate, and as appropriate, to the reimbursement methodology."

*See* 42 C.F.R. § 1001.952(h)(5)(ii); Clarification of the Initial OIG Safe Harbor Provisions and Establishment of Additional Safe Harbor Provisions Under the Anti-Kickback Statute, 64 Fed. Reg. 63,518, 63,530 (Nov. 19, 1999) (Final Rule).

76. The discount safe harbor does not apply to transactions for which the underlying discounts are not based on an arms-length, commercially reasonable transaction. See OIG Advisory Opinion No. 99-2 (Feb. 26, 1999).

77. Under 42 C.F.R. § 1001.952(h) supplying or subsidizing inventory management products to providers "without charge or at a reduced charge to induce the purchase" of pharmaceutical drugs and/or distribution services does not qualify for the discount safe harbor.

78. Under 42 C.F.R. § 1001.952(h) supplying or subsidizing free inventory management products to providers to induce the purchase of pharmaceutical drugs and/or distribution services does not qualify for the discount safe harbor where the pharmaceutical drugs purchased as a result of the transactions are alternately reimbursed by Medicare Part B, Medicare Advantage, Medicaid, and other government payers using different methodologies.

79. Regeneron's payments of discounts through Besse would not survive discount safe harbor scrutiny even to the extent that some of their price concessions were reported as rebates during some periods

80. *See* United States Statement of Interest in the *U.S. ex rel Herman et al v. Coloplast Corp. et* al (11-cv-12131) (D.Mass.) (Dkt. 170) ("The United States submits that remuneration from a manufacturer to a distributor in return for specific conversion and referral activities – even when the remuneration takes the form of a price concession – is not a "discount."); *United States ex rel. Banignan v. Organon USA Inc.,* 883 F. Supp. 2d 277, 296 (D. Mass. 2012) (manufacturer rebates and discounts paid to channel partner did not meet the discount safe harbor where "the contracts did not disclose the complete terms and conditions of the discount or rebate (i.e., that the payments were made to induce or in exchange for drug conversion and therapeutic interchange)

and that the full terms and amounts of the discount were allegedly concealed in various sham collateral contracts.").

***b. Personal Services Safe Harbor***

81. The Personal Services Exception to AKS liability exempts personal services and management contracts from the definition of "remuneration" made "by a principal to an agent as compensation for the services of the agent" when *all* of the following elements are met:

(1) The agency agreement is set out in writing and signed by the parties.

(2) The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent.

(3) If the agency agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a fulltime basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.

(4) The term of the agreement is for not less than one year.

(5) The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arm's length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.

(6) The services performed under the agreement do not involve the counselling or promotion of a business arrangement or other activity that violates any State or Federal law.

(7) The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

*See* 42 CF.R. § 1001.952(d).

82. Under 42 C.F.R. § 1001.952(d)(5), services performed under an agreement for which aggregate compensation paid to the agent over the term of the agreement includes the subsidization of 100% of the cost of products provided by the agent to its customers do not qualify

for the personal services and management safe harbor because the services are not "consistent with fair market value in arm's length transactions" and are "tied to the volume or value of business" generated for Defendants.

83. Under 42 C.F.R. § 1001.952(d)(6), services performed under an agreement that promotes or carries out an illegal kickback arrangement do not qualify for the personal services and management safe harbor because they "involve the counselling or promotion of a business arrangement or other activity that violates any State or Federal Law."

### *c. Bona Fide Services Fee Safe Harbor*

84. While manufacturers must deduct price concessions when calculating ASP, "bona fide services fees" paid to distributors and GPOs are not considered price concessions and therefore not included in this calculation. 42 C.F.R. § 414.804(a)(2).

85. For reporting periods beginning January 1, 2007 and thereafter, manufacturers have been required to use the definition of bona fide service fees specified in 42 C.F.R. § 414.802. *See* 42 C.F.R.§ 414.802 (defining bona fide service fees as "fees paid by a 18 manufacturer to an entity, that represent fair market value for a bona fide, itemized service actually performed on behalf of the manufacturer that the manufacturer would otherwise perform (or contract for) in the absence of the service arrangement, and that are not passed on in whole or in part to a client or customer of an entity, whether or not the entity takes title to the drug.").

86. Distributors such as Besse Medical are among the entities to which manufacturers may pay bona fide service fees. Thus, bona fide service fees include, among other things, fees paid to wholesalers, distributors, and GPOs "includ[ing] . . . distribution service fees, inventory management fees, product stocking allowances, and fees associated with administrative service

agreements." *See* Medicaid Program; Covered Outpatient Drugs, 81 Fed. Reg. 5,170, 5,347 (Feb. 1, 2016).

87. "If a manufacturer has an agreement with the GPO that any of these fees are passed on to the GPO's members or customers, they would be considered price concessions and not excluded as bona fide service fees. When there is evidence or knowledge that the fee or other price concession is passed on to the GPO's member or customers (for example, the contract between the manufacturer and GPO or other service provider may contain a provision that indicates the fee be used by the provider to further discount the price paid by the wholesaler or retail community pharmacy), the manufacturer must account for such fee or price concession." *Id*. at 5,181.

88. In general, a bona fide service fee is a fee that a manufacturer pays to an entity to perform a service that the manufacturer would otherwise perform itself.

89. When certifying to the accuracy of their ASP calculations, if a manufacturer has determined that a fee paid meets the other elements of the definition of bona fide service fee, then the manufacturer may presume, in the absence of any evidence or notice to the contrary, that the fee paid is not passed on to a client or customer of any entity. Physician Fee Schedule (PFS), 71 Fed. Reg. 69,624, 69,669 (Dec. 1, 2006) (final rule); Medicaid Program, Covered Outpatient Drugs, 81 Fed. Reg. 5,170, 5,181 (Feb. 1, 2016).

90. In the absence of specific statutory or regulatory guidance to the contrary, Manufacturers may make "reasonable assumptions" in their calculation of ASP, which should be submitted along with the ASP data and accompanying certifications. *Amgen*, 812 F. Supp. 2d at 72 n. 24. *See also U.S. ex rel. Streck v. Bristol-Myers Squibb Co.*, Civ. No. 13-7547, at *25 (E.D. Pa. Nov. 29, 2018) (denying bona fide safe harbor protection in an FCA case where "even

assuming the ambiguity of the underlying statutes and rules governing the calculation of AMP and the objective reasonableness of BMS's interpretation of them, the motion to dismiss fails because BMS was warned away from its interpretation").

91. Regeneron was warned away from any interpretation of applicable regulations to permit them to extend customers Eylea discounts and free products through Besse without reporting them to CMS for ASP purposes.

92. For example, during relevant periods, Regeneron was placed on notice of certain analogous Veterans Administration ("VA") guidance regarding the government pricing treatment of service fees in the non-Federal Average Manufacturer Prices ("non-FAMP") context.

93. VA requires manufacturers to report service fees similar to those alleged by the Relators for purposes of non-FAMP reporting. See October 18, 2006 VA DML ("Product discounts or rebates granted by manufacturers to wholesalers in order to make their drugs more attractive in the market place cannot be excludable fees."); October 26, 2007 DML ("[P]ercent of sales incentive fees offered to wholesalers, in order to achieve business goals of the manufacturer may not be excluded from non-FAMP price reporting.") (emphasis supplied).

94. Regeneron's passage of prompt pay and other discounts through Besse to Eylea customers, as well as its subsidization of the costs of Besse's inventory management and refrigeration products provided to Besse's Eylea customers, fit squarely into these prohibitions.

### D. The False Claims Act

95. The False Claims Act ("FCA") holds liable anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" by the United States, 31 U.S.C. § 3729(a)(1)(A), or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* at § 3729(a)(1)(B). Those who

violate the FCA are liable for civil penalties not less than $10,781.40 and not more than $21,562.80 per violation, three times the damages sustained by the Government, and litigation costs. *Id*. at § 3729(a)(1).

96. The FCA provides that any person having information about false or fraudulent claims or records presented to the United States may bring an action for both herself and the Government and to share in any recovery. The Act requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to enable the Government to (a) conduct its own investigation without the defendant's knowledge and (b) determine whether to join the action.

97. Federal law makes clear that violation of the Anti-Kickback Statute can support FCA liability. For example, the Patient Protection and Affordable Care Act, Pub. L. No. 111- 148, § 6402(f)(l), 124 Stat. 119 (2010) ("PPACA"), which became law on March 23, 2010, provides: "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." In other words, pursuant to the PPACA, claims for items or services billed to government-funded healthcare programs (including Medicare) "resulting from" a violation of the anti-kickback statute are, *per se*, "false or fraudulent claims" under the FCA.

98. Under federal law, proof that a defendant knew of and specifically intended to violate the AKS is not required; rather, all that is required to give rise to a violation is proof that the defendant intended to perform the actions that violated the AKS. *See* PPACA § 6402(f)(2) ("a person need not have actual knowledge of this section or specific intent to commit a violation" of the AKS in order to be found guilty of a "willful violation").

99. At all times relevant to this Complaint, compliance with the AKS has been a condition to participation for a health care provider under Medicare and other Government Health Care Programs. Further, compliance with the AKS is a condition of payment for claims made to Medicare and other Government Health Care Programs for reimbursement.

100. Accordingly, violations of the AKS are *per se* material under the FCA, *Guilfoile v. Shields*, 913 F.3d 178, 189 (1st Cir. 2019), and all government reimbursement claims for products tainted by a defendant's kickbacks are false or fraudulent in violation of the FCA. *U.S. 21 ex Rel. Hutcheson v. Blackstone Med.*, 647 F.3d 377, 394 (1st Cir. 2011). The AKS covers all Government Health Care Programs, including the Medicare Part B claims at issue in this action.

## V. SUBSTANTIVE ALLEGATIONS

### A. Regeneron Promotes Eylea's Financial Rewards Rather Than Its Clinical Benefits to Providers

#### 1. Neovascular Age-Related Macular Degeneration ("wet AMD") and Its Treatment

101. Eylea is prescribed to treat age-related macular degeneration ("AMD"), the leading cause of vision impairment among people aged 50 or over in the United States.[1] AMD is characterized by slow, progressive vision loss and can ultimately cause patients to become legally blind.

102. Relators' allegations concern the less common but more serious variation of AMD, referred to as Neovascular AMD ("nAMD") or "wet AMD." Wet AMD causes injury to the macula, which is located near the center of the retina, and occurs when blood vessels under the retina grow abnormally, causing scarring and deterioration of the macula and accelerating vision

[1] *See* National Eye Institute, *Age-Related Macular Degeneration* (last updated Aug. 2, 2019), https://www.nei.nih.gov/learn-about-eye-health/eye-conditions-and-diseases/age-related-macular-degeneration.

loss. This activity is caused by vascular endothelial growth factor ("VEGF"), which promotes the growth of weak blood vessels that leak fluids into the macula.

103. The most common treatment for the condition is the administration of anti-VEGF pharmaceutical drugs, which block the detrimental effects of VEGF. Prior to development of VEGF inhibitors, more than 90% of patients diagnosed with wet AMD became legally blind within one year of treatment. VEGF inhibitors have dramatically improved treatment outcomes.

104. Notwithstanding these clinical advancements, "[b]y 2020, it is projected that nearly three million people will experience visual impairment from neovascular age-related macular degeneration."[2]

**2. Eylea and Competitors in the Wet AMD Market**

105. Regeneron received a wet AMD indication (approval) for its VEGF inhibitor Eylea (*aflibercept*) ("Eylea") on November 18, 2011. For this indication of Eylea, 2 mg (0.05 mL) is administered by intravitreal injection every 4 weeks (monthly) for the first 3 months, followed by 2 mg (0.05 mL) via intravitreal injection once every 8 weeks (2 months).[3]

106. Eylea's ASP costs $1,850 per intravitreal injection to treat wet AMD. Typically, the drug costs more than $10,000 per patient per year.

---

[2] DW Hutton, et al., *Switching to Less-Expensive Blindness Drug Could Save Medicare Part B $18 Billion Over A Ten-Year Period*, 2 (June 1, 2015) (author manuscript) (on file with NIH Public Access). *See* National Eye Institute, *Age-Related Macular Degeneration* (last updated Aug. 2, 2019), https://www.nei.nih.gov/learn-about-eye-health/eye-conditions-and-diseases/age-related-macular-degeneration.

[3] Eylea was subsequently approved for an additional wet-AMD indication in May 2016. With respect to the May 2016 indication, some patients required every 4-week (monthly) dosing after the first 12 weeks (3 months). Eylea was previously approved for DME and diabetic retinopathy in patients with DME in 2014 and 2015, respectively.

107. In the nine years between 2011 to the present, Medicare Part B has reimbursed more than $11 billion in Eylea prescriptions. During this same period, Eylea's U.S. sales, for which Regeneron holds to sole rights, have totaled over $20 billion.

108. Many wet AMD patients prefer Eylea to its main competitor, Genentech's Lucentis (*ranibizumab*), because Eylea requires both fewer injections and a lower co-pay. Eylea's less frequent dosing in comparison to Lucentis is viewed in the industry as a clinical advantage and was one of the reasons Eylea received its wet AMD indication.

109. Eylea's principal competitors, Lucentis and Avastin (bevacizumab), are both manufactured by Genentech, Inc. ("Genentech"). Genentech developed and received approval for its own VEGF inhibitor drug, Lucentis, to treat wet AMD in July 2006. Lucentis and Eylea offer comparable efficacy, with Eylea adding the aforementioned clinical benefit. Lucentis' ASP was originally $1,950 per intravitreal injection, but that number has declined in recent years.

110. Genentech's Avastin is derived from the same biological material that Genentech later used to develop Lucentis, resulting in both having a similar (if not identical) anti-VEGF mechanism of action. Avastin is priced at $50 per intravitreal injection for an off-label wet AMD indication and has held significant market share in the Anti-VEGF market throughout the relevant period despite its off-label status.

111. Avastin has never been FDA approved for any ophthalmologic use but is still widely viewed in the medical community as a safe and effective VEGF inhibitor for use in treating wet AMD. This support for Avastin's off-label use has resulted in the drug's receiving *de facto* Medicare approval, insofar as, over time, Medicare carriers nationwide have opted to provide Medicare reimbursement for its off-label use.

### 3. Regeneron's Strategy to Convert Lucentis and Avastin Prescribers to Eylea

112. Regeneron learned soon after Eylea's 2011 launch that its clinical advantage over Lucentis could not overcome Lucentis' economic advantages over Eylea. In view of its otherwise comparable efficacy and safety profile to both Lucentis and Avastin, Eylea's four fewer injections per patient placed it a financial disadvantage.

113. Lucentis prescribers could generate $1200-1500 in revenue per injection per patient per year, along with a fee for performing each of the 12 injections. In contrast, Eylea's less frequent dosing schedule (4-6 annual injections rather than 12) meant less Medicare Part B reimbursement for Regeneron's customer base, and less revenue for Regeneron.

114. Regeneron found that providers' primary objection to converting from Lucentis to Eylea was their inability to profit from the spread between the acquisition cost and the per-injection Medicare Part B reimbursement. For example, during Q3 2012, a Reimbursement Business Manager ("RBM") reported feedback from the Florida Eye Institute that, while physicians at the practice had mediocre clinical results with Eylea, they "like Lucentis' discount."

115. In response, Regeneron introduced a promotional campaign that would increase and then market Eylea's economic benefits over competitors, rather than on its clinical comparative advantage.

116. Regeneron created a preferred distribution channel for Eylea through which it pays remuneration to Defendant Besse Medical, and to patients through Besse Medical, to induce purchases of Eylea (the "Besse Distribution Channel"). The Besse Distribution Channel helped Regeneron to overcome providers' objections by enabling them to profit from the spread between Eylea's purchase price and Medicare Part B's reimbursement rate.

117. Regeneron widened the spread by extending unreported Eylea price discounts and fee waivers to customers indirectly under service agreements with Besse Medical. Specifically, Regeneron pays service fees to Defendant Besse Medical for price discounts, which are in turn passed through to those customers that Besse Medical is able to convert to Eylea from competitors.

118. When passed through to customers, Regeneron's ostensible "service fees" paid to Besse are disguised as legitimate incentives that are traditionally paid by distributors to their customers, such as prompt pay discounts. However, when such discounts are subsidized by the manufacturer, the manufacturer must report them as part of the drug's ASP. Regeneron's Besse Distribution Channel circumvented such reporting for Eylea sales to customers made through Bessie.

119. Further, Regeneron subsidizes the cost of free Besse Medical inventory and other products provided by Besse Medical to new Eylea customers under its distribution contracts. These subsidies, which flow indirectly from Regeneron to customers, were disguised as arms-length discounts extended by Besse Medical through direct contracts with customers.

120. Regeneron knew that, in addition to giving Eylea an economic advantage over competitors, this pass-through arrangement also conferred an economic benefit to Besse Medical: Regeneron's discounts and subsidies incentivized customers to convert all of their distribution business to Besse Medical from competitors like McKesson.

121. With these inducements in place, Regeneron dispatched its sales representatives and RBMs to promote Eylea's profitability over competitors. Regeneron's promotional campaign focused on the reimbursement spread between Eylea and its competitors and the benefits of Besse Medical's free inventory products.

122. When discussing the Eylea spread, Regeneron emphasized its relatively stable ASP in comparison to that of Lucentis. Regeneron highlighted the ASP-eroding effect of Genentech's Lucentis rebates when reported to CMS, which Genentech implemented soon after Eylea's entry into the market. Regeneron's consistent message from launch through approximately 2017 was that Eylea would not be rebated in this manner, and that its ASP would remain intact.

123. For example, an internal Regeneron RBM document titled "2017 National Sales Strategies for Success" lists "[c]onverting Lucentis Rebate Accounts and Fortifying Eylea Accounts from Lucentis Rebate Intrusion" as one such strategy.

124. Even after 2017, when Regeneron began to introduce and to report new Eylea rebates, Regeneron has continued to benefit from the Besse Distribution Channel scheme as its previous pass-through discounts and subsidization of free products remain ongoing.

**B. Regeneron and Besse Medical's Distribution Channel Scheme Violated the Anti-Kickback Statute and the False Claims Act**

125. Defendants Regeneron and Besse Medical knowingly engaged in, participated in, and/or facilitated the illegal inducement of thousands of Eylea purchases by providers, and caused the submission of false claims for reimbursement of those purchases to Medicare Part B and other government health programs.

126. The highest levels of Regeneron's and Besse Medical's corporate management conceived, promoted, and implemented the illegal scheme alleged herein.

127. Relators each have personal knowledge of the scheme and each have had personal conversations with senior members of Regeneron's and/or Besse Medical's corporate management which corroborate their allegations of fraud.

128. Through means of the Besse Distribution Channel scheme, Besse Medical entered into exclusive, direct distribution contracts with individual providers and retina practices which

incorporated the discounts, credit card fee waivers, and free product terms, limited to and applied only to Eylea and subsidized by Regeneron.

129. These incentives individually and collectively had the effect of inducing Besse Medical to convert Lucentis and Avastin prescribers to Eylea and inducing prescribers to purchase and seek reimbursement for Eylea.

130. Eylea's higher margin generated by the pricing and fee waiver discounts, coupled with the lucrative free inventory system provided by Besse Medical and subsidized by Regeneron, caused medical providers to switch from Lucentis to Eylea and from McKesson to Besse Medical.

### 1. Regeneron Paid Kickbacks to Physicians and Retina Practices Indirectly Through Besse Medical's Distribution Channel

#### *a. Regeneron Incentivized Providers to Prescribe Eylea Over Its Competitors by Funneling Eylea Discounts Through Defendant Besse Medical*

131. The Besse Distribution Channel scheme was initiated by Regeneron's U.S./Global Executive Director and Head of Trade, Reimbursement and Managed Markets, Robert Davis, and its Executive Vice President, Commercial, Robert Terifay, in 2014.

132. From 2014 through 2018 and, on information and belief, through to the present, Regeneron offered secret discounts and preferred contract pricing to customers through the Besse Distribution Channel that illegally went unreported to CMS.

133. Messrs. Davis and Terifay had previously worked together at Millennium Pharmaceuticals in 2004 and 2005 where they promoted the oncology drug "Velcade." Millennium had been able to increase Velcade's market share through means of incentives passed on to customers via a preferred distribution channel occupied by Defendant AmerisourceBergen.

134. In 2018, Davis and Terifay left Regeneron and were replaced by Global Channel Senior Director Rena Goins, who was elevated to Executive Director, and Senior Director of

Marketing Emmanuel Hamon. Goins' new position included leading Regeneron's implementation of the Besse Medical Distribution Channel scheme.

135. Messrs. Terifay and Davis, along with Ms. Goins, had conceived of and launched an Eylea distribution scheme in 2014 that was heavily informed by the Velcade model. Regeneron chose Defendant Besse Medical, an AmerisourceBergen subsidiary, as Regeneron's preferred distributor of Eylea.

136. Regeneron misrepresented to the public that it does not promote preferred distributors in order to conceal the illegal nature of the Besse Distribution Channel. During these same periods, Regeneron sought to induce existing customers and potential customers to enter into distribution agreements with Besse Medical that pass-through Regeneron's inducements.[4]

137. Under the scheme, Regeneron discounted all Eylea purchases distributed to customers through Besse Medical. In turn, Besse Medical was to discount Eylea to Regeneron's clients directly while passing through a portion of the discount to the clients, disguised as a Besse Medical discount. By structuring the customer discount as a Besse Medical discount instead of a Regeneron discount, Regeneron could avoid reporting the discount to the CMS and the corresponding reduction in Eylea's ASP that such reporting would trigger.

138. Regeneron's indirect remuneration paid through Besse Medical was intended to avoid mandatory discount reporting to CMS and to maintain Eylea's high ASP at a time when Genentech reported rebates it had extended to its customers in order to compete with Eylea was causing caused Lucentis' ASP to erode.

[4] Regeneron public documents spanning from 2015 through to the present list Besse Medical as only one among several authorized Eylea distributors, including CuraScript SD Specialty Distribution and McKesson Specialty Health, while stating emphatically that "Regeneron does not recommend the use of any particular distributor."

139. Regeneron extended two forms of price discounts to customers through Besse Medical in order to induce the distributor to convert customers to Eylea from Lucentis and Avastin. These discounts were both conditioned upon Besse Medical's securing Eylea customers and designed to help convert those same customers to Besse Medical from other distributors.

140. First, Regeneron subsidized Besse Medical price discounts for customer purchases of Eylea. The Besse Medical price discount consisted of a 1-3% price reduction to customers who applied to all Eylea purchases made through Besse Medical. Regeneron subsidized this discount through service fees paid under its distribution services agreements with Besse Medical.

141. DOE 2 reports that Regeneron's corporate management's discounting strategy was to force Lucentis into an "ASP Death Spiral." Specifically, Regeneron's continuous illegal unreported discounting of Eylea's Wholesale Acquisition Cost ("WAC")[5] price through Besse Medical would force Genentech to respond in kind with legal reportable rebates that would reduce Lucentis' ASP.

142. Regeneron's strategy was particularly effective against Genentech's "Lucentis Direct" program. Under Lucentis Direct, Genentech could not extend similar incentives through distributors because Genentech provided distribution services to its Lucentis customers directly under that program.

143. Second, Regeneron subsidized Besse Medical credit card fee waivers for customer purchases of Eylea. Regeneron's former U.S./Global Executive Director and Head of Trade, Reimbursement and Market Access Mr. Davis described to DOE 1 on several occasions the

[5] WAC is the approximate manufacturer list price charged to wholesalers or other direct purchasers, not including discounts or rebates.

concept of a credit card usage percent discount advantage that customers would receive from Regeneron were they to order Eylea directly from Besse Medical.

144. Besse Medical's credit card fee waivers subsidized by Regeneron further built upon Eylea's ASP advantage over a rebated Lucentis. Retina practices typically purchase buy-and-bill drugs like Eylea and its competitors from specialty distributors such as Besse Medical. Some distributors in turn make high volume credit card purchasing available to customers upon request.

145. However, while providers are not required to secure credit lines through their own collateral when making such purchases through distributors, standard practice in the industry is for distributors to invoice customers for the credit card company's transaction fees.

146. These accounting issues affected the full range of retina practices, from the larger practices, whose monthly spending could reach the seven figures, to very small practices. Besse Medical's waiver of these credit card transaction fees, and Regeneron's subsidization of that waiver, therefore generated windfall profits for customers who accepted the Besse Medical deal.

147. Mr. Davis discussed Besse Medical's credit card fee waiver program with DOE 2 as part of Regeneron's effort to ensure that its customers and potential customers were aware of the benefits of placing orders for Eylea with Besse Medical instead of doing business competitors of with Regeneron and Besse Medical.

148. DOE 1 was directly instructed by Mr. Davis to explain this advantage to customers and potential customers in order to drive customers to Besse Medical when they purchased Eylea.

149. Regeneron's sales force and RBMs were likewise directed to advise customers and potential customers that Besse Medical accepted only American Express ("AMEX") for purposes of the credit card fee waiver and that Regeneron would waive AMEX credit card fees up to 3%.

150. Relators have personal knowledge of Besse Medical's active participation in this scheme. Besse Medical VP of Operations Bob Besse, who managed wholesale distribution at the Company, has spoken directly with DOE 1 regarding both the price discounts and credit card fee waivers alleged herein. Mr. Besse confirmed that the discounts and credit card fee waivers were intended both to maintain existing Eylea customers and to convert Lucentis prescribers to new Eylea customers.

151. Notwithstanding Regeneron's public documents denying a preference for any particular distributor, the discounts and credit card fee waivers made available only through Besse Medical were offered to all physicians and practices nationwide.

152. Regeneron's subsidization of Besse Medical's price discounts and credit card fee waiver extended to customers did not satisfy the personal services safe harbor because Regeneron's subsidization of 100% of the price concessions is not "consistent with fair market value in arm's length transactions" or otherwise commercially reasonable.

***b. Besse Medical Supplied Free Inventory Management and Refrigeration Products Subsidized by Regeneron to Customers to Induce Them to Select Besse Medical as Their Preferred Provider***

153. Besse Medical sought not only to convert physicians' Medicare Part B business from Lucentis in order to generate revenue from Eylea wet AMD prescriptions, but also to convert those same customers to Besse Medical from competing distributors for all of their specialty distribution needs.

154. In order to achieve this conversion, Besse Medical capitalized on a scheme conceived of by Regeneron early in Eylea's lifecycle to utilize free distribution products as a promotional tool for the product. In a November 5, 2012 internal Regeneron "Business Review"

PowerPoint presentation, assembled for the RBM team, slide 34 explicitly identifies the "PODIS Inventory System" as among "Southwest Region Opportunities."

155. Beginning in no later than 2014, Regeneron executives Terifay and Davis negotiated an arrangement with Besse Medical under which the Company would underwrite Besse Medical's free products given exclusively to Eylea customers.

156. Under this arrangement, Besse Medical offered prospective customers free inventory products subsidized by Regeneron in order to induce them to use Besse Medical as their exclusive distributor for all of their injectable drug inventories. Access to Besse Medical's free equipment would be conditioned upon customers' willingness to convert both from Lucentis to Eylea, and from McKesson to Besse Medical.

157. The free products selected for this arrangement included Besse Medical's expensive, customized, cloud-based inventory management system, PODIS (now PODIS Plus). Among other benefits, PODIS provides customers with form automation for physician and practice sales ordering needs. Through the use of barcode labels, PODIS tracks each dose of medication ordered and used by a practice, and interfaces with the physician's practice management system to integrate ordering, billing, payment, reimbursement, and re-ordering the product in a fully integrated and automated order-to-reimbursement system.

158. Regeneron's subsidization of the PODIS system for physicians and practices eliminated a substantial expense that these physicians and practices would otherwise have incurred.

159. Defendant Besse Medical provided PODIS to any account with more than one physician who converted to Eylea. This was because small accounts with only one doctor would likely not need a sophisticated inventory management system to manage their drug supply.

160. Customers were drawn to the Besse Distribution Channel arrangement because wet AMD treatment was the most profitable business driver for their practices. This feature enabled RBMs to convince customers that conversion to Besse Medical for all of their specialty pharmacy business from other distributors would made good business sense as it would secure the best deal on the products needed treat their most lucrative patient population.

161. Regeneron also enlisted customers that had already converted to Eylea and Besse Medical to pitch Defendants' inducements. For example, in a July 2017 email, David Gavin, Practice Administrator of the high Eylea-prescribing Palmetto Retina Center, LLC in West Columbia, South Carolina notified one of Regeneron's RBMs that he had promoted PODIS on Regeneron's behalf to Dr. Susan Andracchi of Wilmington, North Carolina. Mr. Gavin advised that he walked Dr. Andracchi through his own PODIS system as well as how to sign patients up for Eylea prescriptions.

162. On information and belief, Besse Medical also provided practices with free refrigerator-based inventory management systems, subsidized by Regeneron.

163. Among the ophthalmology practices that received these free products from Besse Medical were Palmetto Retina; Carolina Retina Associates; Taylor Retina North Carolina; Retina Consultants of Houston; Wagner Macular & Retina Centers.

164. Besse Medical's provision of free products subsidized by Regeneron under service contracts did not meet the personal service and management safe harbor, both because the services were conditioned upon the customers' entering into Regeneron's unlawful discounting and ASP manipulation scheme and because Regeneron subsidized 100% of Besse Medical's costs to supply the free products.

165. The arrangement also did not qualify for the discount safe harbor because Besse Medical knew that providing a free inventory management system that could be used to manage customers' entire injectable drug inventories was a powerful incentive for them to convert all of their distribution business to Besse Medical from competitors like McKesson.

166. The arrangement also did not qualify for the discount safe harbor because the customers' resulting conversions to Besse Medical generated Eylea purchases not only by Medicare Part B, but also Medicare Advantage, Medicaid, and other government purchasers reimbursed using different methodologies.

### 2. Regeneron Manipulated Eylea's Average Sales Price in Order to Convert and Maximize Medicare Reimbursement to Eylea Customers

167. In violation of the AKS, Regeneron illegally promoted the direct increased revenue that physicians would realize through means of Regeneron's unreported discounts and fee waivers paid through its preferred distributor, Defendant Besse Medical.

168. Regeneron also failed to report any corresponding reduction in ASP despite its illicit *quid pro quo* arrangement with Besse Medical to subsidize the cost of these discounts provided only to customers who converted to Eylea.

#### ***a. Regeneron Marketed the Spread Between Eylea Purchases as Discounted by the Besse Medical Inducements and Purchases of Competing Products***

169. Beginning in the second half of 2014 and throughout 2015, Regeneron directed its sales force and RBMs, including DOES 1 and 2, to aggressively lobby customers to switch to Eylea and convert their distribution business to Besse Medical. Regeneron's core promotional message used to carry out this effort was that conversion to Eylea offered customers an economic advantage over Lucentis.

170. Regeneron RBMs were directed by their superiors to explain to customers the negative impact of Genentech's reported rebates on Lucentis' ASP in order to underscore Lucentis' comparatively less favorable ASP margins.

171. RBMs explained to customers that, in contrast to Genentech, Regeneron did not extend any reportable rebates to Eylea's customers, and that this resulted in Eylea's ASP margins remaining intact.

172. RBMs also made physicians and retina practices nationwide aware of the Besse Medical discounts and free products that were available to those who agreed to convert their business to Eylea and Besse Medical.

173. Regeneron promoted the benefits of Besse Medical's free PODIS inventory management system to customers through its RBMs.

174. Regeneron's RBMs were instructed by their RBM Regional directors to tell the customers to promote this and other benefits of converting their business to Eylea for wet AMD and Besse for drug distribution."

175. Regeneron trained its sales representatives and RBMs to market Eylea using company-provided PowerPoint Presentation slides that highlighted the profit earned from the spread generated by the Besse Medical discounts. Some Regeneron PowerPoint slide decks used by Regeneron RBMs contained several slides that were specifically placed into the presentation to prompt questions by office billing managers, staff, and physicians about the spread and profitability of Eylea incentivized by the Besse Distribution Channel scheme.

176. The following is an example of one such slide from a 2013 presentation titled "EYLEA (aflibercept) Injection Coverage, Coding, and Reimbursement." This slide deck was presented to customers by RBMs as directed by Regeneron:




177. Regeneron RBMs were directed to present slide decks such as the foregoing at dinner events attended by retina practice physicians, billing managers, staff, and owners. Other RBMs who were not speaking at such events were placed in attendance so that they were available discuss and negotiate Defendants' illicit Besse Distribution Channel arrangement with those present.

178. Throughout the Relevant Period, Regeneron compensated physicians and office personnel who had already converted to Eylea and Besse Medical were paid to speak and promote to ophthalmologists and retina practices about Eylea. Provider customers who spoke on behalf of Regeneron would similarly hold dinner programs and round table discussions where they would present a stock Regeneron slide deck.

179. Regeneron encouraged its paid speakers to laud the higher profit margins they achieved following their conversion from Lucentis to Eylea as well as the benefits of the PODIS system as a *quid pro quo* for converting from McKesson or other distributors to Besse Medical.

180. For example, Retina Consultants of Houston COO Shawn Harkey and Administrator John Denny, as well as Palmetto Retina of South Carolina Owner W. Lloyd Clark, M.D., and Administrator David Gavin, were among those customers whom Regeneron frequently paid to speak on behalf of Eylea and Besse Medical. Having received and profited from Defendants' inducements themselves, these high-volume customers and others like them were well-positioned to discuss Eylea's Besse Medical-related discounting practices and free products with the doctors and administrators in attendance.

181. In 2013, Lucentis manufacturer Genentech complained to Regeneron for marketing the "ASP spread" between Eylea and Lucentis in providers' offices. Outwardly, Regeneron presented to the retina practice community that the company would conduct an internal investigation into wrongdoing by rogue employees. Internally, DOES 1 and 2 observed that the purpose of Regeneron's statements was to convey the false impression that the company sought to engage in lawful and ethical compliance practices.

182. Eventually, RBMs' marketing of the spread, and their descriptions of the ASP-eroding effects of Genentech's Lucentis rebates in particular, became so aggressive that Regeneron found it necessary to reduce the illicit marketing scheme's visibility in 2016.

183. Thereafter, Regeneron conducted its promotional campaign in a more covert fashion. Among other safeguards, Regeneron's corporate management instructed RBMs to remove certain sales slides from their stock presentations that had explicitly referenced the Medicare Part B revenue implications of the ASP spread.

184. Regeneron nevertheless continued to encourage RBMs to use unofficial written materials in order to promote Eylea to customers, including documents which calculated the profit retina practices would make by switching to Eylea from Lucentis and Avastin.

185. For example, David Gavin of Palmetto Retina Center in South Carolina used one such document to promote Eylea on behalf of Regeneron during a speaker event held on August 20, 2015 at Flemings Prime Steakhouse in Raleigh, North Carolina (the "2015 ASP Spreadsheet).

186. The August 20, 2015 event, which was overseen by Ms. Sandefur, was not attended by Eylea prescribing physicians. Instead, the event was designed for and attended by Eylea customers' operations and finance personnel.

187. Mr. Gavin received honoraria for promoting Eylea at this event and other events during relevant periods, including a July 13, 2017 speaker event which took place in Charlotte, North Carolina.

188. On information and belief, the 2015 ASP Spreadsheet is representative of documents that were prepared by Regeneron personnel and distributed to RBMs in order to promote Eylea to existing and prospective customers.

189. The following excerpt from the 2015 ASP Spreadsheet illustrates the revenue generated from the Besse Medical price discounts and credit card fee waiver to physicians and retina practices. Regeneron provided this document, which also calculated margins for competing products Lucentis and Avastin, to RBMs for use as a sales tool.

| | Eylea |
|---|---|
| Medicare Allowable | $ 1,961.00 |
| less sequestration | $ 39.22 |
| **Net Allowable** | **$ 1,921.78** |
| | |
| Base Price | $ 1,850.00 |
| less Discount | $ - |
| less rebate | $ 17.58 |
| less Amex Rebate | $ 28.05 |
| plus Alta Fee | $ 9.81 |
| **Net Cost** | **$ 1,814.18** |
| | |
| **Profit** | **$ 107.60** |

190. The Besse Distribution Channel Scheme included a 1-3% price discount on all Eylea purchases made through Besse Medical.

191. The 2015 ASP Spreadsheet reflects that the purported Eylea "rebate" of $17.58 is not deducted from the Medicare Allowable ASP in order to reach the "net allowable" figure featured in the spreadsheet.

192. Upon information and belief, the purported $17.58 rebate is, in fact, the amount of the unreported Besse Medical price discount.

193. Additionally, the "less Amex Rebate" represents the credit-card waiver subsidized by Regeneron and provided through Besse Medical.

194. Based on the 2015 ASP Spreadsheet, a calculation of ASP plus 6% (less the sequestration deduction of approximately 2%), reflects that neither the $17.58 purported rebate nor the $28.05 purported "Amex rebate" are in fact deducted from ASP in the spreadsheet.

195. During the Relevant Period, Regeneron's RBM PowerPoint presentations did not explicitly disclose the Company's subsidization of Besse Medical's price discounts or credit card fee waivers on the face of the presentation. Rather, the presentations were designed to introduce topics that could lead to informal discussions of the Besse Distribution Channel Scheme.

196. For example, the following slide, found in a 2015 RBM deck entitled "Introducing the Retina Administrator Educational Program," states only that "authorized distributors for Eylea" accept credit cards, "[s]ubject to distributor qualification."




197. Because the Besse Distribution Channel scheme allowed Regeneron to conceal its inducements paid to Eylea customers, Regeneron was able to artificially maintain Eylea's ASP at an inflated level. Eylea's higher ASP and reimbursement rate in turn created a financial incentive for physicians and retina practices to convert to Eylea.

198. By increasing the profit margin between Eylea's purchase price and Medicare Part B reimbursement rate in this way, Regeneron was able to exploit the resulting detrimental effects of Genentech's reported (and, as such, legal) rebates on Lucentis' ASP.

199. Regeneron was aware that its promotions of such "indirect" discounts were improper, but nonetheless engaged in these illegal practices. For example, Regeneron's official

notes contained in a 2014 RBM PowerPoint presentation entitled "EYLEA (aflibercept) Injection Components of Reimbursement" state:

> *PLEASE NOTE: RBMs are not permitted to*
>
> - *Discuss or answer questions as it relates to the profitability of a product based on that product's Average Sales Price (ASP) rate*
> - *Compare EYLEA ASP rates vs. Ranibizumab or any other product's rates*
> - *If known, discuss or share the reimbursement rates of individual physician contracts specific to a certain office*

200. RBMs used spreadsheets like the 2015 ASP Spreadsheet when the standard RBM slide deck and/or marketing pitch led to a more granular discussion of the ASP spread. When discussing spread calculations relevant to individual retina practices with the practice's office managers, RBMs used tools such as the 2015 ASP Spreadsheet to show customers that Eylea's unreported front-end discounts achieved through Besse Medical did not negatively affect Eylea's ASP margin.

201. Regeneron's RBMs were also instructed to present the free PODIS system to customers as part of their reward for converting to Eylea and converting all of their direct drug distribution business to Besse Medical. Regeneron's promotion of the benefits of PODIS to customers, while conditioning its subsidies for those products upon Besse Medical's securing of Eylea sales, was intended to induce government reimbursement of those sales.

202. Regeneron's nearly three dozen RBMs were expected to be very aggressive when pitching the Besse Distribution Channel scheme to retina practices. RBMs were instructed at regional meetings to direct their Eylea customers to Besse Medical in order to secure the most lucrative deal on Eylea, including free use of PODIS and other Besse products. The regional meetings were hosted by three regional RBM directors: Andrea Sandefur, Gregory Thorson, and Jean Mukand.

203. One example of Regeneron's aggressive marketing pitch involved the efforts of Ms. Sandefur, the then Senior Director, Field Market Access for Eylea, to promote Besse Medical to an Atlanta, Georgia retina practice.

204. Ms. Sandefur advised the practice that she would call insurance carriers on their behalf to push through any denied Eylea claims. She proceeded to call the customer's insurance carriers while misrepresenting herself as the practice's office manager. Ultimately, Ms. Sandefur was successful both in getting the subject Eylea claims paid and in convincing the practice to convert all of their wet AMD business to Eylea and Besse Medical, including their government payer books of business.

205. Regeneron extended and grew its successful Besse Distribution Scheme beyond 2015. For example, Regeneron's 2015 "Brand Planning and Audit Meeting" PowerPoint presentation identifies "solicitation of discounts and rebates" as a Regeneron "management strategy" with a "likelihood of adoption by 2018." The presenter notes for this slide also state "[w]hile preferred anti-VEGF agents are not common today, they are likely to be adopted by 2018, which could be influenced by manufacturer discounts." These statements are especially noteworthy given Regeneron's consistent statements to the government, customers and the public that they "do not rebate" Eylea as a matter of business strategy. Although the slide is specific to Regeneron's commercial book of business, Relators' documents confirm that Regeneron's marketing for commercial accounts was also based on ASP spread pricing.

206. Ms. Sandefur's conduct was representative of Regeneron's corporate culture and policy, replicated by others at Regeneron. For example, Ms. Sandefur herself trained former Regeneron RBM Joe Barlow on how to convert business to Eylea from the reimbursement perspective. Ms. Sandefur instructed Mr. Barlow to tell customers how Besse Medical could

benefit their practice, including through Eylea's higher ASP and the PODIS inventory system. Mr. Barlow refused to promote Eylea in such a manner.Physicians were quickly able to grasp the profit incentives available by choosing to purchase Eylea through Besse Medical over Defendants' competitors. By mid-2018, more than 60% of all Eylea sales orders and purchases placed by and made by physicians and practices were transacted through Besse Medical.

207. An internal Regeneron report generated by the Analytics Department,[6] dated May 29, 2018 for the Week Ending June 3, 2018, reported that Besse Medical received 61.9% of Eylea sales among all distributors from "Launch to Date." Based upon DOE 2's information and belief derived from his understanding of and past access to this data, this number was substantially higher.

***b. Regeneron Failed to Include Besse Medical Discounts in Eylea's Reported ASP***

208. Regeneron Director of Market Access Emmanuel Hamon had confirmed for RBMs that the Besse Medical discounts and credit card fee arrangements under the Besse Distribution Channel scheme would not affect ASP. .

209. As reflected in the Excel formulas embedded in the 2015 ASP Spreadsheet, Regeneron's illicit front-end discounts through Besse Medical did not affect Eylea's ASP. Regeneron offered two reportable rebates in 2016 and 2018 that lowered Eylea's ASP marginally,[7]

---

[6] "ICS" refers to "ISS Corporate Solutions," which is a third-party consultant hired by Regeneron to provide data analytics and advisory services in collaboration with the Analytics division, including in connection with Regeneron's sales of Eylea through Besse Medical.

[7] Regeneron publicly announced that it would be offering 1.1% and 2.5% reportable discounts off of Eylea's WAC price, not limited to any distributor, in 2016 and in 2018, respectively. *See, e.g.*, Eylea Product Support Page at https://hcp.eylea.us/eylea4u/product-support ("The [WAC] discount is available to . . . practices who are treating patients on an outpatient basis and who purchase EYLEA directly from the Authorized Distributors listed above. . . . [and] is intended to constitute a discount as such term is defined in 42 U.S.C. § 1320a-7(b)(3) and 42 C.F.R. § 1001.952(h). . . . [that] must be reported by any eligible

but Regeneron concealed the indirect Besse Medical discounts alleged herein throughout the Relevant Period and through to the present.

210. The 2015 ASP Spreadsheet confirms that, by 2015, Regeneron was paying or planning to pay customers two rebates that were not reported as part of ASP. These consisted at that time of an "Amex rebate" of 1.5% and another unspecified rebate of approximately 1%, both consistent with the concept of unreported pass-through price discounts and credit card fee waivers.

211. Instead, Regeneron paid Besse Medical for the discounts, fee waivers and free products in the form of "service fees" that were reflected in its own agreements with Besse Medical as its distributor.

212. Regeneron's 1-3% administrative fees paid to Besse Medical are not a bona fide service fee, but rather a price concession that should be included in Eylea's ASP.

213. Regeneron's 1.5% credit card waiver fee paid to customers through Besse Medical is not a bona fide service fee, but rather a price concession that should be included in Eylea's ASP.

214. Regeneron's discounts extended to Besse Medical may also have included prompt payment discounts of 1% or more during relevant periods. Consistent with Regeneron's stated policy of not discounting or rebating Eylea in order to preserve its ASP, any such prompt pay discounts were not reported to CMS.

215. Prompt payment discounts paid to Besse for its high volume purchases would enable it to extend generous extended payment terms to customers that would in turn help customers manage their cash flow when purchasing their own large volumes of Regeneron's $1,850 per vial drug, i.e. customers' "drug float."

---

purchaser in any costs claimed or charges made to any federal healthcare program, including Medicare and Medicaid.") (last accessed July 22, 2020).

216. Extended payment terms enabled practices to pay their credit card balances with the Medicare reimbursement before the credit card bill comes due, and such early payment avoids any interest charges. This economic benefit passed on to customers through Besse can also be referred to as "trade credit."

217. *In Catalano, Inc v. Target Sales, Inc*, 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980), the Supreme Court affirmed the concrete remunerative value of trade credit:

> [T]he extension of interest-free credit is an indirect price reduction and that the elimination of such credit is therefore a method of raising prices….'The purchase of goods creates an obligation to pay for them. Credit is one component of the overall price paid for a product. The cost to a retailer of purchasing goods consists of (1) the amount he has to pay to obtain the goods, and (2) the date on which he has to make that payment. If there is a differential between a purchase for cash and one on time, that difference is not interest but part of the price. See *Hogg v. Ruffner,* 66 U.S. (1 Black) 115, 118-119, 17 L.Ed. 38 (1861). Allowing a retailer interest-free short-term credit on beer purchases effectively reduces the price of beer, when compared to a requirement that the retailer pay the same amount immediately in cash; and, conversely, the elimination of free credit is the equivalent of a price increase." Id., at 1103.

218. OIG Guidance and the relevant Final Rule provide that, when directed by a manufacturer, such a "pass through" violates the bona fide service fee safe harbor and must be reported as a discount. A manufacturer's knowledge of or involvement in a vendor's passing through of fees to its customers triggers that manufacturer's obligation to report the fees as part of ASP.

219. Besse Medical extended the price discounts and credit card fee waivers to customers as an inducement to convert customers to Eylea and to Besse Medical with the full knowledge and participation of Regeneron.

220. OIG Guidance allows manufacturers to presume that a fee is not passed on "in the absence of evidence or notice to the contrary." Here, however, Defendants' pass-through

discounts and fee waivers paid to customers through Besse Medical were conceived of by the manufacturer itself, as a substitute for reportable discounts that could be paid to them directly.

221. Regeneron's distribution service fees paid to Besse Medical are routinely passed through to Besse Medical's customers with Regeneron's full knowledge and encouragement. Such pass-throughs disqualify the distribution fees paid to Besse Medical as bona fide service fees and require Regeneron to report the fees as discounts on ASP, which it failed to do.

222. Regeneron's failure to report the above discounts to CMS is further corroborated by an internal 2013 Regeneron PowerPoint presentation. The presentation includes an extensive discussion of ASP reimbursement methodology under Medicare Part B, without explicitly identifying the revenue implications of purchasing Eylea over Lucentis.



223. This Regeneron slide is designed to explain and invite discussion of the relationship between the reporting of discounts and the ASP of a drug reimbursed under Medicare Part B. The demonstrative chart plots two timelines, for two hypothetical products, measuring "CMS Payment Rates" as an "[e]xample of how products ASP + 6% can fluctuate."

224. Hypothetical product one in the chart is shown to vary over three years between approximately $2,030 and $1,990—a variation of $40. Hypothetical product two is shown to be perfectly constant at $1960 in the same time span. This Regeneron slide then states: "It is important to understand the quarterly ASP + 6% payment rates for products your practice utilizes."

225. On information and belief, the above slide is a veiled illustration of the spread between Lucentis and Eylea resulting from Eylea's comparatively fixed ASP.

226. The Regeneron slide bears a close resemblance to a table found in a publicly available November 2017 Bates White Economic Consulting study titled "Biosimilar coding and reimbursement under Medicare Part B":




Source: ASP data

227. The Bates White study concluded, among other things, that "Eylea came to the market at a lower price and appears to have caused the ASP of Lucentis to drop as well."

228. In April 2019, the Medicare Payment Advisory Commission testified before the U.S. House of Representatives that Eylea's ASP declined only 2% between its launch at $1850 and Q1 2019 (presumably resulting from the reported WAC discounts), while Lucentis' ASP declined 11% between 2009 and 2019.[8]

229. Eylea's comparatively fixed ASP could not have been possible were Regeneron to have properly reported its discounts to customers that it provided (but did not report) through Defendant Besse Medical, Regeneron's preferred distributor.

230. Regeneron's own 2013 presentation materials emphasizing the stability of Eylea's ASP shows the promotional importance the Company placed on illicitly avoiding reported discounts that would reduce Eylea's ASP.

231. On information and belief, Eylea's modest reduction in ASP after 2016 is attributable to the aforementioned WAC discounts and not to the unreported pass-through discounts extended under the distribution channel arrangement.

### 3. Regeneron Closely Monitored the Progress and ROI of Defendants' Distribution Channel Arrangement

232. Regeneron's illegal inducements made through the Besse Distribution Channel were sophisticated and informed by robust sales data. Throughout the Relevant Period, these data were continuously reviewed, approved, and acted upon by Regeneron's corporate management and its Data Analytics department.

---

[8] April 30, 2019 Statement of James E. Mathews, Ph.D., Executive Director, Medicare Payment Advisory Commission, before the Subcommittee on Health, Committee on Energy and Commerce, U.S. House of Representatives, at 13.

233. During relevant periods, Ms. Goins and Regeneron Distribution Channels Manager Katherine (Kate) Hilliard Dolcine managed Regeneron's monitoring of the progress and investment return of the Besse Distribution Channel scheme.

234. Regeneron's data-driven policy of promoting the reimbursement spread between Eylea and Lucentis was orchestrated at the highest levels of the company. For example, DOE 1 recalls a Regeneron conference call led by Brenda Bloom, Regeneron's Director of Health Policy and Advocacy, in which Ms. Bloom explained to Regeneron personnel "how to figure out how to make money" using customized ASP spread calculations.

235. Contemporaneously, Ms. Bloom emailed a document to the Regeneron sales team reflecting some of her statements made on the call. The document included a paragraph describing how to calculate the spread for customers and compare Eylea's costs to that of Lucentis as a function of all discounts and rebates.

236. Regeneron's intensely data-driven contracting and discounting decisions were centralized in its Analytics Department's "Field Intelligence" Operation. More specifically, the Analytics division centralized their efforts in their Monthly Business Reviews, which focused on individual accounts by region. The reviews in turn generated smaller meetings and communications among Regeneron RBMs and management in which candidates for new Besse Medical deals are selected based upon the data presented.

237. Regeneron's pharmaceutical sales tracking database was specifically modified to account for discounts from Besse Medical so that the Besse Distribution Channel scheme could be implemented more effectively and efficiently.

238. The Analytics division's recommendations to Regeneron regarding the Besse Distribution Channel scheme relied on sales reports that tracked purchases made through Besse Medical independently from other data.

239. During his tenure at Regeneron, DOE 2 became aware that Regeneron tracked the performance of all Besse Medical accounts on a monthly basis, including the number of transactions and the corresponding dollar amounts of Lucentis conversions to Eylea, independently from all other sales.

240. Regeneron also identified and tracked physicians and practices with Lucentis Direct contracts targeted for conversion. Lucentis contracts were monitored by volume in order to help RBMs pitch retina practices with high Lucentis prescribers using data demonstrating that Lucentis' spread was inferior to Eylea's.

241. The Regeneron database flagged and monitored large pricing disparities across customer accounts, such as steep discounts, using a coding system. These and all other pricing anomalies were identified using exception reports as well.

242. The Analytics division relied upon the Regeneron database to identify accounts that fell outside of certain price ranges, as these accounts were deemed to likely benefit from the Besse Distribution Channel scheme.

243. The Analytics division closely followed the performance of all accounts and prospective accounts both to retain customers and to convert new customers from Lucentis.

244. Regeneron purposefully tracked Besse Medical data separately from that of other distributors, in order to continuously monitor the Besse Distribution Channel Scheme.

245. Ms. Goins oversaw a database which independently recorded and monitored all discounts applied to Eylea purchases that were made through Besse. DOE 2 observed that Ms.

Goins was highly secretive about the database, and withheld details of its contents and purpose from DOE 2 even when he specifically inquired.

246. Regeneron designed its database architecture to track and monitor the progress of the Besse Distribution Channel Scheme nationwide.

247. As a result of Defendants' combined efforts, Regeneron's Besse Medical accounts grew to comprise a large majority of Eylea Medicare Part B sales. By 2018, sales through Besse Medical were far greater than sales through any other distributor, *i.e.*, more than 60%.

248. An internal 2018 Regeneron document titled "ICS Sales to Distributors: Summary" tracked sales percentages by Partner. The document indicates that Defendant Besse Medical comprised 55.6% of all sales in the first half of 2018, and 61.9% of all sales from "Launch to Date." 9 at 1. On information and belief, this number has increased with the continued rise in Eylea's revenue.

#### 4. Defendants' Besse Medical Distribution Channel Scheme Steered Business Away from Besse Medical's Competitors Who Did Not Offer Illicit Inducements

249. As Besse Medical's sales grew to represent more than 60% of Eylea Medicare B Sales, the Company's medical accounts grew exponentially. In other words, the attendant effect of Regeneron's subsidization of Besse Medical's unreported Eylea discounts and fee waivers, and of free Besse Medical products such as the PODIS system, not only resulted in skyrocketing Eylea sales, but it also incentivized providers to use Besse Medical as their exclusive specialty drug distributor over other distributors that did not offer improper incentives.

250. The conversion of these medical accounts was incentivized and in turn caused by the Besse Medical Distribution Channel scheme. As such, all claims submitted by providers that

converted to Defendant Besse Medical during the Relevant Period were tainted and rendered false within the meaning of the False Claims Act.

**C. Regeneron and Besse Medical Caused False Claims to be Submitted to the Government**

251. Defendants Regeneron and Besse Medical each and together caused government health programs to reimburse the Regeneron product Eylea subject to unreported and otherwise unlawful discounts provided by Regeneron, through and with Besse Medical, in violation of the AKS.

252. Through means of the Besse Distribution Channel scheme alleged herein, Regeneron provided illegal subsidies through Besse Medical to induce thousands of purchases of Eylea, resulting in billions of dollars of false claims submitted to the United States and Plaintiff States. These sales include Medicare Part B, Medicare Part C (Medicare Advantage), Medicare Part D, and Medicaid.

253. Regeneron was aware that the vast majority of the Eylea prescriptions secured through the Besse Distribution Channel scheme would be reimbursed by Medicare. In its 2017 presentation entitled "Introducing the Practice Administrator Educational Program," Regeneron states that Medicare Part B reimburses 56% of all Eylea prescriptions for Wet AMD, while Medicare Advantage and Medicaid reimburse 25% and 4% of all such prescriptions, respectively.

254. The 2017 presentation also instructed RBMs to advise retina practice administrators that "[f]or Wet Age-related Macular Degeneration (AMD), government payers insure approximately **85%** of Eylea patients." (emphasis retained from original). The below representative cross-section of retina practices are among those that had entered into contracts with Besse Medical to purchase Eylea by no later than 2015.

255. All of these practices received Eylea discounts, Eylea credit card fee waivers, and/or a free PODIS system through Besse Medical, as an inducement to convert their business to Eylea and Besse Medical.

| Ophthalmology Practices | Location | Promotional Target | False Claims for Eylea Sales Made Through Besse Distribution Channel |
|---|---|---|---|
| Palmetto Retina Center | South Carolina (West Columbia, Downtown Columbia, Orangeburg, Sumter, Aiken, and Florence) | Dr. W. Lloyd Clark, M.D. (Owner)<br>David Gavin (Practice Administrator) | 2018 Sales: $3.1 Million (Medicare Part B); $1.2 Million (Medicare Advantage); $42,500.00 (Medicaid) |
| Retina Vitreous Surgeons | Syracuse, New York | Dr. Rutledge (Senior Business Partner); Dr. Hampton (Senior Business Partner); Larry P. (Office Manager) | 2017 Pt. Count:[9] 136 (Medicare Parts A & B); 391 (Medicare Advantage)<br>2016 Pt. Count: 234 (Medicare Part A & B); 472 (Medicare Advantage) |
| Charlotte Eye Ear Nose and Throat Associates | North Carolina (Southpark, Albemarle, Belmont, Blakeney, and 14 additional locations in North Carolina) | Bradley Allen, M.D. (Owner); George Alter, M.D. (Owner); Andrew N. Antoszyk, M.D. (Owner) | 2017 Pt. Count: 327 (Medicare Part A & B); 165 (Medicare Managed Care)<br>2016 Pt. Count: 360 (Medicare Part A & B); 159 (Medicare Managed Care) |
| Piedmont Retina Specialists | North Carolina (Greensboro and Winston-Salem) | Jason Sanders, M.D. (Owner); Charles Richards, M.D. (Owner); Nathan Haines, M.D. (Owner) | 2017 Pt. Count: 250 (Medicare Part A & B); 260 (Medicare Managed Care)<br>2016 Pt. Count: 270 (Medicare Part A & B); 273 (Medicare Managed Care) |
| Southeastern Retina Associates | Tennessee (Knoxville, Chattanooga, and Tri-Cities) | Nicholas G. Anderson, M.D. (Owner); Scott Barb, M.D. (Owner); Richard Breazeale, M.D. (Owner) | 2017 Pt. Count: 328 (Medicare Part A & B); 206 (Medicare Managed Care)<br>2016 Pt. Count: 137 (Medicare Part A & B); 124 (Medicare Managed Care) |
| Eye Centers of Tennessee | Tennessee (Crossville, Cookeville Willow, Jamestown, McMinnville, | Larry Patterson, M.D. (Owner); James | 2017 Pt. Count: 55 (Medicare Part A & B); 30 (Medicare Advantage); 3 |

[9] "Pt. Count" in Column 4 refers to the medical practice in question's patient count for the insurance program and time period indicated. Depending on the reimbursement methodology for the government healthcare program in question, the number of false claims submitted generally will equal the Patient Count multiplied by the number of doses given to each patient each year. As alleged herein, the approximate cost of Eylea per patient per year is $10,000.

| | | | |
|---|---|---|---|
| | Byrdstown, Livingston, and Sparta) | Grisolano, M.D. (Owner) | (Medicaid Managed Care); 2 (VA Benefits)<br><br>2016 Pt. Count: 59 (Medicare Part A & B); 23 (Medicare Advantage); 3 (Medicaid Managed Care); 1 (VA Benefits) |
| Mid-South Retina Associates | Tennessee (Memphis, Corinth, Dyersburg, Blytheville, Jackson, Paris, and Jonesboro) | William Priester, M.D. (Owner); Lawrence W. Gordon, M.D. (Owner) | 2017 Pt. Count: 24 (Medicare Part A & B); 18 (Medicare Advantage)<br><br>2016 Pt. Count: 33 (Medicare Part A & B); 21 (Medicare Advantage) |
| Southeast Eye Associates | Tennessee (Chattanooga, Knoxville, Nashville, and 16 additional locations in Tennessee) | Randall Funderburk, M.D. (Owner); Christopher Haggerty, M.D. (Owner); D. Lee McDaniel, M.D. (Owner) | 2017 Pt. Count: 401 (Medicare Part A & B); 219 (Medicare Advantage)<br><br>2016 Pt. Count: 332 (Medicare Part A & B); 183 (Medicare Advantage) |

256. Defendants' implementation of the Besse Distribution Channel scheme corresponded with a growing outperformance of Eylea over Lucentis in the wet AMD and buy and bill markets through at least 2017

257. Eylea's market share for wet AMD surpassed Lucentis' in 2014, with Eylea sales in the US of $1.74 billion as compared to $1.7 billion for Lucentis.

258. By 2016, Eylea was ranked first among all drugs as measured by Part B expenditures in physician offices, after generating $2.2 billion in Part B sales that year. Lucentis was ranked eighth in the same category that year, with $1.04 billion in sales.

259. Regeneron and Besse Medical have exploited, and are poised to continue to exploit, the Besse Distribution Channel scheme to secure illegal Medicare and Medicaid reimbursements for injectable drug sales of Eylea induced by unreported discounts and free products, to the detriment of taxpayers.

## VI. CAUSES OF ACTION

**COUNT I**
**Federal False Claims Act—**
**Violations for Causing Submission of False Claims to the United States**
**U.S.C. § 3729(a)(1)(A)**

260. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

261. Relators seek relief against Defendants under Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

262. As described above, Defendants have knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

263. As a result of these false claims, the United States has been damaged in a substantial amount and continues to be damaged, in an amount yet to be determined.

264. Additionally, the United States is entitled to the maximum penalty of $21,562.80 for each and every false and fraudulent claim made and caused to be made by Defendants and arising from their fraudulent conduct as described herein.

**COUNT II**
**Federal False Claims Act –**
**Violations for Causing Submission of False Claims to the United States**
**U.S.C. § 3729(a)(1)(B)**

265. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

266. Relators seek relief against Defendants under Section 3729(a)(1)(B) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

267. As described above, Defendants have knowingly made, used, or caused to be made or used false records and statements material to false or fraudulent claims paid or approved by the United States, in violation of 31 U.S.C. § 3729(a)(1)(B).

268. As a result of these false claims, the United States has been damaged in a substantial amount and continues to be damaged, in an amount yet to be determined.

269. Additionally, the United States is entitled to the maximum penalty of $21,562.80 for each and every false and fraudulent claim made and caused to be made by Defendants and arising from their fraudulent conduct as described herein.

## COUNT III
## Violations of the False Claims Act – Conspiracy
## 31 U.S.C. § 3729(a)(1)(C)

270. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

271. Relators seek relief against the Defendants under Section 3729(a)(1)(C) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

272. As set forth above, Defendants have conspired with their officers, agents, and employees to defraud the United States Government by presenting false or fraudulent claims for payment in violation of 31 U.S.C. § 3729(a)(1)(C).

273. Defendants conspired together with their officers, agents, and employees authorizing them to take and conceal the actions set forth above.

274. As set forth in the preceding paragraphs, Defendants have knowingly violated 31 U.S.C. § 3729(a)(1)(C) and have thereby damaged the United States Government by their actions in an amount to be determined at trial.

**COUNT IV**
**California False Claims Act**
**Cal. Govt Code §12651(a)(1) and (2)**

275. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

276. This is a claim for treble damages and penalties under the California False Claims Act.

277. By virtue of the acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims to the California State Government for payment or approval.

278. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

279. The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continue to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

280. By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

281. The State of California is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

282. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of California in the operation of its Medicaid program.

**COUNT V**
**Violation of the Colorado Medicaid False Claims Act**
**Colo. Rev. Stat. § 25.5-4-305**

283. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

284. This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303 *et seq*.

285. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Colorado State Government for payment or approval.

286. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Colorado State Government to approve and pay such false and fraudulent claims.

287. The Colorado State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

288. By reason of Defendants' acts, the State of Colorado has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

289. The State of Colorado is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

290. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Colorado in the operation of its Medicaid program

**COUNT VI**
**Violation of the Connecticut False Claims Act for Medical Assistance Programs**
**Conn. Gen. Stat. § 17b-301b**

291. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

292. This is a claim for treble damages and penalties under the Connecticut Medicaid False Claims Act, Conn. Gen. Stat. § 17-b-301a *et seq*.

293. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Connecticut State Government for payment or approval.

294. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Connecticut State Government to approve and pay such false and fraudulent claims.

295. The Connecticut State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

296. By reason of Defendants' acts, the State of Connecticut has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

297. The State of Connecticut is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

298. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Connecticut in the operation of its Medicaid program.

**COUNT VII**
**Violation of the Delaware False Claims and Reporting Act**
**6 Del. C. §1201(a)(1) and (2)**

299. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

300. This is a claim for treble damages and penalties under the Delaware False Claims and Reporting Act.

301. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

302. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Delaware State Government to approve and pay such false and fraudulent claims.

303. The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and

continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

304. By reason of Defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

305. The State of Delaware is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

306. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Delaware in the operation of its Medicaid program.

**COUNT VIII**
**Violation of the Florida False Claims Act**
**Fla. Stat. Ann. §68.082(2)**

307. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

308. This is a claim for treble damages and penalties under the Florida False Claims Act, Fla. Stat. Ann. §68.081 *et seq*.

309. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

310. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

311. The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

312. By reason of Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

313. The State of Florida is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

314. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Florida in the operation of its Medicaid program.

**COUNT IX**
**Violation of the Georgia State False Medicaid Claims Act**
**Ga. Code Ann. § 49-4-168.1 *et seq.***

315. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

316. This is a claim for treble damages and penalties under the Georgia State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.1 *et seq.*

317. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

318. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Georgia State Government to approve and pay such false and fraudulent claims.

319. The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

320. By reason of Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

321. The State of Georgia is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

322. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Georgia in the operation of its Medicaid program.

## COUNT X
## Violation of the Hawaii False Claims Act
## Haw. Rev. Stat. §661-21(a)

323. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

324. This is a claim for treble damages and penalties under the Hawaii False Claims Act, Haw. Rev. Stat. §661 *et seq.*

325. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval.

326. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Hawaii State Government to approve and pay such false and fraudulent claims.

327. The Hawaii State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

328. By reason of Defendants' acts, the State of Hawaii has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

329. The State of Hawaii is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

330. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Hawaii in the operation of its Medicaid program.

**COUNT XI**
**Violation of the Illinois Whistleblower Reward and Protection Act (as amended)**
**740 Ill. Comp. Stat. §175/3(a)(1), (2)**

331. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

332. This is a claim for treble damages and penalties under the under the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175 *et seq.*, as amended.

333. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

334. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

335. The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

336. By reason of Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

337. The State of Illinois is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

338. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Illinois in the operation of its Medicaid program.

**COUNT XII**
**Violation of the Indiana False Claims and Whistleblower Protection Act**
**IC 5-11-5.5 *et seq.***

339. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

340. This is a claim for treble damages and penalties under the under the Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5 *et seq.*

341. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Indiana State Government for payment or approval.

342. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Indiana State Government to approve and pay such false and fraudulent claims.

343. The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

344. By reason of Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

345. The State of Indiana is entitled to the maximum penalty of $5,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

346. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Indiana in the operation of its Medicaid program.

**COUNT XIII**
**Violation of the Iowa False Claims Act**
**Iowa Code § 685.2**

347. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

348. This is a claim for treble damages and penalties under the under the Iowa False Claims Act, Iowa Code §§ 685.1 *et seq*.

349. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Iowa State Government for payment or approval.

350. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Iowa State Government to approve and pay such false and fraudulent claims.

351. The Iowa State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

352. By reason of Defendants' acts, the State of Iowa has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

353. The State of Iowa is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

354. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Iowa in the operation of its Medicaid program.

**COUNT XIV**
**Violation of the Louisiana Medical Assistance Programs Integrity Law**
**La Rev. Stat. Ann § 46:438.3**

355. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

356. This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law, La Rev. Stat. Ann § 46:437.1 *et seq*.

357. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Louisiana State Government for payment or approval.

358. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Louisiana State Government to approve and pay such false and fraudulent claims.

359. The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

360. By reason of Defendants' acts, the State of Louisiana has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

361. The State of Louisiana is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

362. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Louisiana in the operation of its Medicaid program.

**COUNT XV**
**Violation of the Maryland False Health Claims Act**
**MD Code Ann. § 2-602**

363. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

364. This is a claim for treble damages and penalties under the Maryland False Health Claims Act, Annotated Code of Maryland § 2-601 *et seq*.

365. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Maryland State Government for payment or approval.

366. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Maryland State Government to approve and pay such false and fraudulent claims.

367. The Maryland State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

368. By reason of Defendants' acts, the State of Maryland has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

369. The State of Maryland is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

370. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Maryland in the operation of its Medicaid program.

**COUNT XVI**
**Violation of the Massachusetts False Claims Law**
**Mass. Gen. Laws ch. 12 §5B(1), (2)**

371. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

372. This is a claim for treble damages and penalties under the Massachusetts False Claims Law.

373. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Massachusetts Commonwealth Government for payment or approval.

374. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Massachusetts Commonwealth Government to approve and pay such false and fraudulent claims.

375. The Massachusetts Commonwealth Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by

Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

376. By reason of Defendants' acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

377. The Commonwealth of Massachusetts is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

378. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Massachusetts in the operation of its Medicaid program.

## COUNT XVII
## Violation of the Michigan Medicaid False Claim Act
## MCL 400.607

379. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

380. This is a claim for treble damages and penalties under the Michigan Medicaid False Claim Act, MCL 400.601 *et seq*.

381. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Michigan State Government for payment or approval.

382. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Michigan State Government to approve and pay such false and fraudulent claims.

383. The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

384. By reason of Defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

385. The State of Michigan is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

386. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Michigan in the operation of its Medicaid program.

**COUNT XVIII**
**Violation of the Minnesota False Claim Act**
**Minn. Stat. § 15C.02**

387. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

388. This is a claim for treble damages and penalties under the Minnesota False Claim Act, Minn. Stat. § 15C.01 *et seq.*

389. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Minnesota State Government for payment or approval.

390. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Minnesota State Government to approve and pay such false and fraudulent claims.

391. The Minnesota State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

392. By reason of Defendants' acts, the State of Minnesota has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

393. The State of Minnesota is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

394. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Minnesota in the operation of its Medicaid program.

**COUNT XIX**
**Violation of the Montana False Claims Act**
**MCA § 17-8-403**

395. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

396. This is a claim for treble damages and penalties under the Montana False Claims Act, MCA § 17-8-401 *et seq.*

397. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Montana State Government for payment or approval.

398. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Montana State Government to approve and pay such false and fraudulent claims.

399. The Montana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

400. By reason of Defendants' acts, the State of Montana has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

401. The State of Montana is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

402. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Montana in the operation of its Medicaid program.

**COUNT XX**
**Violation of the Nevada False Claims Act**
**Nev. Rev. Stat. Ann. §§ 357.040(1)(a), (b)**

403. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

404. This is a claim for treble damages and penalties under the Nevada False Claims Act.

405. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

406. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

407. The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

408. By reason of Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

409. The State of Nevada is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

410. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Nevada in the operation of its Medicaid program.

**COUNT XXI**
**Violation of the New Hampshire False Claims Act**
**N.H. Rev. Stat. Ann. § 167:61-b *et seq.***

411. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

412. This is a claim for treble damages and penalties under the New Hampshire False Claims Act, N.H. Rev. Stat. Ann. § 167:61-b *et seq*.

413. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Hampshire State Government to approve and pay such false and fraudulent claims.

414. The New Hampshire State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

415. By reason of Defendants' acts, the State of New Hampshire has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

416. The State of New Hampshire is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

417. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Hampshire in the operation of its Medicaid program.

## COUNT XXII
## Violation of the New Jersey False Claims Act
## N.J.S.A. 2A:32C-3

418. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

419. This is a claim for treble damages and penalties under the New Jersey False Claims Act, N.J.S.A. 2A:32C-1 *et seq.*

420. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Jersey State Government to approve and pay such false and fraudulent claims.

421. The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

422. By reason of Defendants' acts, the State of New Jersey has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

423. The State of New Jersey is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

424. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Jersey in the operation of its Medicaid program.

**COUNT XXIII**
**Violations of the New Mexico Medicaid False Claims Act, N. M. S. A. 1978, §§ 27-14-1 *et seq.* and the New Mexico Fraud Against Taxpayers Act, N. M. S. A. 1978, §§ 44-9-1 *et seq.***

425. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

426. This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act, N. M. S. A. 1978, § 27-14-1 *et seq.* and the New Mexico Fraud Against Taxpayers Act, N. M. S. A. 1978, § 44-9-1 *et seq.*

427. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Mexico State Government to approve and pay such false and fraudulent claims.

428. The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

429. By reason of Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

430. The State of New Mexico is entitled to the maximum penalty under of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

431. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Mexico in the operation of its Medicaid program.

**COUNT XXIV**
**Violation of the New York False Claims Act**
**N.Y. State Finance Law § 189**

432. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

433. This is a claim for treble damages and civil penalties under the New York False Claims Act, NY State Finance Law § 187 *et seq.*

434. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

435. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New York State Government to approve and pay such false and fraudulent claims.

436. The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

437. By reason of Defendants' acts, the State of New York has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

438. The State of New York is entitled to the maximum penalty of $12,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

439. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New York in the operation of its Medicaid program.

**COUNT XXV**
**Violation of the North Carolina False Claims Act**
**N.C.G.S. § 1-607**

440. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

441. This is a claim for double damages and penalties under the under the North Carolina False Claims Act, N.C.G.S. § 1-605 *et seq.*

442. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the North Carolina Government for payment or approval.

443. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the North Carolina State Government to approve and pay such false and fraudulent claims.

444. The North Carolina State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

445. By reason of the Defendants' acts, the State of North Carolina has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

446. The State of North Carolina is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

447. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of North Carolina in the operation of its Medicaid program.

**COUNT XXVI**
**Violation of the Oklahoma Medicaid False Claims Act**
**63 Okl. St. Ann. § 5053.1**

448. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

449. This is a claim for double damages and penalties under the under the Oklahoma Medicaid False Claims Act, 63 Okl. St. Ann. § 5053 *et seq*.

450. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

451. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Oklahoma State Government to approve and pay such false and fraudulent claims.

452. The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

453. By reason of Defendants' acts, the State of Oklahoma has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

454. The State of Oklahoma is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

455. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Oklahoma in the operation of its Medicaid program.

**COUNT XXVII**
**Violation of the Rhode Island State False Claims Act**
**R.I. Gen. Laws § 9-1.1-3**

456. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

457. This is a claim for double damages and penalties under the under the Rhode Island State False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq*.

458. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Rhode Island State Government for payment or approval.

459. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Rhode Island State Government to approve and pay such false and fraudulent claims.

460. The Rhode Island State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by

Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

461. By reason of Defendants' acts, the State of Rhode Island has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

462. The State of Rhode Island is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

463. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Rhode Island in the operation of its Medicaid program.

**COUNT XXVIII**
**Violation of the Tennessee Medicaid False Claims Act**
**Tenn. Code Ann. § 71-5-182(a)(1)**

464. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

465. This is a claim for double damages and penalties under the under the Tennessee Medicaid False Claims Law.

466. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

467. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

468. The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

469. By reason of Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

470. The State of Tennessee is entitled to the maximum penalty of $25,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

471. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Tennessee in the operation of its Medicaid program.

**COUNT XXIX**
**Violation of the Texas Medicaid Fraud Prevention Law**
**Tex. Hum. Res. Code Ann. § 36.002**

472. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

473. This is a claim for double damages and penalties under the under the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. § 36.001 *et seq.*

474. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Texas State Government for payment or approval.

475. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Texas State Government to approve and pay such false and fraudulent claims.

476. The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

477. By reason of Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

478. The State of Texas is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

479. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program.

**COUNT XXX**
**Violation of the Vermont False Claims Act**
**32 V.S.A. § 630 *et seq.***

480. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

481. This is a claim for double damages and penalties under the under the Vermont False Claims Act 32 V.S.A. § 630 *et seq.*

482. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Vermont State Government for payment or approval.

483. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Texas State Government to approve and pay such false and fraudulent claims.

484. The Vermont State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

485. By reason of Defendants' acts, the State of Vermont has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

486. The State of Vermont is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

487. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Vermont in the operation of its Medicaid program.

## COUNT XXXI
## Violation of the Virginia Fraud Against Taxpayers Act
## Va. Code Ann. § 8.01-216.3(A)(1), (2)

488. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

489. This is a claim for treble damages and penalties under the under the Virginia Fraud Against Taxpayers Act Va. Code Ann. § 8.01-216.1 *et seq.*

490. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Virginia Commonwealth Government for payment or approval.

491. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Virginia Commonwealth Government to approve and pay such false and fraudulent claims.

492. The Virginia Commonwealth Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

493. By reason of Defendants' acts, the Commonwealth of Virginia has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

494. The Commonwealth of Virginia is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

495. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Virginia in the operation of its Medicaid program.

**COUNT XXXII**
**Violation of the Washington State Medicaid Fraud False Claims Act**
**RCW 74.66.020(1)**

496. Relators repeat and reallege each and every allegation contained in the paragraphs above as though fully set forth herein.

497. This is a claim for treble damages and penalties under the under the Washington State Medicaid Fraud False Claims Act, Revised Code of Washington 74.66.005 *et seq.*

498. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Washington State Government for payment or approval.

499. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Washington State Government to approve and pay such false and fraudulent claims.

500. The Washington State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

501. By reason of the Defendants' acts, the State of Washington has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

502. The State of Washington is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

503. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Washington in the operation of its Medicaid program.

**COUNT XXXIII**
**Violation of the District of Columbia Procurement Reform Amendment Act**
**D.C. Code Ann. §1-1188.14(a)(1), (2)**

504. Relator re-alleges and incorporates by reference the allegations in the previous paragraphs of this Complaint.

505. This is a claim for treble damages and penalties under the District of Columbia Procurement Reform Amendment Act, D.C. Code Ann. §2-381.01 *et seq*.

506. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

507. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the District of Columbia Government to approve and pay such false and fraudulent claims.

508. The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

509. By reason of Defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

510. The District of Columbia is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

511. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the District of Columbia in the operation of its Medicaid program.

**COUNT XXXIV**
**Violation of the Allegheny County False Claims Act**
**§ 485-1 *et seq.***

512. Relator re-alleges and incorporates by reference the allegations in the previous paragraphs of this Complaint.

513. This is a claim for treble damages and penalties under the Allegheny False Claims Act § 485-1 *et seq*.

514. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Allegheny County Government for payment or approval.

515. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Allegheny County Government to approve and pay such false and fraudulent claims.

516. The Allegheny County Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

517. By reason of Defendants' acts, the County of Allegheny has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

518. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the County of Allegheny in the operation of its Medicaid program.

**COUNT XXXV**
**Violation of the Chicago False Claims Act**
**Chi. Mun. Code Ch. 1-22-020(1-2))**

519. Relator re-alleges and incorporates by reference the allegations in the previous paragraphs of this Complaint.

520. This is a claim for treble damages and penalties under the Chicago False Claims Act, Chi. Mun. Code Ch. 1-22-020(1-2).

521. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the City of Chicago Government for payment or approval.

522. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the City of Chicago Government to approve and pay such false and fraudulent claims.

523. The City of Chicago Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

524. By reason of Defendants' acts, the City of Chicago has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

525. The City of Chicago is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

526. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the City of Chicago in the operation of its Medicaid program.

**COUNT XXXVI**
**Violation of the City of New York False Claims Act**
**Local Law 53, Chapter 8 § 7-801 *et seq.***

527. Relator re-alleges and incorporates by reference the allegations in the previous paragraphs of this Complaint.

528. This is a claim for treble damages and penalties under the City of New York False Claims Act, Local Law 53, Chapter 8 § 7-801 *et seq*.

529. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the City of New York Government for payment or approval.

530. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the City of New York Government to approve and pay such false and fraudulent claims.

531. The City of New York Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

532. By reason of Defendants' acts, the City of New York has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

533. The City of New York is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

534. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the City of New York in the operation of its Medicaid program.

**COUNT XXXVII**
**Violation of the Philadelphia False Claims Act**
**§ 19-3601 *et seq.***

535. Relator re-alleges and incorporates by reference the allegations in the previous paragraphs of this Complaint.

536. This is a claim for treble damages and penalties under the Philadelphia False Claims Act, § 19-3601 *et seq*.

537. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the City of Philadelphia Government for payment or approval.

538. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the City of Philadelphia Government to approve and pay such false and fraudulent claims.

539. The City of Philadelphia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by

Defendants, paid and continues to pay the claims that would not be paid but for Defendants' false and illegal marketing practices.

540. By reason of Defendants' acts, the City of Philadelphia has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

## VII. PRAYER FOR RELIEF

**WHEREFORE**, Relators request that judgment be entered against Defendants, ordering that:

B. Defendants cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729-33, as amended;

C. Defendants pay not less than $10,781.40 and not more than $21,562.80 per false claim, as adjusted by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (28 U.S.C. § 2461), plus three times the amount of damages the United States has sustained because of their actions;

C. Relators be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d) and the equivalent provisions of the State False Claims Acts set forth above;

D. Relators be awarded all costs of this action, including attorneys' fees and expenses pursuant to 31 U.S.C. § 3730(d); and

E. The United States and Relators be awarded such other relief as the Court deems just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues triable of right by jury.

Dated: July 6, 2022

Respectfully submitted,

/s/ Jason W. Morgan

Jason W. Morgan (BBO #633802)
Jeffrey H. Katzenstein (BBO #674749)
**DROHAN TOCCHIO & MORGAN P.C.**
175 Derby Street, Suite 30
Hingham, Massachusetts 02043
Tel: (781) 749-7200 x 137
Fax: (781) 740-4335
jmorgan@dtm-law.com
jkatzenstein@dtm-law.com

Ross B. Brooks (to be admitted *pro hac vice*)
Alastair Findeis (to be admitted *pro hac vice*)
**BROOKS LLC**
173 Huguenot Street, Suite 200
New Rochelle, NY 10801
Tel.: (914) 821-6717
Fax: (914) 363-8723
ross@brooksllc.com
alastair@brooksllc.com

*Counsel for Plaintiffs-Relators Does 1-2*