**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, *ex rel.* JULIANNE NUNNELLY and MATTHEW SHANKS<br><br>Plaintiffs,<br>v.<br><br>REGENERON PHARMACEUTICALS, INC.,<br>Defendant. | No. 20-cv-11401-PBS |

## MEMORANDUM OF LAW IN OPPOSITION TO THE NON-*QUI TAM* INTERVENING STATES' CONSOLIDATED MOTION TO DISMISS REGENERON'S COUNTERCLAIMS

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(d), Defendant and Counter-Plaintiff Regeneron Pharmaceuticals, Inc. ("Regeneron") respectfully requests a hearing on the Non-*Qui Tam* Intervening States' Consolidated Motion to Dismiss Regeneron's Counterclaims. Given the important legal issues presented by the Motion, as well as the complexity of the statutory and regulatory scheme at issue, Regeneron submits that argument would be helpful to the Court in resolving the motion.

## PRELIMINARY STATEMENT

Regeneron submits this Memorandum of Law in Opposition to the Consolidated Motion to Dismiss Regeneron's Counterclaims ("Motion to Dismiss" or "Mot."), Dkt. No. 230, filed by Maine, Nebraska, Ohio, Oregon, and Wyoming (collectively, "Non-*Qui Tam* Intervening States").

The Non-*Qui Tam* Intervening States are trying to hide the ball. They allege that Regeneron cost them money by improperly calculating EYLEA®'s Average Sales Price ("ASP"), but they want to exclude from this case Regeneron's contingent counterclaims, which simply make clear the logical consequence of the States' position: If EYLEA's ASP was too high, as they claim, then EYLEA's Average Manufacturer Price ("AMP") was also too high—in which case Regeneron *overpaid* the States in Medicaid rebates. That is not disputed. The Non-*Qui Tam* Intervening States do not (and could not) deny that under their theory of the case, a determination as to whether credit card service fees constitute bona fide service fees ("BFSFs") affects both sides of the ledger, but in opposite directions.

This indisputable reality puts companies like Regeneron in a bind. It exposes them to regulatory action—and *qui tam* whistle-blower lawsuits—*regardless of which choice they make about how to treat a specific type of service fee, including credit card service fees.* If a company

determines a fee should be excluded from government pricing calculations, it faces potential False Claims Act lawsuits based on an inflated Medicare reimbursement theory, as is the case here. On the flip side, if a company makes the opposite determination, it faces potential False Claims Act lawsuits based on an underpayment of Medicaid rebates theory. *See United States ex rel. Streck v. Bristol-Myers Squibb Co.*, 2018 WL 6300578, at *1 (E.D. Pa. Nov. 29, 2018).

This undermines the Non-*Qui Tam* Intervening States' claim that Regeneron did anything wrong, so now they seek to keep the real-world implications of their arguments out of the case. But none of the States' attempts to change the subject can obscure the key point: The Non-*Qui Tam* Intervening States seek to benefit financially from the position they have taken on the ASP side of Regeneron's choice regarding credit card service fees, while excluding from this case the flip side of the same coin: the financial *benefit* the States obtained from the AMP consequences of that same decision. Fairness and logic require consideration of both sides at the same time.

No theory or authority supports the Non-*Qui Tam* Intervening States' manifestly unfair position. First, the Non-*Qui Tam* Intervening States urge dismissal based on the doctrine of sovereign immunity, arguing that Regeneron's counterclaim is not sufficiently "related" to their affirmative claim. This argument hinges on a superficial parsing of the underlying facts at issue (Regeneron's determination of how to treat credit card fees for purposes of Medicaid reimbursement) into multiple "events" by noting that the ensuing regulatory calculations (ASP and AMP) resulted in payments at different times. But the compulsory counterclaim standard does not require all the underlying events to have occurred simultaneously; the question is simply whether those events and ensuing claims are *logically related*. And, here, they obviously are. The States' claims and Regeneron's counterclaims flow from the same decision-making about the same set of credit card fees on the same drug product (EYLEA), where a change to one side of the ledger

2

necessarily implicates a change to the other.  Sovereign immunity does not afford the Non-*Qui Tam* Intervening States the heads-I-win-tails-you-lose superpowers they seek.

Second, the Non-*Qui Tam* Intervening States request dismissal of Regeneron's counterclaims based on the doctrine of ripeness.  This argument, too, fails.  The Non-*Qui Tam* Intervening States do not appear to dispute that contingent counterclaims can be proper and are routine in civil litigation, even though they are (by definition) contingent on something else happening.  Rather, they attempt to side-step the issue by inventing a "ripeness" theory, asserting that Regeneron must bring its contingent counterclaims for a setoff or recoupment of AMP overpayments to the Centers for Medicare and Medicaid Services ("CMS") first.  But the authorities they cite say no such thing.  To the contrary, 42 C.F.R. § 447.510(b)(1)(v) expressly contemplates that a company may obtain a "court order" prior to reporting a revision to AMP—making perfectly clear that there is no regulatory impediment to Regeneron advancing its position here.  Regeneron's contingent counterclaims appropriately protect Regeneron from the prospect of the Non-*Qui Tam* Intervening States obtaining an AMP-based windfall if the States were to prevail on their underlying BFSF theory, and these counterclaims are ripe for inclusion in this case.

The Non-*Qui Tam* Intervening States can't have it both ways.  They can't sue Regeneron for millions of dollars based on an allegedly miscalculated ASP, while excluding from the case the reality that if their own theory is correct, *they also owe Regeneron money* because EYLEA's AMP would also be miscalculated.  The law does not countenance their effort to achieve this result, and the Court should deny the Non-*Qui Tam* Intervening States' Motion to Dismiss.

## LEGAL BACKGROUND

The United States provides insurance to qualifying individuals for drugs like EYLEA through Medicare Part B and Medicaid.  Both programs rely on pricing data submitted by

manufacturers to determine the net prices paid under each program: ASP for Medicare Part B and certain state Medicaid programs, and AMP for all Medicaid rebates.

### A.  Medicare Reimbursement for EYLEA

In general, Medicare Part B does not reimburse physicians based on the amount they paid for a drug.  Rather, Medicare determines reimbursement amounts for prescription drugs using a statutory formula based on ASP.  *See* 42 U.S.C. §§ 1395w-4(a)(1), 1395u(o)(1), 1395x(s)(2)(A), 1395w-3a; 42 C.F.R. § 414.904.  Manufacturers must report a drug's ASP to CMS on a quarterly basis.  42 C.F.R. § 414.804(a)(5).  As relevant here, although state Medicaid programs can determine their own Medicaid reimbursement methodology, the Non-*Qui Tam* Intervening States allege that their respective state Medicaid programs "reimburse physician-administered drugs based on the Average Sales Price."  Non-*Qui Tam* Intervening States Compl. ¶ 5.

At a high level, ASP is the average sales price of a drug, minus specific "price concessions" enumerated by Congress.  42 U.S.C. § 1395w-3a(c)(1)(A)–(B).  Under the ASP statute, manufacturers must subtract six enumerated price concessions from ASP.  *Id.* § 1395w-3a(c)(3). BFSFs are "not considered price concessions" for purposes of the ASP calculation, and these fees are thus not subtracted from ASP.  42 C.F.R. § 414.804(a)(2)(ii).  The Medicare reimbursement amount is set by statute at 106% of ASP.  42 U.S.C. §§ 1395w-4(a)(1), 1395w-3a(b)(1)(B).  Thus, the higher the ASP, the higher the Medicare reimbursement amount paid by the Non-*Qui Tam* Intervening State Medicaid programs to physicians who administer EYLEA.

### B.  Medicaid Drug Rebate Program

AMP is defined as the "average price paid to the manufacturer for the drug" by certain entities, subject to certain exclusions, and is used to calculate quarterly Unit Rebate Amounts paid by manufacturers under Medicaid.  42 C.F.R. § 447.504(a); *see also* 42 U.S.C. § 1396r-8(k)(1);

42 C.F.R. § 447.509.  As with ASP, BFSFs need not be deducted from AMP.  42 U.S.C. § 1396r-8(k)(1)(B)(II); 42 C.F.R. 447.504(c)(14), (e)(5).  And for both ASP and AMP, CMS has instructed manufacturers to make "reasonable assumptions" when analyzing whether a fee is bona fide.  71 Fed. Reg. 69,624, 69,669 (Dec. 1, 2006); 81 Fed. Reg. 5,170, 5,210 (Feb. 1, 2016).  This means that under Plaintiffs' theory of the case, if credit card service fees are not bona fide, they must be deducted from *both* ASP and AMP.

But the consequences of not deducting a fee from AMP are the opposite of the consequences of not deducting a fee from ASP:  Under Medicaid, the Non-*Qui Tam* Intervening States benefit from a higher AMP.  The Non-*Qui Tam* Intervening States' Medicaid programs, with the support of the United States, reimburse providers who administer EYLEA to Medicaid patients.  42 U.S.C. §§ 1396b(a), 1396d(a)–(b), 1396r-8(b)(1)(B), (C).  For a manufacturer's drugs to qualify for federal funding under Medicaid and Medicare Part B, a manufacturer must enter into an agreement with the Secretary of Health & Human Services to participate in the Medicaid Drug Rebate Program ("MDRP").  Under this agreement, when a state Medicaid program pays for a drug administered or dispensed to a patient, the manufacturer of the drug must pay a rebate back to the state, and that rebate amount is tied to the drug's AMP.  *See id.* § 1396r-8(a)(1), (b)(1).  This payment by the manufacturer is known as the Medicaid unit rebate amount.  For each unit of EYLEA administered to a patient, the state pays money to reimburse the physician for administering the drug, and also receives money from Regeneron in the form of a rebate, which then works to reduce the state's net expenditure for the drug.  The higher the AMP, the higher the Medicaid rebate paid by the manufacturer *to the state*, and the lower the state's net expenditure.

The state and federal governments share the cost of state Medicaid programs.  The amount paid by the United States to state Medicaid programs is called the Federal Medical Assistance

Percentage ("FMAP").  *Id.* § 1396d(b).  FMAP rates are determined annually and range from 50% to 83%.  *Id.*  This means that the United States pays between 50% and 83% of each state's medical assistance costs under Medicaid.  For FY2025, regular FMAP rates range from 50% (10 states) to 76.9% (Mississippi).  *See* Alison Mitchell, Cong. Rsch. Serv., R43847, *Medicaid's Federal Medical Assistance Percentage (FMAP)*, Appendix A (Apr. 2, 2025).  Any amount not covered by FMAP is paid by the state.  42 U.S.C. §§ 1396b(a), 1396d(b).

A state's medical assistance cost amount, to which the FMAP is applied, reflects the state's *net* expenditure on prescribed drugs, *i.e.*, both the cost of drugs paid for by the state Medicaid program as well as the rebates manufacturers pay to the state for those drugs.  *Id.* § 1396d(a)(12).  In this case, the starting point for calculating the relevant state medical assistance cost amount is the amount the Non-*Qui Tam* Intervening States' Medicaid programs reimburse providers who administer EYLEA to Medicaid patients.  *Id.* §§ 1396b(a), 1396d(a)–(b), 1396r-8(b)(1)(B), (C).  Then, the "[a]mounts received by a State under [the MDRP] in any quarter [acts as] a reduction in the amount expended under the State plan in the quarter for medical assistance [*i.e.*, the reimbursement for the prescribed drug]."  *Id.* § 1396r-8(b)(1)(B).  The FMAP is applied to that net amount, such that the federal share is lower when the state medical assistance cost amount is lower.

\*     \*     \*

While the regulatory ins and outs of these programs can be quite complicated, the important point for present purposes is a simple one:  If credit card fees were wrongly excluded from EYLEA's ASP (because they actually are not BFSFs and are price concessions), then they were also wrongly excluded from AMP (for the same reason).  So, if EYLEA's AMP is too high—and should have been lower because credit card service fees should have been deducted from AMP (like ASP)—it means that Regeneron has been overpaying Medicaid rebates to the States for years,

and that the state and federal governments have been benefiting financially with respect to the Medicaid program.

## LEGAL STANDARD

When ruling on a Federal Rule of Civil Procedure 12(b)(1) motion, courts in this Circuit must "credit the [counter-plaintiff]'s well-pled factual allegations and draw all reasonable inferences in the [counter-plaintiff]'s favor." *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010); *see also United States v. Zajanckauskas*, 346 F. Supp. 2d 251, 253 (D. Mass. 2003) ("When deciding a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), 'the district court must construe the [counterclaim] liberally, treating all well-pleaded facts as true and indulging all reasonable inferences in favor of the [counter-claimant].'" (alterations in original) (quoting *Aversa v. United States*, 99 F.3d 1200, 1210 (1st Cir. 1996)); *Williams v. Mass. Bay Transp. Auth.*, No. 17-cv-11632, 2021 WL 682003, at *3 (D. Mass. Jan. 29, 2021), *rep. and rec. adopted* (Feb. 22, 2021) ("[O]n a motion to dismiss counterclaims, [the Court] must indulge all inferences in favor of the [non-movant].").  No affirmative pleading of subject-matter jurisdiction is required "as long as the facts alleged are sufficient to establish jurisdiction." *Envisn, Inc. v. Davis*, No. 11-cv-12246, 2012 WL 1672887, at *2 (D. Mass. May 11, 2012) (citing *In re Mailman Steam Carpet Cleaning Corp.*, 196 F.3d 1, 5 (1st Cir. 1999)).

"When a [counter-defendant] moves to dismiss for lack of federal subject matter jurisdiction, 'the party invoking the jurisdiction of a federal court carries the burden of proving its existence.'" *Johansen v. United States*, 506 F.3d 65, 68 (1st Cir. 2007) (quoting *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995)).  In evaluating whether the party has met its burden of proof, the court "may consider extrinsic materials and, to the extent it engages in jurisdictional factfinding, is free to test the truthfulness of the plaintiff's allegations." *Daly v. Mason*, 752 F.

Supp. 3d 368, 374 (D. Mass. 2024) (quoting *Dynamic Image Techs., Inc. v. United States*, 221 F.3d 34, 37 (1st Cir. 2000)).

## ARGUMENT

### I. The Non-*Qui Tam* Intervening States Waived Sovereign Immunity By Suing Regeneron In Federal Court Over The Treatment Of Credit Card Service Fees.

By filing suit in federal court, the Non-*Qui Tam* Intervening States waived sovereign immunity with respect to all defensive counterclaims "aris[ing] from the same event," transaction, or occurrence. *Massachusetts v. Wampanoag Tribe of Gay Head*, 98 F. Supp. 3d 55, 73 (D. Mass. 2015). Under this standard, Regeneron is entitled to litigate any counterclaim that is both defensive and "compulsory." *Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 947 (Fed. Cir. 1993) ("A counterclaim must be 'compulsory' in order to be raised as of right in an area of law in which the state is otherwise immune from suit." (citing Fed. R. Civ. P. 13(a)), *abrogated on other grounds by Wilton v. Seven Falls. Co.*, 515 U.S. 277, 289 (1995). Defendants may assert compulsory counterclaims when sued by a state in federal court because it is "unfair to allow a state to bring a claim in federal court while simultaneously invoking sovereign immunity to shield itself from counterclaims arising out of the same transaction or occurrence." *Bergemann v. R.I. Dep't of Envtl. Mgmt.*, 665 F.3d 336, 341-342 (1st Cir. 2011). Those precise fairness concerns are front-and-center here, where the Non-*Qui Tam* Intervening States are seeking millions of dollars from Regeneron for allegedly keeping EYLEA's ASP too high, while trying to *avoid significant recoupments and setoffs* based on the AMP consequences of that very same conduct.

#### A. By Filing Suit In Federal Court, The Non-*Qui Tam* Intervening States Waived Sovereign Immunity As To Defensive Compulsory Counterclaims.

A state's sovereign immunity is not absolute. *See Missouri v. Fiske*, 290 U.S. 18, 24 (1933) ("Immunity from suit under the Eleventh Amendment is a personal privilege which may be

waived."); *Canales v. Gatzunis*, 979 F. Supp. 2d 164, 173 (D. Mass. 2013) ("The Eleventh Amendment also bars suits in federal court against states and state officers . . . unless the state has waived its immunity.").   A state can waive sovereign immunity by "litigation conduct." *Bergemann*, 665 F.3d at 341-342.  The "waiver by litigation conduct doctrine is animated by [a] desire to avoid unfairness."  *Id.* at 341.  This means that "[w]here a state plaintiff voluntarily submits to federal-court jurisdiction—for example, by filing a federal complaint—the state has made itself a party to the litigation to the full extent required for a complete determination." *Wampanoag Tribe of Gay Head*, 98 F. Supp. 3d at 73 (quotation marks omitted).  This doctrine turns on "the judicial need to avoid inconsistency, anomaly, and unfairness, and not upon a State's actual preference or desire, which might, after all, favor selective use of 'immunity' to achieve litigation advantages." *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 620 (2002).

There are two requirements to find a waiver of sovereign immunity with respect to a defendant's counterclaim.  *First*, the counterclaim must be compulsory.  It thus must "arise[] from the same event underlying the state's cause of action."  *Wampanoag Tribe of Gay Head*, 98 F. Supp. 3d at 73 (citing *In re Dep't of Energy Stripper Well Exemption Litig.*, 956 F.2d 282, 285 (Temp. Emer. Ct. App. 1992)); *see also United States v. Mottolo*, 605 F. Supp. 898, 910 (D.N.H. 1985) (describing the standard as whether "any counterclaim asserted by a defendant" "arises out of the same event underlying the State's claim").   This standard has also been described as examining whether the "counterclaim arose out of the same transaction or occurrence." *Genentech*, 998 F.2d at 947; *see also In re Newport Sav. & Loan Ass'n*, 928 F.2d 472, 478 (1st Cir. 1991) (citing 14 Wright & Miller's Federal Practice and Procedure § 3654 (4th ed. 1985)); *FDIC v. Gladstone*, 44 F. Supp. 2d 81 (D. Mass. 1999).

*Second*, the counterclaim must be defensive. "The counterclaim is not cognizable if it is 'for the purpose of obtaining an affirmative judgment against the State.'" *Wampanoag Tribe of Gay Head*, 98 F. Supp. 3d at 73 (quoting *Woelffer v. Happy States of Am., Inc.*, 626 F. Supp. 499, 502) (N.D. Ill. 1985)). A counterclaim may be asserted "defensively by way of recoupment to defeat or diminish the state's recovery." *Id.* (quoting *In re Dep't of Energy Stripper Well Exemption Litig.*, 956 F.2d at 285). A "defensive counterclaim is clearly permissible" in a suit against a state, and the state's attempt to dismiss a defensive counterclaim on sovereign immunity grounds "must be denied." *Mottolo*, 605 F. Supp. at 911. Courts thus examine whether a counterclaim is "sufficiently equivalent to a recoupment or set-off to fall within the narrow exception to sovereign immunity recognized by the courts." *Wampanoag Tribe of Gay Head*, 98 F. Supp. 3d at 73 (quoting *Woelffer*, 626 F. Supp. at 503). Both requirements are met here.

**B.  Regeneron's Counterclaims Are Compulsory.**

Regeneron's counterclaims against the Non-*Qui Tam* Intervening States are compulsory because they arise out of the same event, transaction, or occurrence. This is not a close call: The Non-*Qui Tam* Intervening States are seeking a recovery against Regeneron based on the treatment of credit card fees when physicians purchase EYLEA, and Regeneron is seeking recoupment or setoff based on the very same treatment of credit card fees when physicians purchase EYLEA.

The Non-*Qui Tam* Intervening States appear to acknowledge that the same event, transaction, or occurrence standard applies, *see* Mot. 10-11, and that the relevant question is whether Regeneron's counterclaims are compulsory, *see id.* at 12 (citing Fed. R. Civ. P. 13(a)). But they fail to identify, much less address, the core test for determining whether a counterclaim is compulsory. Although courts have sometimes used different formulations to describe the standard, *see Iglesias v. Mutual Life Insurance Co. of New York*, 156 F.3d 237, 241 (1st Cir. 1998),

the First Circuit recently made clear that for purposes of determining whether a counterclaim is compulsory, Rule 13(a)'s "'transaction or occurrence' standard requires *only a 'logical relation'* between the claims." *Kress Stores of P.R., Inc. v. Wal-Mart P.R., Inc.*, 121 F.4th 228, 245 (1st Cir. 2024) (emphasis added). That "logical relation" test is met here, and then some. Under that test, a counterclaim has a logical relationship to the original claim where either "the same aggregate of operative facts serves as the basis of both claims" or "the aggregate core of facts upon which the original claim rests activates additional legal rights in a party defendant that would otherwise remain dormant." *Iglesias*, 156 F.3d at 242 (quotation marks omitted). This is a "flexible" standard, *Moore v. New York Cotton Exchange*, 270 U.S. 593, 610 (1926), that courts interpret "broadly" to require "only a 'logical relation' between the claims." *Kress*, 121 F.4th at 245 (citing *Moore*'s holding that "transaction is a word of flexible meaning" (alterations omitted)).

The "same aggregate of operative facts" test is unquestionably satisfied: The core of facts at the center of this case involves the treatment of credit card service fees with respect to *the same universe of credit card transactions*, and in particular whether those service fees are bona fide under CMS regulations (and if not, whether that impacts EYLEA's reported price). *See, e.g.*, United States Compl. in Intervention ¶ 12 (Dkt. No. 58); Compl. ¶ 4 (incorporating by reference the United States Compl. in Intervention).[1] If credit card service fees are *not* bona fide—and should have been deducted from ASP, reducing EYLEA's ASP as the Non-*Qui Tam* Intervening States contend—that conclusion determines *both* whether Regeneron correctly reported its ASP *and* whether Regeneron overpaid Medicaid rebates due to the corresponding AMP calculation.

---

[1] Regeneron continues to believe this is an issue of law that should be resolved in Regeneron's favor. However, the Court denied Regeneron's motion to dismiss, so the case is proceeding into factfinding with respect to the definition of BFSFs.

At least one court has found the logical relationship test to be satisfied in directly analogous circumstances. In *Ramadoss v. Caremark, Inc.*, No. 99-cv-914, 2010 WL 11507448 (W.D. Tex. June 8, 2010), the court found a "logical relationship between the States' claims for damages resulting from alleged reverse false claims" and the defendants' counterclaims seeking "recoupment of any overpayment . . . to the States arising from the calculation of reimbursements to the States' Medicaid programs." *Id.* at *6. In contrast, the Non-*Qui Tam* Intervening States do not cite a single case dismissing a counterclaim for recoupment or setoff under similar facts. For example, they cite *In re Department of Energy Stripper Well Exemption Litigation*, 956 F.2d at 285, but that case is not on point. There, the court simply held that a state's intervention in a case to obtain a state-level share of an escrow fund, where that entitlement *had previously been established by a settlement agreement*, did not allow for a counterclaim regarding other supposed wrongdoing by the state that had left shortfalls in the escrow account. Notably, the state at issue had "not intervene[d] to litigate the merits of the action" and so was found not to have waived sovereign immunity over merits issues. *Id.* at 285. The States' other cited case, *Burgess v. M/V Tamano*, 382 F. Supp. 351 (D. Me. 1974), is likewise distinguishable. In that case, the court found that counterclaims based on deficient state cleanup activities could not be asserted against states bringing claims for damages based on the oil spill itself, finding those actions unlinked. *Id.* at 355-356.[2] Unlike *In re Department of Energy Stripper Well Exemption Litigation* or *Burgess*, which both involved independent allegations of wrongdoing by the state (*i.e.*, whether the state had left shortfalls in the escrow account or engaged in deficient cleanup activities), the core inquiry here— whether credit card service fees are bona fide under CMS regulations and should have been

---

[2] *Burgess* pre-dates the First Circuit's more recent precedent on compulsory counterclaims, and did not recite or attempt to apply the "logical relationship" test.

deducted from ASP (and also therefore from AMP)—is the same for both the States' claims and Regeneron's counterclaims.

The Non-*Qui Tam* Intervening States nevertheless contend that Regeneron's counterclaims fail the compulsory counterclaim test because the Non-*Qui Tam* Intervening States' claims involve "claims [for reimbursement] submitted by physicians for Eylea reimbursement," whereas Regeneron's counterclaims involve rebates paid by Regeneron. *See* Mot. 10-11. According to the Non-*Qui Tam* Intervening States, the "invoicing and payment of rebates was an entirely separate transaction from the claims submitted by physicians," which "were made months before the rebate invoices were issued and paid." *Id.* This framing ignores entirely the "logical relationship" between these events. These payments were based on the same disputed conduct about the treatment of credit card fees, and the same administrations of EYLEA. It was the same decision-making process because the *definition of BFSFs—by design—is identical in relevant part under both regimes.* *Compare* 42 C.F.R. § 414.804(a)(2)(ii) (ASP), *with* 42 U.S.C. § 1396r-8(k)(1)(B)(II) (AMP).[3] The same "aggregate of operative facts" thus resulted in both sets of payments, regardless of whether, administratively, one set of payments preceded the other in time.

And, to the extent the Non-*Qui Tam* Intervening States suggest that a counterclaim cannot be compulsory if it results in the application of additional statutes and regulations beyond those

---

[3] There are multiple acknowledgments in the federal regulations of the relationship between AMP and ASP calculations. *See, e.g.*, 81 Fed. Reg. at 5,178 ("In light of comments regarding the need for the same application of the four-part test in the AMP, best price and ASP calculations, we have decided to revise our position taken in regards to the 2007 AMP final rule for the 'not passed on' prong of the bona fide service fee test to more fully align with the ASP policy."); *see also* Social Security Act § 1847A(d)(3) (allowing substitution of ASP with 103 percent of AMP or the widely-available market price if ASP exceeds AMP or the widely-available market price by five percent or more); 42 C.F.R. § 414.904(d)(3) (same); *cf.* 81 Fed. Reg. at 5,178 (citing the "need for the same application of the [BFSF] four-part test in the AMP, best price, and ASP calculations" as a basis for modifying the Medicaid program's approach to the last prong of the test, so that it conforms to the BFSF test employed by the Medicare program in relation to ASP).

cited by the plaintiff, that is not the law.  The fact that a defendant's compulsory counterclaims "expose[] the parties and the Court to examination of a complex and multi-faceted statutory scheme involving federal and state agency review" does not prevent a defendant from litigating those claims; "[s]uch is the stuff of federal law suits." *Ramadoss*, 2010 WL 11507448, at *9; *see Corker v. ezCater, Inc.*, 2025 WL 2076698, at *6 (D. Mass. July 23, 2025) (applying the Rule 13(a) "logical relation" test to hold that claims brought under Title VII of the Civil Rights Act, the Family and Medical Leave Act, the Paid Family and Medical Leave Act, and the Massachusetts Pay Equity Law had logical connections sufficient to constitute the same "transaction or occurrence").

While the court's compulsory counterclaim analysis could end there, Regeneron notes that the "activates additional legal rights" prong of the First Circuit's logical relationship test is also satisfied.  If the Non-*Qui Tam* Intervening States are correct that EYLEA's ASP was too high, such a finding would "activate additional legal rights" for Regeneron because that would mean EYLEA's AMP was also too high, and that Regeneron overpaid Medicaid rebates to the States. *See* Answer and Counterclaims ¶¶ 28–29, Dkt. No. 220.  The Non-*Qui Tam* Intervening States' claims—if successful—would *create the basis* for Regeneron's counterclaims.

Regeneron's counterclaims qualify as compulsory and should be treated as such, as it would be fundamentally unfair and inefficient to require Regeneron to pay damages to the Non-*Qui Tam* Intervening States without recoupment or a setoff when those very same States significantly benefit from the very conduct they complain of.

### C.  Regeneron's Counterclaims Are Defensive.

The Non-*Qui Tam* Intervening States do not dispute that Regeneron's counterclaims are defensive.  *See* Mot. 9-10 (describing defensive standard but making no argument on that issue).

They are.  Regeneron seeks only to reduce any damages awarded to the Non-*Qui Tam* Intervening

States, assuming they prevail on their claims—which Regeneron will vigorously dispute.  Because

its counterclaims are defensive and compulsory, Regeneron should be permitted to litigate them.

## II.    Regeneron's Counterclaims Are Ripe.

In addition to asserting sovereign immunity, the Non-*Qui Tam* Intervening States argue

that Regeneron's conditional counterclaims are non-justiciable because they are "unripe" unless

and until Regeneron submits revised AMP calculations to CMS, and CMS accepts them.  Mot. 13-

14.  That argument is meritless.  First of all, a claim (whether asserted by a plaintiff or a defendant)

is ripe if there is a "substantial controversy, between parties having adverse legal interests, of

sufficient immediacy and reality to warrant the issuance of the judicial relief sought."  *Project*

*Veritas Action Fund v. Conley*, 270 F. Supp. 3d 337, 340 (D. Mass. 2017) (quotation marks

omitted).  And a substantial and immediate controversy with respect to damages is present here.

Regeneron contends that if "the Court or jury find that (1) Regeneron should have deducted credit

card processing fees when calculating EYLEA's ASP" and "(2) the deduction of these credit card

processing fees would have reduced EYLEA's ASP," then Regeneron is entitled to a recoupment

or setoff, reducing any damages owed to the Non-*Qui Tam* Intervening States.  Second, the

regulatory provisions and case law that the Non-*Qui Tam* Intervening States cite do not remotely

support the proposition that Regeneron needs to go anywhere else before this Court can rule on its

counterclaims.  The claims are appropriately before this Court as contingent counterclaims, and

the Court may rule on them.

### A.    Counterclaims Are Not Unripe Just Because They Are Contingent.

Although the Non-*Qui Tam* Intervening States do not come out and say it, at times they

seem to think that contingent counterclaims are unripe as a matter of law.  That argument should

not detain the Court for long, as it is obviously wrong.  The fact that a right or obligation in controversy is contingent does not bar a litigant from seeking relief "when the circumstances revealed a need for a present adjudication."  *Metayer v. PFL Life Ins. Co.*, 30 F. Supp. 2d 57, 60 (D. Me. 1998).  Indeed, courts routinely consider contingent counterclaims without dismissing them as non-justiciable.  *See, e.g.*, *City of Seattle v. Monsanto Co.*, 387 F. Supp. 3d 1141, 1162 (W.D. Wash. 2019) (explaining that counterclaims can be pleaded on a conditional or a contingent basis); *W. Am. Life Ins. Co. v. Dye*, No. 21-cv-1747, 2022 WL 2288474, at *4 (C.D. Cal. Mar. 9, 2022) ("Conditional counterclaims have been regularly recognized by federal courts.").[4]

Here, Regeneron has a present need for adjudication of its contingent counterclaims in connection with any ruling by the Court that its ASP was too high.  Otherwise, the Non-*Qui Tam* Intervening States would obtain a windfall based on Regeneron's overpayment of rebates to them on the correspondingly miscalculated AMP.  They also would obtain a slanted adjudication that does not require confronting the reality Regeneron (and other manufacturers) face—namely, that in calculating ASP and AMP, a decision to exclude a certain fee as a BFSF will cost the government money under one rubric but save the government money under the other.  Regeneron

---

[4] *See also, e.g.*, *United States v. Von Neumann*, 474 U.S. 242, 247 (1986) (acknowledging contingent counterclaim filed by the government); *Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348, 353-354 (1961) (conditional counterclaim met jurisdictional requirements); *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 906 (Fed. Cir. 2014) (presiding over conditional counterclaims); *Matter of Peachtree Lane Assocs., Ltd.*, 150 F.3d 788, 799 (7th Cir. 1998) (same); *Hardware Mut. Cas. Co. v. McIntyre*, 304 F.2d 566, 569 (5th Cir. 1962) (same); *Jones v. Ford Motor Credit Co.*, 358 F.3d 205 (2d Cir. 2004) (vacating district court dismissal of conditional counterclaims); *Monsanto Co.*, 387 F. Supp. 3d at 1162 (quoting *Evans*, 344 F.3d at 1033, n.6, and explaining that counterclaims can be pleaded on a conditional or a contingent basis); *Aunyx Corp. & Aunyx Bus. Machs. Co. v. Canon, U.S.A. Inc.*, No. 86-cv-2083, 1989 WL 73296, at *3 (D. Mass. June 6, 1989) (denying summary judgment on defendant's counterclaims); *cf. In re Citigroup Inc. Cap. Accumulation Plan Litig.*, 2008 WL 3982065, at *20 n.32 (D. Mass. Aug. 8, 2008) (holding as moot counterclaim contingent on judgment in plaintiffs' favor).

is entitled to reduce the damages (if any) awarded to the Non-*Qui Tam* Intervening States through its requested declaratory relief.  That issue is plainly justiciable.

### B.  There Is No Regulatory Impediment To The Ripeness of Regeneron's Claims.

The core of the Non-*Qui Tam* Intervening States' ripeness argument is that Regeneron's contingent counterclaims cannot be ripe unless it first goes to CMS with revised AMP calculations, where they must be accepted.  Mot. 14.  But none of its cited authority supports this proposition.

First, the Non-*Qui Tam* Intervening States cite 42 C.F.R. § 447.510(b).  That section outlines AMP reporting requirements to CMS and does not create a mandatory process for adjudication of a manufacturer's position—much less one that must be completed before proceeding with a counterclaim.  The Non-*Qui Tam* Intervening States omit from their discussion § 447.510(b)(1)(v), which specifically contemplates the prospect of court resolution of AMP questions.  That subsection provides that a manufacturer may report changes exceeding a 12-month period where, among other exceptions, the change is required by CMS "*or court order*."  42 C.F.R. § 447.510(b)(1)(v) (emphasis added).  Accordingly, nothing about § 447.510(b) remotely suggests that a manufacturer cannot have a ripe counterclaim on AMP issues until it has reported revisions to CMS.

In connection with their argument on this point, the Non-*Qui Tam* Intervening States also cite, with no explanation, *Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F. 3d 953 (D.C. Cir. 2019), as supposedly supporting the proposition that Regeneron would have to report changes to AMP "before it could file a suit based on a previously miscalculated AMP."  Mot. at 14.  That is not what *Ipsen* says, and the case is inapposite in all events.  *Ipsen* did not entail examination of a regulation that expressly provided for the prospect of a "court order," did not involve the assertion

of a counterclaim, and simply found that CMS correspondence could serve as a "final agency action" under the APA—which is not at issue here.

The Non-*Qui Tam* Intervening States' further argument (based on 42 C.F.R. § 447.511(a)) that they "have no ability to unilaterally adjust URAS or reissue rebate invoices until Regeneron successfully revises its AMP submissions and calculates a corresponding new URA" simply misses the point. Mot. 14. Regeneron is not asking the Non-*Qui Tam* Intervening States to reissue rebate invoices. Regeneron is asking *this Court* to reduce any damages ultimately awarded to the Non-*Qui Tam* Intervening States based on a too-high ASP and to issue accompanying declaratory relief if those States succeed on their claims, consistent with basic notions of fairness. *See*, *e.g.*, Answer and Counterclaims ¶¶ 29, 32, 35, 39, 45, 49, 53, 59, 63, 67, 73, 77, 81, 87, 91, 95, 100.

When a litigant brings suit "in the Federal District Court for the District of Massachusetts, it submit[s] itself to the jurisdiction of the court with respect to all the issues embraced in the suit, including those pertaining to the counterclaim of the defendant." *Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 451 (1932). The Non-*Qui Tam* Intervening States are suing Regeneron for millions of dollars. Regeneron is entitled to defend against those claims, including by pointing out the necessary result of the Non-*Qui Tam* Intervening States' position: that, in the event they were to prevail, those States would owe Regeneron money for overpaying Medicaid rebates for years. The States cannot have it one way but not the other. Regeneron's counterclaims are properly before the Court and it should be entitled to litigate them.

## CONCLUSION

For the foregoing reasons, Regeneron respectfully requests that the Court deny the Non-*Qui Tam* Intervening States' Consolidated Motion to Dismiss Counterclaims and afford such other and further relief as the Court deems just and proper.

Date: September 24, 2025                    Respectfully submitted,

                                           REGENERON PHARMACEUTICALS, INC.,
                                           By its attorneys,
                                           */s/ Gregory F. Noonan*
                                           Gregory F. Noonan (BBO No. 651035)
                                           Katherine B. Wellington (BBO No. 688577)
                                           HOGAN LOVELLS US LLP
                                           125 High Street, Suite 2010
                                           Boston, MA 02110
                                           (617) 371-1000
                                           gregory.noonan@hoganlovells.com
                                           katherine.wellington@hoganlovells.com

                                           Gejaa T. Gobena (admitted *pro hac vice*)
                                           Mitchell J. Lazris (admitted *pro hac vice*)
                                           Emily M. Lyons (admitted *pro hac vice*)
                                           HOGAN LOVELLS US LLP
                                           555 Thirteenth St. NW
                                           Washington, D.C. 20004
                                           (202) 637-5600
                                           gejaa.gobena@hoganlovells.com
                                           mitch.lazris@hoganlovells.com
                                           emily.lyons@hoganlovells.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 24, 2025 a copy of the foregoing document, filed through the Electronic Case Management system, will be sent electronically to registered participants identified in the Notice of Electronic Filing.

/s/ *Gregory F. Noonan*
Gregory F. Noonan