UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
UNITED STATES OF AMERICA, et al., )
ex rel. JULIANNE NUNNELLY and    )
MATTHEW SHANKS,                  )
                                 )
              Plaintiffs,        )
                                 )        Civil Action
v.                               )        No. 20-cv-11401-PBS
                                 )
REGENERON PHARMACEUTICALS, INC., )
                                 )
              Defendant.         )
_____)
```

**MEMORANDUM AND ORDER**

March 2, 2026

Saris, J.

**INTRODUCTION**

This litigation raises complex issues regarding sovereign immunity. It stems from three separate complaints under the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq., and state analogs of the FCA: one filed by the United States; one filed by Colorado, Georgia, Michigan, North Carolina, Texas, and Washington (the "Qui Tam States"); and one filed by Maine, Nebraska, Ohio, Oregon, and Wyoming (the "Non-Qui Tam States").[1] Plaintiffs seek to recover a

---

[1] The action was initially brought by Defendant's former employees on behalf of the United States and the Qui Tam States, among other states and localities. The United States and the Qui Tam States subsequently intervened. The employees did not sue on behalf of the Non-Qui Tam States, which intervened separately under Federal Rule of Civil Procedure 24.

portion of the reimbursements they made to physicians for sales of Eylea, a prescription drug manufactured by Defendant Regeneron Pharmaceuticals, Inc. ("Regeneron"). The United States seeks recovery of alleged overpayments from Medicare Part B, while the Qui Tam States and Non-Qui Tam States (together, the "State Plaintiffs") seek recovery of alleged overpayments from their Medicaid programs.

The present dispute centers on Regeneron's attempt to assert contingent counterclaims for recoupment, offset, and unjust enrichment related to its own alleged overpayments of rebates to state Medicaid programs. Regeneron has raised these counterclaims in its answer to the Non-Qui Tam States' complaint and has moved to amend its answer to the Qui Tam States' complaint to do the same. Regeneron has also moved to amend its answer to the United States' complaint to add similar counterclaims based on the assertion that the federal government paid a lower portion of Medicaid costs to states due to Regeneron's alleged actions. Now before the Court are Regeneron's motion to amend its answers to the United States' and the Qui Tam States' complaints and the Non-Qui Tam States' motion to dismiss Regeneron's counterclaims.

The United States and the State Plaintiffs have invoked sovereign immunity with respect to the counterclaims asserted by Regeneron. Regeneron argues that Plaintiffs impliedly waived their immunity by bringing their complaints in federal court. After

hearing, the Court concludes that the State Plaintiffs have waived their sovereign immunity but the United States has not. The Court therefore **DENIES** the Non-Qui Tam States' motion to dismiss (Dkt. 230) and **ALLOWS** Regeneron's motion for leave to amend (Dkt. 227) with respect to the Qui Tam States but not the United States.

## BACKGROUND

For purposes of the instant motions, the Court "accepts as true all well-pleaded facts in the counterclaim[s]" asserted (and proposed to be asserted) by Regeneron. Dubliner, Inc. v. E. Coast Tavern Grp., Inc., 706 F. Supp. 3d 181, 189 (D. Mass. 2023). The Court assumes familiarity with its opinion denying Regeneron's motion to dismiss. See United States ex rel. Nunnelly v. Regeneron Pharms., Inc., 780 F. Supp. 3d 336 (D. Mass. 2025).

### I.  Average Sales Price

The central issue in this litigation is whether Regeneron was required to treat credit card processing fees related to Eylea sales as price concessions under relevant regulations. See 42 C.F.R. § 414.804(a)(2) (defining price concessions). Regeneron did not treat credit card processing fees as price concessions, instead classifying them as bona fide service fees ("BFSFs"). See id. § 414.802 (defining BFSFs); id. § 414.804(a)(2)(ii) ("[B]ona fide service fees are not considered price concessions.").

Because it treated credit card processing fees as BFSFs rather than price concessions, Regeneron did not deduct the amount of

those fees from the average sales price ("ASP") of Eylea. <u>See</u> <u>id.</u> § 414.804(a)(2)(i)-(ii) (requiring manufacturer to deduct price concessions, but not BFSFs, when calculating the ASP). Regeneron then reported the ASP to the Centers for Medicare & Medicaid Services ("CMS"). Medicare Part B reimburses physicians for Eylea based in part on the ASP, with a higher ASP resulting in a larger reimbursement. Therefore, Regeneron's decision to treat credit card processing fees as BFSFs rather than price concessions resulted in higher payments from the United States (through Medicare Part B) to physicians. Similarly, because the reimbursements paid by state Medicaid programs to physicians are generally based on the Medicare Part B reimbursement rate, the State Plaintiffs also paid an increased amount due to Regeneron's classification of the fees as BFSFs.

Plaintiffs argue that Regeneron should have treated the credit card processing fees as price concessions. They claim that Regeneron's failure to do so violated the FCA and state analogs and resulted in higher federal expenditures from Medicare Part B and state expenditures from Medicaid programs.

## II.  <u>Average Manufacturer Price</u>

Another figure reported by Regeneron to CMS is the average manufacturer price ("AMP") of Eylea. The AMP is used to calculate the amount of rebates owed by Regeneron to state Medicaid programs under the Medicaid Drug Rebate Program. A higher AMP typically, if

not always, results in a higher rebate amount. See 42 U.S.C. § 1396r-8(c)(1); 42 C.F.R. § 447.509(a).

Regeneron alleges that, as with the ASP, the AMP is not reduced by any amount which Regeneron classifies as a BFSF. See 42 U.S.C. § 1396r-8(k)(1)(B)(II); 42 C.F.R. § 447.504(c)(14), (e)(5). But, according to Regeneron, the consequences of not deducting a fee from the AMP are the opposite of not deducting that fee from the ASP. While a higher ASP results in a higher amount paid by the government (via both Medicare Part B and Medicaid), Regeneron contends that a higher AMP results in a higher amount paid by the manufacturer (via Medicaid rebates). Therefore, because it treated credit card processing fees as BFSFs, Regeneron allegedly paid higher rebates to state Medicaid programs than it would have if it had classified the fees as price concessions.

The state and federal governments share the cost of Medicaid: the United States pays, among other things, a percentage of a state's net expenditure called the Federal Medical Assistance Percentage ("FMAP"). See 42 U.S.C. §§ 1396b(a)(1), 1396d(b). Therefore, when a higher AMP increases rebates paid to states and thereby decreases states' net Medicaid expenditures, the federal government ends up paying a lower amount to the states.

In its counterclaims, Regeneron alleges that its treatment of credit card processing fees as BFSFs resulted in increased rebates to the State Plaintiffs and decreased outlays by the United States.

Thus, Regeneron contends, Plaintiffs' potential recovery against it should be reduced by those benefits.

**LEGAL STANDARD**

"District courts apply the same legal standard to motions to dismiss counterclaims pursuant to Fed. R. Civ. P. 12(b)(6) as they do when reviewing motions to dismiss a complaint." Sensitech Inc. v. LimeStone FZE, 548 F. Supp. 3d 244, 257 (D. Mass. 2021). Under that standard, a counterclaim must allege "a plausible entitlement to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007). A counterclaim "is facially plausible if, after accepting as true all non-conclusory factual allegations, the court can draw the reasonable inference that the counter-defendant is liable for the misconduct alleged." Sensitech, 548 F. Supp. 3d at 257.

A party seeking to amend a pleading at this stage of the litigation requires either "the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." Id. In the absence of a specific reason to deny a motion to amend, "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment," the court's leave "should, as the rules require, be 'freely given.'" Amyndas Pharms.,

S.A. v. Zealand Pharma A/S, 48 F.4th 18, 36 (1st Cir. 2022)
(quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).

## DISCUSSION

### I.   Ripeness

The State Plaintiffs first contend that Regeneron's
counterclaims are not ripe. The State Plaintiffs do not argue that
the counterclaims are not ripe merely because they are contingent
on the Court's adjudication of the State Plaintiffs' claims. See,
e.g., Argonaut Ins. Co. v. St. Francis Med. Ctr., 17 F.4th 1276,
1282 (9th Cir. 2021) ("[C]onditional pleadings are a recognized
part of federal practice . . . ."). Rather, the State Plaintiffs
contend that the counterclaims are not ripe because Regeneron can,
at any time, submit revised AMP calculations to CMS and request a
refund on overpaid rebates. The State Plaintiffs point out that a
manufacturer is required to report a revised AMP if it believes
that its original calculations were incorrect, see 42 C.F.R.
§ 447.510(b), and argue that state Medicaid programs have no power
to unilaterally refund rebates until the manufacturer submits that
report.

This argument is a square peg in a round hole. Regeneron does
not allege that it submitted a revised AMP and that the State
Plaintiffs failed to reimburse it. Rather, Regeneron argues that
it cannot submit a revised AMP because it does not believe that
its original calculation was incorrect, precisely for the reason

at issue in this litigation, i.e., that Regeneron continues to believe that a credit card processing fee is a BFSF. Moreover, to the extent the State Plaintiffs' argument amounts to one requesting administrative exhaustion, Regeneron points out that the pertinent regulations contain no such requirement: On the contrary, they expressly contemplate that a manufacturer can report a revised AMP "to address specific rebate adjustments . . . as required by . . . [a] court order." Id. § 447.510(b)(1)(v). The Court therefore concludes that the counterclaims are routine contingent counterclaims that are ripe to be asserted by Regeneron, even though, as with all contingent counterclaims, they cannot be adjudicated until the event that they are "condition[ed] on" occurs. Argonaut Ins. Co., 17 F.4th at 1281 n.1.

## II.  Sovereign Immunity

The parties agree that the United States and the State Plaintiffs enjoy sovereign immunity in federal court. At issue is whether Plaintiffs have impliedly waived that immunity through their "invocation of the jurisdiction" of this Court. Arecibo Cmty. Health Care, Inc. v. Puerto Rico, 270 F.3d 17, 27 (1st Cir. 2001). The Court concludes, as explained below, that the relevant legal standard differs with respect to the federal government and the states, and that the United States has not waived its sovereign immunity but the State Plaintiffs have.

### A.    Sovereign Immunity of the United States

Under Federal Rule of Civil Procedure 13, a party typically is required to assert any compulsory counterclaim, _i.e._, a claim that "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." Fed. R. Civ. P. 13(a)(1)(A). But Rule 13(d) expressly provides that this requirement "do[es] not expand the right to assert a counterclaim -- or to claim a credit -- against the United States." Fed. R. Civ. P. 13(d). As a result, even counterclaims that ordinarily are considered compulsory may not be asserted against the federal government if they are barred by sovereign immunity. See 6 Wright & Miller's Federal Practice & Procedure § 1427 (3d ed. 2025) ("Rule 13(d) reaffirms the general principle of sovereign immunity by specifically stating that Rule 13 does not expand the right of a party to sue the United States . . . .").

Nevertheless, "[d]espite the sovereign-immunity doctrine and the language of Rule 13(d), when the United States institutes an action, [a] defendant may assert by way of recoupment any claim arising out of the same transaction or occurrence as the original claim in order to reduce or defeat the government's recovery." Id. (emphasis added); see also 3 Moore's Federal Practice § 13.50[2][c] (3d ed. 2026) ("[W]hen the United States brings a suit, it . . . waive[s] its sovereign immunity as to any recoupment claims of the defendant."). A recoupment counterclaim is one which "allows a

defendant to . . . assert[] -- up to the amount of the claim --
the defendant's own claim against the plaintiff growing out of the
same transaction." In re Sheedy, 801 F.3d 12, 21 (1st Cir. 2015)
(quoting Bolduc v. Beal Bank, SSB, 167 F.3d 667, 672 (1st Cir.
1999)); see also 3 Moore's Federal Practice § 13.50[2][c] (noting
that a recoupment counterclaim must "arise from the same
transaction or occurrence as the government's claim, seek relief
of the same kind or nature[,] and seek an amount not in excess of
the opposing claim").

The question for the Court thus is whether Regeneron's
proposed counterclaims against the United States are recoupment
claims. They are not. Although Regeneron styles some of them as
such, the proposed counterclaims in fact arise out of a separate
transaction than the claims asserted by the United States. The
United States seeks partial reimbursement of amounts that it paid
through Medicare Part B to physicians. Regeneron's proposed
counterclaims, on the other hand, seek to reduce the United States'
potential recovery by the amount that the federal government
allegedly underpaid to states due to the application of the FMAP
to decreased net expenditures by the states' Medicaid programs.
These transactions plainly are distinct.

Indeed, Regeneron's proposed counterclaims likely are not
even setoff claims vis-à-vis the United States. "A setoff is C's
deduction from C's debt to B of an amount based on B's unrelated

debt to C." In re Slater Health Ctr., Inc., 398 F.3d 98, 103 (1st Cir. 2005); see also Texas v. Caremark, Inc., 584 F.3d 655, 659–60 (5th Cir. 2009) ("Recoupment is a demand asserted to diminish or extinguish the plaintiff's demand that arises out of the same transaction forming the basis of the plaintiff's claim; setoff, on the other hand, arises out of a transaction extrinsic to the plaintiff's claim." (quoting In re Gober, 100 F.3d 1195, 1207 (5th Cir. 1996))). Regeneron's proposed counterclaims seek to reduce the United States' recovery by the amount of its underpayments to states, not to Regeneron. As the United States points out, allowing Regeneron to benefit from that alleged debt of the federal government to the states could potentially result in an unwarranted windfall.

In any event, neither setoff counterclaims nor unjust enrichment counterclaims are permissible where the United States has impliedly waived its immunity only to recoupment claims. See 3 Moore's Federal Practice § 13.31 ("Claims for setoff are . . . permissive counterclaims."); Caremark, 584 F.3d at 659 ("Sovereign immunity is not waived as to permissive counter-claims . . . ."). The Court thus will deny Regeneron's motion to amend with respect to the United States because amendment would be futile. See infra Section III.

**B.    Sovereign Immunity of the State Plaintiffs**

A state may waive its Eleventh Amendment immunity when it "'voluntarily invoke[s]' the jurisdiction of the federal courts." Bergemann v. R.I. Dep't of Env't Mgmt., 665 F.3d 336, 340 (1st Cir. 2011) (quoting Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 675 (1999)). The scope of that waiver is broader than a waiver by the United States, in part because "Rule 13(d)'s provision regarding sovereign immunity and counterclaims against the United States is not applicable to counterclaims brought against states." 3 Moore's Federal Practice § 13.50[4].

The "trend among the courts," accordingly, "is to interpret th[e] waiver of immunity" by states to "include[] not only claims in recoupment but also all compulsory counterclaims." Id.; see, e.g., Bd. of Regents of the Univ. Of Wis. Sys. v. Phoenix Int'l Software, Inc., 653 F.3d 448, 469–70 (7th Cir. 2011) (agreeing with the "trend among the circuits" that "when a state waives its sovereign immunity by litigation conduct, that waiver opens the door to counterclaims regarded as compulsory within the meaning of [Rule] 13(a)"); Regents of the Univ. of N.M. v. Knight, 321 F.3d 1111, 1124, 1126 (Fed. Cir. 2003) (rejecting argument that a state "waive[s] its immunity only with respect to counterclaims in recoupment" and instead holding that immunity is waived with respect to "all compulsory counterclaims"). In keeping with this

12

trend, the First Circuit has "held that it would be unfair to allow a state to bring a claim in federal court while simultaneously invoking sovereign immunity to shield itself from counterclaims arising out of the same transaction or occurrence." Bergemann, 665 F.3d at 341-42 (emphasis added); see Arecibo Cmty. Health Care, 270 F.3d at 28 ("Where a state avails itself of the federal courts . . ., we think it reasonable to consider that action to waive the state's immunity with respect to that claim in toto and, therefore, to construe that waiver to encompass compulsory counterclaims . . . .").

The question for the Court thus is not whether Regeneron's counterclaims against the State Plaintiffs are recoupment claims, but rather whether they are compulsory counterclaims under Rule 13(a). That is a less stringent standard. See 3 Moore's Federal Practice § 13.11 ("[R]ecoupment has been given a more limited construction than the modern compulsory counterclaim . . . . [W]hile recoupment claims may be by definition compulsory counterclaims, the converse is not true." (citation omitted)); 6 Wright & Miller's Federal Practice & Procedure § 1410 (noting that "[c]ourts generally have agreed that" the compulsory counterclaim standard under Rule 13(a) "should be interpreted liberally").

A compulsory counterclaim is one which "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." Fed. R. Civ. P. 13(a). The First Circuit

13

"interpret[s] th[is] provision broadly." Kress Stores of P.R., Inc. v. Wal-Mart P.R., Inc., 121 F.4th 228, 245 (1st Cir. 2024) (per curiam). "[T]he 'transaction or occurrence' standard requires only a 'logical relation' between the claims . . . ." Id. (quoting Iglesias v. Mut. Life Ins. Co. of N.Y., 156 F.3d 237, 241 (1st Cir. 1998)). A "'logical relation' between claims exists when 'the same aggregate of operative facts serves as the basis of both claims'" or where "the aggregate core of facts upon which the original claim rests activates additional legal rights in a party defendant that would otherwise remain dormant." Id. at 245 & n.9 (quoting Iglesias, 156 F.3d at 241-42). This liberal standard "allows the court to apply Rule 13(a) to any counterclaim that from an economy or efficiency perspective could be profitably tried with the main claim." 6 Wright & Miller's Federal Practice & Procedure § 1410.

The Court concludes that Regeneron's counterclaims against the State Plaintiffs fall within this broad umbrella and that "the interests of both economy and fairness will be served by requiring the counterclaim[s] to be brought in the same suit" as the State Plaintiffs' claims. 3 Moore's Federal Practice § 13.10[3]. The counterclaims directly stem from the same legal issue as the State Plaintiffs' claims. See id. § 13.10[1][b] (noting that courts look to the "similarity of factual and legal issues" in assessing whether claims "share an 'aggregate of operative facts'"). That

issue is whether a credit card processing fee must be classified as a price concession or a BFSF. And if the State Plaintiffs are correct that it must be treated as a price concession, then that result would potentially "activate[] additional legal rights" for Regeneron, which alleges that it could then seek partial reimbursement of the rebates it paid to the State Plaintiffs' Medicaid programs. Kress Stores, 121 F.4th at 245 n.9 (quoting Iglesias, 156 F.3d at 242).

The Court further notes that unlike the United States, which seeks recovery only of overpayments made by Medicare Part B, the State Plaintiffs seek recovery for their Medicaid programs. A factual overlap thus exists between the State Plaintiffs' claims and Regeneron's counterclaims, which collectively will determine the correct balance of funds owed between Regeneron and the State Plaintiffs' Medicaid programs. See United States ex rel. Ramadoss v. Caremark, Inc., No. 99-cv-914, 2010 WL 11507448, at *6 (W.D. Tex. June 8, 2010) (finding a "logical relationship" between states' requested damages for false claims and defendant's request for recovery of "any overpayment by [the defendant] to the States arising from the calculation of reimbursements to the States' Medicaid programs").

Considerations of "fairness" also favor Regeneron. 3 Moore's Federal Practice § 13.10[3]. As Regeneron points out, barring its counterclaims would result in a situation where it could face

unmitigated liability no matter how it decided to categorize its credit card processing fees. Where, as here, Regeneron treats credit card processing fees as BFSFs, it can be subject to a false claims action based on states' alleged overpayments to physicians. On the other hand, if Regeneron had treated the fees as price concessions, it could face suit from states alleging that Regeneron's Medicaid rebates were too low. See United States ex rel. Streck v. Bristol-Myers Squibb Co., No. 13-cv-07547, 2018 WL 6300578, at *3 (E.D. Pa. Nov. 29, 2018) (describing similar lawsuit). The most equitable way to resolve this catch-22 is to allow Regeneron to assert its contingent counterclaims to attempt to square the ledger.

The State Plaintiffs object that allowing Regeneron to assert its counterclaims will result in additional discovery obligations because the ASP and the AMP are calculated differently. Even if that is true, the Court notes that the First Circuit "does not use a 'same evidence' test for purposes of Rule 13(a)" but rather uses the "logical relation" test. Phoenix Int'l Software, 653 F.3d at 470; see 6 Wright & Miller's Federal Practice & Procedure § 1410 ("[A] counterclaim arising from the same events as those underlying plaintiff's claim is compulsory, even though the evidence needed to prove the opposing claims may be substantially different."). Under the "logical relation" test, the claims and counterclaims "focus on a single factual dispute": the treatment by Regeneron of

16

credit card processing fees as BFSFs rather than price concessions. Phoenix Int'l Software, 653 F.3d at 471.

Finally, the Qui Tam States argue that Regeneron cannot assert any counterclaims seeking to offset the Texas Health Care Program Fraud Prevention Act ("THFPA") claim. The Qui Tam States assert that the Texas Supreme Court has held that "remedies available under the THFPA are punitive" and that "penalties under the THFPA 'cannot be offset against the state.'" Dkt. 236 at 15 (quoting Nazari v. State, 561 S.W.3d 495, 509 (Tex. 2018)). But Nazari applied state-law principles in determining that Texas had not waived its immunity to the defendants' counterclaims "in its own courts." Nazari, 561 S.W.3d at 501. Where, as here, Texas has submitted to the jurisdiction of a "federal court," the "question of whether the state has waived sovereign immunity . . . is one of federal law." Parente v. Lefebvre, 122 F.4th 457, 462 (1st Cir. 2024); cf. Lapides v. Bd. of Regents of the Univ. Sys. of Ga., 535 U.S. 613, 619 (2002) ("[A] State's voluntary appearance in federal court amount[s] to a waiver of its Eleventh Amendment immunity." (emphasis added)). As already discussed, federal precedent allows Regeneron to assert its counterclaims.

The Court thus concludes that the State Plaintiffs have impliedly waived their sovereign immunity to Regeneron's

counterclaims.[2] For that reason, the Court will deny the Non-Qui Tam States' motion to dismiss Regeneron's counterclaims. The Court will also allow Regeneron's motion to amend with respect to Qui Tam States, as further explained below.

### III. __Motion to Amend__

Regeneron has moved to amend its answers to the United States' and Qui Tam States' complaints to assert the proposed counterclaims. At the outset, the United States and Regeneron debate whether this motion should be analyzed under Federal Rule of Civil Procedure 15 or 16. The United States argues that Rule 16 applies because a scheduling order exists in this case and because the scheduling order's deadline to amend pleadings has passed. Regeneron contends that Rule 15 applies because the scheduling order did not, in fact, contain any such deadline.

The Court agrees with Regeneron that Rule 15 applies. The scheduling order in this case does not contain a deadline to amend pleadings. See Dkt. 205 at 2 (proposed schedule); Dkt. 216 at 1 (adopting proposed schedule). The United States asserts that the Court orally foreclosed the possibility of amended pleadings in a scheduling conference. But during that conference, the Court

---

[2] The Court agrees with the State Plaintiffs, however, that Regeneron's claims related to the AMP are more properly stated as counterclaims rather than affirmative defenses. The Court will "treat the pleading as though" the issue was "correctly designated" as a counterclaim. Fed. R. Civ. P. 8(c)(2).

merely asked the United States if it intended on amending its pleadings, and when the United States responded that it did not, the Court declined to create a deadline for the United States to do so. The Court never stated that the deadline for Regeneron to move to amend its answers had passed or that the Court would refuse to entertain any such motion.[3]

Because no deadline was set for Regeneron to amend its answers, the Court analyzes Regeneron's motion to amend under Rule 15, which requires the Court to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). This standard is a "liberal" one. Amyndas, 48 F.4th at 36. Leave to amend should be given unless there is a specific ground for denial, such as futility, undue delay, or undue prejudice to the opposing party. See id.

The United States and the Qui Tam States contend that amendment would be futile due to sovereign immunity. As already explained, the United States would be immune to Regeneron's proposed counterclaims, see supra Section II.A, but the Qui Tam States would not, see supra Section II.B. The Court thus will deny Regeneron's motion to amend with respect to the United States as

---

[3] Indeed, the Court initially stated that it was contemplating setting an amendment deadline in "July or August[] 2025," Dkt. 197 at 4, and Regeneron filed its motion to amend in August.

futile but cannot deny the motion with respect to the Qui Tam States on that ground.

Further, Regeneron did not demonstrate "undue delay" in moving to amend. Amyndas, 48 F.4th at 37. Regeneron moved to amend approximately two and a half months after filing its initial answers. That delay falls "well short of the timeframes that [First Circuit] cases have identified as undue and cannot, under all the circumstances, be characterized as substantial." Id. at 38; see id. at 39 (contrasting delays of one to two months with cases involving delays of a year or more). Further, even though Regeneron discussed the AMP and Medicaid rebates in its motion to dismiss briefing and thus was already aware of those issues, the fact that the allegations underlying the proposed counterclaims "[a]re not 'new' . . . taken in a vacuum, cannot serve as a basis for denying [Regeneron's] motion to amend" based on undue delay. Id. at 39.

Finally, the Court cannot conclude that "undue prejudice" will result from allowing Regeneron to assert its contingent counterclaims against the Qui Tam States. Id. at 36 (quoting Foman, 371 U.S. at 182). Discovery is scheduled to continue until 2027 and will already include AMP-related discovery with respect to the Non-Qui Tam States, against whom Regeneron's counterclaims were undisputedly timely. Undergoing AMP-related discovery with respect to the Qui Tam States will not present an undue burden to the parties.

The Court thus will allow Regeneron's motion to amend with respect to the Qui Tam States.

**ORDER**

For the foregoing reasons, Regeneron's motion for leave to amend (Dkt. 227) is **ALLOWED** with respect to its answer to the Qui Tam States' complaint but **DENIED** with respect to its answer to the United States' complaint; the Non-Qui Tam States' motion to dismiss (Dkt. 230) is **DENIED**; and the discovery stay previously imposed by the Court (see Dkt. 273) is **LIFTED**.


SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge