**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br>*ex rel.* JULIANNE NUNNELLY and<br>MATTHEW SHANKS,<br><br>*Plaintiffs,*<br><br>v.<br><br>REGENERON PHARMACEUTICALS, INC.,<br><br>*Defendant.* | Civil Action No. 20-cv-11401-PBS |

# NON-PARTY EYEPOINT, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO QUASH

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 2

LEGAL STANDARD.................................................................................................. 5

ARGUMENT .............................................................................................................. 6

I. RULE 45 REQUIRES QUASHING THE SUBPOENA BECAUSE COMPLIANCE WOULD SUBJECT NON-PARTY EYEPOINT TO AN UNDUE BURDEN. ............................................................................ 6

A. Nearly All of the Requests (Nos. 1–11 and 13–15) Seek Documents That Are Wholly Irrelevant to Any Party's Claim or Defense. ............................ 7

B. Even Assuming EyePoint's Practices Have Some Relevance to This Case, the Subpoena is Grossly Overbroad and Unduly Burdensome.................... 10

C. Requests No. 1, 2, 4, 10, and 12 Request Documents That EyePoint Is Ill-Suited to Provide.............................................................................. 12

II. TO THE EXTENT THAT EYEPOINT MUST COMPLY WITH THIS SUBPOENA, REGENERON SHOULD BE ORDERED TO COVER THE COSTS. ........................................................................................ 14

CONCLUSION.......................................................................................................... 16

## TABLE OF AUTHORITIES

**CASES** **Page(s)**

*Barclays PLC v. FX Transparency, LLC*,
No. 1:22-MC-91048, 2022 WL 3227534 (D. Mass. Apr. 27, 2022) ............................... 15

*Behrend v. Comcast Corp.*,
248 F.R.D. 84 (D. Mass. 2008)........................................................................... 6, 15

*Cascade Yarns, Inc. v. Knitting Fever, Inc.*,
755 F.3d 55 (1st Cir. 2014)........................................................................... 5, 7

*Cheek v. United States*,
498 U.S. 192 (1991)........................................................................... 8

*Cusumano v. Microsoft Corp.*,
162 F.3d 708 (1st Cir. 1998)........................................................................... 5, 5, 7, 9

*Demers v. LaMontagne*,
No. CIV. A. 98-10762, 1999 WL 1627978 (D. Mass. May 5, 1999)................................ 6

*Doe v. Sanderson*,
No. 16-CV-12068, 2021 WL 828379 (D. Mass. Mar. 4, 2021)....................................... 14

*Heidelberg Americas, Inc. v. Tokyo Kikai Seisakusho, Ltd.*,
333 F.3d 38 (1st Cir. 2003)........................................................................... 10, 12

*In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*,
No. 08-1967, 2010 WL 5157355 (W.D. Mo. Dec. 20, 2010)............................................ 9

*In re Blue Cross Blue Shield Antitrust Litig.*,
No. 2:13-cv-20000, 2018 WL 11425554 (N.D. Ala. Oct. 24, 2018)............................... 15

*In re Pub. Offering PLE Antitrust Litig.*,
427 F.3d 53 (1st Cir. 2005)........................................................................... 6, 7

*Massachusetts Nurses Ass'n v. Radius Specialty Hosp., LLC,*
No. CV 14-13686, 2016 WL 6090713 (D. Mass. Oct. 18, 2016)................................... 12

*Matter of Magnolia Fleet, LLC*,
No. CV 22-504, 2023 WL 2601450 (E.D. La. Mar. 23, 2023).......................................... 9

*Microsoft Corp. v. Tech. Enterprices, LLC*,
No. 107-MC-210, 2008 WL 424613 (S.D. Ind. Feb. 13, 2008) ........................................ 9

*MSP Recovery Claims, Series LLC v. Farmers Ins. Exch.*,
No. 1:19-MC-91025, 2020 WL 6384647 (D. Mass. Jan. 16, 2020) .................................. 13

*Rockstar Consortium US LP*,
No. 14-91322, 2015 WL 5972422 (D. Mass. Oct. 14, 2015) .......................................... 13

*Solamere Cap. v. DiManno*,
621 F. Supp. 3d 152 (D. Mass. 2022) ..................................................................... 5

*Tresona Multimedia, LLC v. Legg,*
No. 15 C 4834, 2015 WL 4911093 (N.D. Ill. Aug. 17, 2015)......................................... 13

*United States ex rel. Schutte v. SuperValu Inc.*,
598 U.S. 739 (2023)............................................................................................. 8

*United States v. Columbia Broad. Sys., Inc.*,
666 F.2d 364 (9th Cir. 1982) ................................................................................ 15

*United States v. Hunter*,
554 F. App'x 5 (D.C. Cir. 2014) ............................................................................ 8

*United States v. Hunter*,
809 F.3d 677 (D.C. Cir. 2016)............................................................................... 8

*United States v. Kahn*,
711 F. Supp. 2d 9 (D.D.C. 2010)............................................................................ 8

*United States v. Manghis*,
No. 08-cr-10090, 2010 WL 349583 (D. Mass. Jan. 22, 2010) ........................................ 10

*United States v. W. Titanium, Inc.*,
No. 08-cr-4229, 2010 WL 4569890 (S.D. Cal. Nov. 4, 2010) .................................... 8, 10

*Waymo LLC v. Uber Techs., Inc.*,
No. 17-CV-00939, 2017 WL 2929439 (N.D. Cal. July 7, 2017)............................. 8, 9, 14

*Wells Fargo Bank, N.A. v. Konover*,
259 F.R.D. 206 (D. Conn. 2009)........................................................................... 15

**FEDERAL RULES**

Fed. R. Civ. P. 26 ......................................................................................... 5, 7, 13, 14

Fed. R. Civ. P. 45 ........................................................................................... *passim*

## INTRODUCTION

In this False Claims Act litigation, the United States has alleged that Regeneron Pharmaceuticals, Inc. ("Regeneron") knowingly misrepresented its pricing to the government to gain a competitive advantage and inflate its profits. Now, in an apparent effort to shift blame and mount an everyone-was-doing-it defense, Regeneron has issued a set of broad subpoenas to a collection of unrelated drug and biopharmaceutical research companies, including EyePoint, Inc. ("EyePoint"). This is a quintessential fishing expedition. EyePoint has no connection whatsoever to this litigation. And this Court has already held that, for purposes of scienter, the relevant question is Regeneron's subjective understanding about how to calculate pricing under the relevant statute and regulations. That makes EyePoint's calculation of its own pricing during the limited time period it commercialized pharmaceutical products—which, of course, Regeneron had no awareness of—completely irrelevant.

The fact that EyePoint just happens to be one of hundreds of companies that may have interpreted the statute and regulations in question is plainly insufficient to justify the significant burdens that would flow from forcing EyePoint—a clinical-stage biopharmaceutical company whose small staff is working around the clock to bring a product to market that has the potential to be a paradigm shift in the treatment of two leading causes of blindness—to expend the resources that would be needed to answer a sprawling, fifteen-topic subpoena (with sub-parts totaling 24) seeking documents spanning an eight-year period. That conclusion is underscored by the fact that Regeneron did not even exhaust its efforts to obtain this information from the government through party discovery before serving the subpoena at issue. Because the subpoena seeks irrelevant information and is overbroad on its face, Rule 45 requires that this Court "*must* quash" (or at least modify) it. *See* Fed. R. Civ. P. 45(d)(3)(A)(iv) (emphasis added).

## BACKGROUND

Two years ago, the United States initiated this False Claims Act litigation against Regeneron, a global pharmaceutical company that manufactures and markets (among other products) Eylea, a physician-administered drug that treats a form of macular degeneration. United States' Compl. in Intervention Against Regeneron Pharmaceuticals, Inc. ¶ 1 (Mar. 28, 2024), ECF No. 58 ("Govt. Compl.").[1] The government alleges that Regeneron reimbursed distributors for credit card processing fees associated with purchases of Eylea, but did not include these reimbursements in its calculation of the average sales price ("ASP") of Eylea. *Id.* ¶ 2. According to the government, Regeneron knew these reimbursements were "price concessions" that should have been included in its ASP calculations, but intentionally did not report them as such in an effort to inflate its ASP and boost its profits. *Id.*

Regeneron moved to dismiss the complaint, arguing that the reimbursements did not need to be included in the ASP calculation because they are not price concessions but rather Bona Fide Service Fees, and that even if they should have been included in the ASP calculation, Regeneron's interpretation was reasonable. *See generally* Def. Regeneron's Mem. of Law in Supp. of its Mot. to Dismiss (Oct. 4, 2024), ECF No. 146 ("MTD Mem."). This Court disagreed, finding Regeneron's "reasonableness" argument "unpersuasive" because "the relevant inquiry under the FCA is Regeneron's *subjective* state of mind at the time of the alleged misconduct." Mem. and Order at 23 (Apr. 29, 2025), ECF No. 173 ("MTD Order") (emphasis added).

Discovery began last spring. As part of that process, Regeneron has issued a subpoena (the "Subpoena") to EyePoint, a small Massachusetts-based clinical-stage biopharmaceutical company

[1] The case originally named distributors AmerisourceBergen and Besse Medical as defendants, but these defendants have since been dismissed pursuant to a settlement, Joint Stipulation of Dismissal as to Besse Medical and AmerisourceBergen (Dec. 20, 2024), ECF No. 162.

with no connection to this litigation. EyePoint currently has no commercial products on the market, and is singularly focused on the final phase of a clinical trial for a new therapeutic aimed at curing leading causes of blindness.[2] Ex. A, March 16, 2026 R. Honig Decl. ¶ 6 ("Honig Decl.").

Regeneron's Subpoena includes fifteen requests, with numerous sub-parts, *see generally* Ex. B, Feb. 9, 2026 Subpoena at 12–15 ("Subpoena"), and seeks documents spanning an eight-year time period (2018–present), *see* Subpoena at 11 ¶ 12. It asks EyePoint to provide not only documents in its possession, custody, and control, but also documents "known" to it. *Id.* at 9 ¶ 2. And, as described in more detail below, the subpoena seeks "all documents" related to at least three broad categories of information: (1) EyePoint's practices concerning credit card processing fees, *Id.* at 12–15 ¶¶ 3–9, 10(b); (2) EyePoint's treatment of credit card fees in its calculations of its ASP, Average Manufacturer Price, and Best Price, *Id.* at 12–15 ¶¶ 1, 7, 11, 13–15; and (3) "industry custom" and the practices of physicians related to credit card processing fees, *Id.* at 12–15 ¶¶ 2, 10(a), 12.

**Documents relating to EyePoint's practices with respect to credit card processing fees.** *See id.* at 12–15 ¶¶ 3–9, 10(b). The requests concerning this topic include:

- Request No. 3: "All Documents in Your possession that Relate to Any practice or potential practice Concerning credit card payments for Physician-Administered Drugs[.]"
- Request No. 4: "All Documents in Your possession that Relate to the payment, reimbursement, or recoupment of Credit Card Processing Fees in connection with the sale of Any of Your Physician-Administered Drugs," to include "presentations, memoranda, talking points, notes, market or competitor research, brand plans, or strategic plans[.]"
- Request Nos. 5, 7: "All Documents" relating to communications with distributors or credit card companies "regarding the actual or potential payment,

[2] Until 2023, EyePoint marketed physician-administered drugs to treat inflammation in the eye. Those drugs did not (and do not) compete with Eylea. *See* Ex. B, Feb. 9, 2026 Subpoena; Ex. A, March 16, 2026 R. Honig Decl. ¶ 4

reimbursement, or recoupment of Credit Card Processing Fees."

- Request No. 6: "All Documents" exchanged with physician practices who purchased physician-administered drugs relating to credit card processing fees.

- Request No. 8: "All Distribution Agreements in Your possession that Relate to Credit Card Processing Fees," including "Documents Relating to negotiations or drafts of [such] Distribution Agreements."

- Request No. 9(a): "Documents sufficient to identify All purchase transactions for each of Your Physician-Administered Drugs that includes information including product, buyer, Distributor, date of purchase, units sold, price, total sales, method of payment, Credit Card Processing Fees paid or reimbursed for each transaction, and, where applicable, who paid the Credit Card Processing Fee."

- Request No. 10(b): "Any documents utilized by Your Reimbursement Employees Concerning the reimbursement, coverage, or payment of Credit Card Processing Fees."

**Documents relating to EyePoint's treatment of credit card fees in its calculations of ASP, AMP, and BP.** *See id.* at 12–15 ¶¶ 1, 7, 11, 13–15. The requests concerning this topic include:

- Request No. 1: "All Documents" submitted to any government agency "Related to the treatment of Credit Card Processing Fees in ASP, AMP, or BP of Any of Your Physician-Administered Drugs."

- Request No. 7: "All Documents that Relate to Any discussion between You and any Credit Card Company regarding . . . the treatment of Credit Card Processing Fees for ASP, AMP, or BP purposes."

- Request No. 11: "All Documents in Your possession Relating to the treatment of the payment, reimbursement, or recoupment of Credit Card Processing Fees for any purchase of Any of Your Physician-Administered Drugs in ASP, AMP, and/or BP."

- Request Nos. 13–15: "All Documents" concerning whether credit card processing fees are Bona Fide Service Fees, Price Concessions, or should be included in or excluded from ASP, AMP, or BP "in Any context."

**Documents relating to industry custom and the practices of physicians related to credit card processing fees.** *See id.* at 12–15 ¶¶ 2, 10(a), 12. The requests concerning this topic include:

- Request No. 2: "All Documents that relate to Any Industry Custom or Practice in regard to payment, reimbursement, or recoupment of Credit Card Processing Fees in connection with the sale or distribution of Any drug."

- Request No. 10(a): "Any Communications, market research, or analysis regarding the preference of purchasers to use credit cards[.]"

- Request No. 12: "All Documents in Your possession Relating to physicians' economic or financial considerations or preferences Related to the payment, reimbursement, or recoupment of Credit Card Processing Fees for Any of Your Physician-Administered Drugs."

The parties met and conferred on February 19, 2026, and March 12, 2026, but were unable to resolve the dispute over relevance and burden.

**LEGAL STANDARD**

Discovery must be not only relevant to a party's claim or defense but also proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1); *see also Solamere Cap. v. DiManno*, 621 F. Supp. 3d 152, 158 (D. Mass. 2022) ("A third-party subpoena is subject to the relevance and proportionality requirements of Rule 26(b)(1)."). In determining proportionality, courts consider, among other factors, "the importance of discovery in resolving the issues" and "whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). A court also must limit discovery if it "can be obtained from some other source that is more convenient, less burdensome, or less expensive[.]" Fed. R. Civ. P. 26(b)(2).

In weighing these factors, courts recognize that while the parties to a lawsuit "must accept [the] travails [of discovery]," non-parties, as "strangers" to the litigation with "no dog in [the] fight" have "a different set of expectations." *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998). Accordingly, when a subpoena is directed to a non-party, "[c]oncern for the unwanted burden thrust upon [the] non-part[y] is a factor entitled to special weight in evaluating the balance of competing needs." *Id.*; *Cascade Yarns, Inc. v. Knitting Fever, Inc.*, 755 F.3d 55, 59 (1st Cir.

2014) (citation omitted); *In re Pub. Offering PLE Antitrust Litig.*, 427 F.3d 49, 53 (1st Cir. 2005); *see also Demers v. LaMontagne*, No. CIV. A. 98-10762, 1999 WL 1627978, at *2–3 (D. Mass. May 5, 1999) (a non-party is given "heightened" consideration regarding inconvenience and expense). In addition, under the plain text of Rule 45, courts "*must* quash or modify" third-party subpoenas that "subject[] a person to undue burden." Fed. R. Civ. P. 45(d) (emphasis added). When determining whether a Rule 45(d) subpoena duces tecum results in an undue burden, factors to consider include "the relevance of the documents sought, the necessity of the documents sought, the breadth of the request," and the "expense and inconvenience." *Behrend v. Comcast Corp.*, 248 F.R.D. 84, 86 (D. Mass. 2008) (quoting *Demers,* 1999 WL 1627978, at *2).

## ARGUMENT

### I. RULE 45 REQUIRES QUASHING THE SUBPOENA BECAUSE COMPLIANCE WOULD SUBJECT NON-PARTY EYEPOINT TO AN UNDUE BURDEN.

This case is about Regeneron, its treatment of credit card fees, and its subjective state of mind when it calculated its ASP. EyePoint's practices have no bearing whatsoever on these issues. Even if broader industry practices were somehow relevant, Regeneron has offered no reason to believe that *EyePoint's* practices are representative of the industry as a whole. The Subpoena is also rife with overbroad requests that have no bearing on this case. It seeks "all documents" pertaining to more than a dozen categories of information, including detailed sales data and marketing research. It goes further still, seeking documents reflecting the practices and preferences of other third-parties, such as physicians and distributors. And, although party discovery is ongoing, it asks non-party EyePoint to provide documents that could be obtained from the government, a party to the underlying case. Because relevance is the touchstone for discoverability, the Court can and should quash the subpoena on that basis alone.

But complying with the Subpoena would also impose significant burdens on EyePoint, a

small company with minimal legal and administrative staff, and would divert limited company resources away from important medical research and product development. Honig Decl. ¶¶ 8–9. That is another basis to reject Regeneron's efforts here. *See, e.g.*, *Cusumano,* 162 F.3d at 717 (burden and proportionality concerns are heightened in the context of third-party discovery); *Cascade Yarns, Inc.*, 755 F.3d at 59 (similar); *In re Pub. Offering PLE Antitrust Litig.*, 427 F.3d at 53 (similar).

### A. Nearly All of the Requests (Nos. 1–11 and 13–15) Seek Documents That Are Wholly Irrelevant to Any Party's Claim or Defense.

Almost all of Regeneron's requests seek patently irrelevant information that does not pass the baseline test for relevance test under Rule 26, much less the heightened proportionality demands of third party discovery. *See Cusumano*, 162 F.3d at 717. In particular, Request Nos. 1–11 and 13–15 ask EyePoint to collect, review, and produce a sweeping set of documents related to EyePoint's treatment of credit card processing fees, including documents and communications about any actual or potential payment, reimbursement, or recoupment of credit card processing fees (Request Nos. 2–8); documents related to the treatment of any such payment, reimbursement, or recoupment in its ASP, AMP, or BP calculations (Request Nos. 1, 7, 11); documents related to EyePoint's understanding of how various parts of the statute and regulations regarding ASP calculation apply to credit card fees (Request Nos. 13–15); EyePoint's marketing and promotion research regarding credit card fees (Request No. 10); and EyePoint's sales data (Request No. 9). None of these categories of documents relates to Regeneron: EyePoint and Regeneron are entirely separate entities, and Regeneron had no knowledge of EyePoint's treatment of credit card processing fees or of EyePoint's interpretation of the statute and regulations governing ASP calculations. Subpoena at 12–15.

The only argument for relevance for these documents that Regeneron has offered is that

they might show that another company in the industry interpreted the statute and regulations at issue the same way Regeneron did. *See* MTD Mem. at 8–9, 30 (alluding to the practices and confusion of other companies in the industry to argue that its interpretation was objectively reasonable). But this Court (citing Supreme Court precedent) already rejected Regeneron's "reasonableness" defense as a matter of law, finding that "the relevant inquiry under the FCA is Regeneron's *subjective state of mind* at the time of the alleged misconduct." MTD Order at 23 (emphasis added) (citing *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749 (2023)). Regeneron's requests about EyePoint's practices, which Regeneron had no knowledge of at the time of the alleged misconduct, plainly are not relevant to Regeneron's own subjective state of mind. *See United States v. Kahn*, 711 F. Supp. 2d 9, 12 (D.D.C. 2010), *aff'd sub nom. United States v. Hunter*, 554 F. App'x 5 (D.C. Cir. 2014), *aff'd sub nom. United States v. Hunter*, 809 F.3d 677 (D.C. Cir. 2016), and *aff'd sub nom. United States v. Hunter*, 809 F.3d 677 (D.C. Cir. 2016) ("[W]hether defendant[]'s actions and beliefs are shared by other individuals is not relevant to whether he acted in good faith. The inquiry is subjective and thus must focus on the belief of the defendant." (citing *Cheek v. United States*, 498 U.S. 192, 202 (1991))); *Waymo LLC v. Uber Techs., Inc.*, No. 17-CV-00939, 2017 WL 2929439, at *3 (N.D. Cal. July 7, 2017) (quashing third-party subpoena aimed at proving industry practice where "the issue in th[e] lawsuit is how plaintiff treated its information, not how [subpoenaed party] treats its information").

And even if broader industry practices across manufacturers had some relevance to this case, "the fact that other companies may have engaged in the same type of transactions charged in this case does not necessarily prove an *accepted* industry practice." *United States v. W. Titanium, Inc.*, No. 08-CR-4229, 2010 WL 4569890, at *2 (S.D. Cal. Nov. 4, 2010) (emphasis in original) (quashing third party subpoenas to multiple competitors seeking information that defendant argued

would establish industry practice). In other words, even if Regeneron had some basis for "suggest[ing] that [EyePoint] may have engaged in practices similar to those charged against [Regeneron]," (and Regeneron has identified no such bases), Regeneron has made "no showing that any such practices were accepted within the industry." *Id.*; *see also Matter of Magnolia Fleet*, LLC, No. CV 22-504, 2023 WL 2601450, at *3–4 (E.D. La. Mar. 23, 2023) (quashing subpoena seeking information from a third party in an attempt to establish industry custom or practice because "merely introducing examples of what some other competitors do falls short of establishing industry custom or practice").

Nor is there anything about EyePoint that uniquely situates it—as opposed to any one of hundreds of other pharmaceutical companies—to provide this information; under Regeneron's "reasoning, Defendants would be entitled to subpoena all [pharmaceutical] companies to determine 'industry practice.'" *See Waymo LLC*, 2017 WL 2929439, at *3. That is not how Rule 45 works, and Regeneron's speculative requests lack sufficient relevance to justify the burden on EyePoint, a "stranger" to the litigation with "no dog in [the] fight." *Cusumano*, 162 F.3d at 717. *See also In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*, No. 08-1967, 2010 WL 5157355, at *2 (W.D. Mo. Dec. 20, 2010) (denying motion to compel because subpoena-issuer's argument would mean "they could issue a subpoena to every expert in the world who has researched [the relevant topic]"); *Microsoft Corp. v. Tech. Enterprices, LLC*, No. 107-MC-210, 2008 WL 424613, at *2 (S.D. Ind. Feb. 13, 2008) (rejecting Microsoft's argument that it was entitled to certain information from a third party account used in transactions with infringers of its software because "[i]f that were the case, [it] could subpoena such confidential information from any entity ever known to have dealings with any infringers").

### B. Even Assuming EyePoint's Practices Have Some Relevance to This Case, the Subpoena is Grossly Overbroad and Unduly Burdensome.

Even if EyePoint's treatment of credit card processing fees and interpretation of the requirements regarding ASP calculation were relevant to this case, Regeneron's requests extend far beyond what would be needed to establish that information. *See Heidelberg Americas, Inc. v. Tokyo Kikai Seisakusho, Ltd.*, 333 F.3d 38, 41 (1st Cir. 2003) (it is appropriate to quash a subpoena even if documents "have some relevance to [the] litigation" if "the subpoena cast[s] too wide a net"). Nearly all of Regeneron's requests seek "all documents" pertaining to each category of information sought, and the time period for Regeneron's requests extends from February 2018 through the present, Subpoena, at 11 ¶ 12, even though EyePoint has not marketed any drugs since May 2023, Honig Decl. ¶ 5. This type of request for "the wholesale production of 'any and all' documents relating to broad categories over a substantial period of time in the hope that [the issuing party's] suspicions will be borne out," is overly broad and constitutes an improper fishing expedition. *United States v. W. Titanium, Inc.*, No. 08-cr-4229, 2010 WL 4569890, at *2 (S.D. Cal. Nov. 4, 2010), *see also, e.g.*, *United States v. Manghis*, No. 08-cr-10090, 2010 WL 349583, at *2 (D. Mass. Jan. 22, 2010) (subpoena "request for 'any and all documents' relating to [agencies'] interpretation and implementation of certain regulatory provisions is overbroad and amounts to little more than a fishing expedition").

On top of these global defects, certain of Regeneron's requests are at best only indirectly related to EyePoint's treatment of credit card processing fees. For example, Request No. 9 seeks *all* of EyePoint's purchase data, including dates of purchase, buyers, distributors, method of purchase, and other information. Subpoena at 14 ¶ 9. And Request No. 3 seeks "all documents" related to "whether to sell [EyePoint's physician-administered drugs] directly to Physician Practices or through a Distributor or Any other third party[.]" *Id.* at 12 ¶ 3.

Responding to these expansive requests would likely require collecting and reviewing tens of thousands of documents from a range of custodians and sources, and would pose a significant burden on EyePoint. Honig Decl. ¶ 7. For example, responding to Request No. 3 (seeking "all documents . . . that Relate to Any practice or potential practice Concerning credit card payments for Physician-Administered Drugs," Subpoena at 12 ¶ 3) would ostensibly require EyePoint to search through eight years of email inboxes, calendars, notes, and other documents from an untold number of current and former employees for common, broad terms such as "credit card," "CC," "fees," and "reimburse." To respond to Request No. 11, (seeking "All Documents Relating to the treatment of the payment, reimbursement, or recoupment of Credit Card Processing Fees for any purchase of Any of Your Physician-Administered Drugs in ASP, AMP, and/or BP," Subpoena at 15 ¶ 11), EyePoint might need to search for and review documents that hit on a host of standard industry terms (for example, "ASP," "average sales price," "AMP, "average manufacturer price," "BP," and "best price") that are likely to yield a significant number of documents that are not responsive to the Subpoena and have absolutely nothing to do with this litigation. As another example, to respond to Request No. 9 (seeking a host of information about "all purchase transactions" "including whether purchased directly from [EyePoint] or through a Distributor" for an eight-year period, Subpoena at 14 ¶ 9), EyePoint would need to search for documents pertaining to thousands of transactions with different purchasers over the course of several years.

Additionally, many of these documents were maintained and organized in finance and accounting systems that are no longer in use now that EyePoint is no longer marketing a commercial product. Honig Decl. ¶ 8. Other documents were kept in the files and emails of employees who are no longer with the company because EyePoint has dismantled much of its commercial operation and laid off most of its commercial staff. *Id.* ¶¶ 5, 8. Retrieving and

reviewing these documents at this point, given EyePoint's very limited administrative and commercial staff and resources, would be a significant challenge. *Id.* ¶¶ 2, 9.

Because EyePoint has minimal legal and administrative staff and has eliminated much of its commercial arm in order to focus on its clinical trial work, the burden of coordinating the collection and review of these tens of thousands of documents would fall entirely on its Chief Legal Officer and Corporate Controller. *Id.* ¶ 9. Diverting their limited time and the company's limited resources to collecting, reviewing, redacting, and producing these documents would be disruptive to EyePoint's efforts to conduct the final stage of its clinical trial and get its potentially life-changing biopharmaceutical therapies to the market. *Id.* ¶¶ 6, 9. Given the "imbalance between [Regeneron]'s need and the imposition on [EyePoint]," this Court should quash the Subpoena on this basis alone. *Heidelberg Americas, Inc.*, 333 F.3d at 42.

### C. Requests No. 1, 2, 4, 10, and 12 Request Documents That EyePoint Is Ill-Suited to Provide.

On top of the issues described above, still others of Regeneron's requests seek information related to other third-parties' practices that EyePoint is not well positioned to provide. For example, Request No. 1 seeks documents submitted to government agencies. Subpoena at 12 ¶ 1. These documents could be obtained from the United States,[3] which—as a party to this action—is a more appropriate target of Regeneron's discovery requests, particularly given that party discovery is still ongoing. *See Massachusetts Nurses Ass'n v. Radius Specialty Hosp., LLC*, No. CV 14-13686, 2016 WL 6090713, at *2 (D. Mass. Oct. 18, 2016) ("non-party subpoena seeking information that is readily available from a party through discovery may be quashed as duplicative

[3] During the meet and confer process, Regeneron asked EyePoint if it would consent to the government producing EyePoint's ASP-related submissions for its physician-administered drugs. Although Regeneron did not offer to withdraw or narrow any of its discovery requests to EyePoint in exchange for EyePoint's consent, EyePoint has agreed not to object to the government's production of these documents.

or cumulative" (quoting *Tresona Multimedia, LLC v. Legg*, No. 15 C 4834, 2015 WL 4911093, at *3 (N.D. Ill. Aug. 17, 2015))); *MSP Recovery Claims, Series LLC v. Farmers Ins. Exch.*, No. 1:19-MC-91025, 2020 WL 6384647, at *1 (D. Mass. Jan. 16, 2020) (denying motion to reconsider order granting motion to quash: "the court's principal concern was to avoid placing an undue burden on a non-party when the discovery could be obtained from a party, and where the record reflected that discovery in the underlying litigation was ongoing"); *see also* Rule 26(b)(2)(C)(i) (court must limit discovery if "the discovery sought . . . can be obtained from some other source that is more convenient, less burdensome, or less expensive"). Yet, Regeneron's counsel conceded during the meet and confer process that they had not exhausted their efforts to get this information through party discovery before burdening third parties like EyePoint. *See Rockstar Consortium US LP*, No. 14-91322, 2015 WL 5972422, at *6 (D. Mass. Oct. 14, 2015) ("Rule 45 does not excuse imposing an undue burden on [] a non-party, because of discovery difficulties with [a party].").

EyePoint is also not the right target for Request Nos. 2, 4, 10, and 12, which seek documents related to the considerations, practices, and preferences of entities other than EyePoint, such as "industry customs or practices" in regard to the treatment of credit card processing fees broadly, preferences and desires of purchasers to use credit cards to buy EyePoint's drugs, and considerations and preferences of physicians regarding the treatment of credit card processing fees for EyePoint's drugs. Subpoena at 12–15 ¶¶ 2, 4, 10, 12. Whatever marginal relevance this information may have (if any) is presumably tied to the Court's conclusion that the "prevailing industry practices" alleged in the government's complaint—including the practices of physicians and retina practices in the industry, *see also* Govt. Compl. ¶¶ 10, 52–58, 83, as well as the practices of Eylea's competitors, *id.* ¶¶ 7, 77, and of distributors, *id.* ¶¶ 6, 59, 75–76—might be relevant to its determination of whether reimbursement of credit card fees in fact constitutes a price

concession. MTD Order at 17–18 (finding that government plausibly alleged in its complaint that credit card fee reimbursements were price concessions "in light of prevailing industry practices").

But EyePoint is no better situated to provide information about these separate entities than any other pharmaceutical company, including Regeneron itself. And it would be more convenient, less burdensome, and less expensive to obtain this information either from Regeneron or directly from the entities (i.e. physicians and distributors) themselves. *See* Fed. R. Civ. P. 26(b)(2)(C)(i); Fed. R. Civ. P. 45(d)(1). To the extent the requests seek information about physicians' considerations, preferences, and desires with respect to purchase of EyePoint's drugs specifically, it is unclear how that information is any more relevant than their considerations, preferences, and desires with respect to any other drugs—including Eylea. *See Waymo LLC*, 2017 WL 2929439, at *3. This information is minimally relevant at best, and cannot justify imposing such a significant burden on EyePoint, a non-party. *See* Fed. R. Civ. P. 26(b)(1) (discovery must be "proportional to the needs of the case"); *Doe v. Sanderson*, No. 16-CV-12068, 2021 WL 828379, at *2 (D. Mass. Mar. 4, 2021) (denying motion to compel where requested evidence was only marginally relevant because it was not proportional to the needs of the case).

* * *

For all of these reasons, the Subpoena is overbroad and unduly burdensome and should be quashed.

## II. TO THE EXTENT THAT EYEPOINT MUST COMPLY WITH THIS SUBPOENA, REGENERON SHOULD BE ORDERED TO COVER THE COSTS.

Complying with this subpoena would be time-consuming and expensive, and would take away EyePoint's limited resources, which are currently focused on conducting its clinical trial to collect important data and information about the effectiveness and safety of new therapies that have the potential to significantly improve the treatment paradigm for two leading causes of blindness. Honig Decl. ¶ 6. EyePoint, as a non-party, is "powerless to control the scope of [this]

litigation and discovery, and should not be forced to subsidize an unreasonable share of the[se] costs[.]" *United States v. Columbia Broad. Sys., Inc.*, 666 F.2d 364, 371 (9th Cir. 1982). If this Court finds that EyePoint must comply in whole or in part with the subpoena, it "must protect [EyePoint] from significant expense resulting from compliance." *See* Fed. R. Civ. P. 45(d)(2)(B)(ii). In this case, that requires ordering Regeneron to cover the costs of collecting, reviewing, and producing documents responsive to the Subpoena.

In determining whether cost-shifting to the party serving the Rule 45 subpoena is appropriate, courts consider: "(1) whether the non-party actually has an interest in the outcome of the case, (2) whether the non-party can more readily bear the costs than the requesting party, and (3) whether the litigation is of public importance." *Behrend v. Comcast Corp.*, 248 F.R.D. 84, 86 (D. Mass. 2008). All three factors need not be present for cost-shifting to be appropriate. *See, e.g.*, *In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-cv-20000, 2018 WL 11425554, at *8 (N.D. Ala. Oct. 24, 2018) (shifting costs even though the litigation was of public importance because of the other two factors). The first factor turns on "whether the non-party was substantially involved in the underlying transaction and could have anticipated that such transaction could potentially spawn litigation or discovery." *Wells Fargo Bank, N.A. v. Konover*, 259 F.R.D. 206, 207 (D. Conn. 2009); *see also Behrend*, 248 F.R.D. at 87. Here the answer is plainly no: EyePoint had no involvement in Regeneron's treatment of credit card fees or its calculation of ASP, and could not have anticipated that Regeneron would be sued or that it would seek discovery from EyePoint in such suit. As to the second and third factors, Regeneron is a much larger company than EyePoint, and can more readily bear the cost of providing the discovery. *See Barclays PLC v. FX Transparency, LLC*, No. 1:22-MC-91048, 2022 WL 3227534, at *4 (D. Mass. Apr. 27, 2022) (shifting costs to the party serving the Rule 45 subpoena in part because "[g[iven its size and

resources, [it] can more readily bear the cost of discovery").[4] And Regeneron is a private company whose defense in this suit is not of any particular public importance. In light of the balance of these factors, this Court should require Regeneron to bear the burden of any discovery costs.

**CONCLUSION**

For the reasons set forth above, EyePoint respectfully submits that the Subpoena should be quashed in its entirety. In the event the Court disagrees, EyePoint requests that the Court order Regeneron to reimburse EyePoint's costs of compliance.

Dated: March 20, 2026

Respectfully submitted,

*<u>/s/ David Zimmer</u>*
David Zimmer (BBO #692715)
ZIMMER, CITRON & CLARKE LLP
130 Bishop Allen Dr.
Cambridge, MA 02139
Telephone: 617-676-9421
dzimmer@zimmercitronclarke.com

Kathryn M. Ali *(pro hac vice forthcoming)*
Elizabeth C. Lockwood *(pro hac vice forthcoming)*
Arianna H. Zoghi *(pro hac vice forthcoming)*
ALI & LOCKWOOD LLP
501 H Street NE, Suite 200
Washington, D.C. 20002
Telephone: 202-651-2475
katie.ali@alilockwood.com
liz.lockwood@alilockwood.com
arianna.zoghi@alilockwood.com

*Counsel for Non-Party EyePoint, Inc.*

[4] *Compare* Regeneron Pharmaceuticals, Inc. Key Statistics, https://finance.yahoo.com/quote/REGN/key-statistics/ (last visited February 27, 2026) (Regeneron is a global company with a broad portfolio of products and has an enterprise value of $58.83 billion), *with*, EyePoint, Inc. Key Statistics, https://finance.yahoo.com/quote/EYPT/key-statistics/ (last visited Feb. 27, 2026) (EyePoint has insignificant revenue and an enterprise value of approximately $1 billion),

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of March 2026, a copy of the foregoing has been filed electronically. Notice of this filing has been served upon counsel of record via the Court's electronic filing system. Access to this filing can be obtained via the Court's electronic filing system.

*/s/ David Zimmer*