**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.,* *ex rel.* JULIANNE NUNNELLY and MATTHEW SHANKS,<br><br>      Plaintiffs,<br><br>v.<br><br>REGENERON PHARMACEUTICALS, INC.,<br><br>      Defendant. | No. 20-cv-11401-PBS |

## UNITED STATES' STATEMENT OF INTEREST

The government submits this Statement of Interest to aid the Court in its disposition of a pending Motion to Quash a Rule 45 subpoena that defendant Regeneron Pharmaceuticals, Inc. issued to a third party, EyePoint, Inc.  This statement of interest will assist the Court because the government is in the best position to correct Regeneron's mischaracterizations of the record and to respond to the faulty premise on which Regeneron's opposition to Eyepoint's Motion is based: namely, that "it is indisputable that the categories of documents Regeneron has requested from EyePoint are relevant and discoverable."  ECF No. 308 ("Regeneron Opp'n") at 9.  In fact, the relevance of this evidence is very much disputed, and Regeneron's insistence that the Court already deemed "industry practice" evidence relevant is simply incorrect.

To be clear, at no time has the government taken the position that how other drug manufacturers reported Average Sales Price ("ASP") is relevant to the analysis of Regeneron's False Claims Act ("FCA") liability—because it is not.  Industry practice is not relevant to falsity, which is an objective analysis.  The governing law requires Regeneron, and every other drug manufacturer, to report all price concessions—full stop.  42 C.F.R. § 414.804(a)(2).  Nor is

industry practice relevant to materiality—false ASP price reports are material because they directly influence the government's payment.  As for scienter, the record demonstrates that Regeneron was not aware of other manufacturers' highly confidential ASP reporting practices, which Regeneron acknowledged in an interrogatory response, and therefore the ASP reporting practices of other manufacturers have no relevance.

Regeneron mischaracterizes the record, citing to four paragraphs in the government's Complaint and a page in the government's opposition to Regeneron's motion to dismiss that purportedly suggest, according to Regeneron, that "Regeneron's ASP treatment of credit card service fee reimbursements was an industry outlier, and was unreasonable in light of broader industry practice."  Regeneron Opp'n at 2.  These references, however, have nothing to do with any other drug manufacturer's ASP reporting.

Instead, the four paragraphs in the government's Complaint describe: (i) the other drugs approved to treat Wet AMD at the time Eylea launched; (ii) an internal email at Besse Medical ("Besse")—one of several distributors with which Regeneron contracted to distribute Eylea— describing Genentech's direct distribution model and Besse's view that Regeneron believed it was "fighting Genentech 'with [Besse]'"; and (iii) a description of a *Regeneron* slide deck used to train new employees, which highlighted that Regeneron subsidized credit card use through distributors, but that its competitor, Genentech, did not.  Compl. ¶¶ 42–43, 84, 87.  Further, the government's opposition to Regeneron's motion to dismiss did not rely on "broader industry practice" in articulating its view of the facts or legal theory in this case.  Rather, the government argued that Regeneron's reporting practices were unreasonable because "the plain text of the ASP regulation unambiguously requires the reporting of all price concessions."  ECF No. 151 at 16.  In short, the government has never suggested that industry practice is relevant to the analysis

2

of Regeneron's FCA liability, and Regeneron's mischaracterizations are an insufficient foundation for the expansive discovery it is seeking.

Nor did the Court "put industry practice at issue." Regeneron Opp'n at 7. The Court has made only two passing references to industry practices. First, in the Court's Order denying Regeneron's motion to dismiss, the Court held that "the [ASP reporting] regulation broadly requires manufacturers to deduct all price concessions, and the complaint plausibly alleges that this included the credit card fee reimbursements in light of prevailing industry practices." ECF No. 173 at 18. As the United States understands the Court's decision, "prevailing industry practices" referred to the practices of drug *distributors* when customers sought to pay with credit cards, not the ASP reports submitted by each and every "*pharmaceutical compan[y]* who sell[s] physician-administered-drugs." Regeneron Opp'n at 6 (emphasis added).[1]

Second, during a hearing on Regeneron's motion for leave to amend its answer, the Court referenced industry practice in response to a statement about whether credit card fees constitute bona fide service fees ("BFSFs"). But at this point, the Court had already held that Regeneron's reimbursement of credit card fees does not satisfy the BFSF test because, at minimum, such fees do "not qualify under the second prong" of the BFSF criteria (*see* ECF No. 173 at 18–19); thus, this singular statement during an unrelated hearing cannot credibly be understood to modify the Court's Order on the motion to dismiss and is an insufficient basis for Regeneron's fishing expedition.

---

[1] Notably, how other manufacturers reported ASP was not discussed in the hearing on the motion to dismiss, but there was lengthy discussion about how the "market" worked (*i.e.*, whether and how drug distributors charged customers to use credit cards). *See, e.g.*, ECF No. 165 at 30–35. This is relevant to the analysis of whether Regeneron's payment of the credit card fees constituted a price concession.

And this is quite the fishing expedition.  Regeneron's subpoena to EyePoint is one of *seventeen* substantially identical subpoenas Regeneron has issued to drug manufacturers— including Regeneron's direct competitors—seeking broad swaths of information, much of which is nonpublic commercially-sensitive information, in an attempt to engineer a schoolyard defense that Regeneron's fraudulent conduct was permissible because other companies may have done it too.  Not only is such a defense a logical fallacy, but in the context of this FCA litigation, it is also legally irrelevant, in large part because Regeneron had *no* contemporaneous knowledge about the ASP reporting practices of any other company.  By definition, an "industry standard" requires the industry to *know* the typical practices of the industry participants.

Here, the purported "industry standard" that Regeneron attempts to engineer relates to drug manufacturers' ASP reporting to the Centers for Medicare and Medicaid Services ("CMS"). ASP reporting is—by statute—confidential, 42 U.S.C. § 1396r-8(b)(3)(D), and manufacturers consider their ASP submissions to be commercially sensitive information that warrants highly confidential treatment.  Given that ASP submissions to CMS are nonpublic, it is no surprise that Regeneron did not know whether or how other manufacturers classified credit card fee reimbursements on their ASP reports.

Moreover, Regeneron's proposed discovery is manifestly impractical and unreasonable because it seeks information concerning other manufacturers' legal interpretations.  Setting aside potential privilege and confidentiality concerns, it would necessitate discovery into not only what other manufacturers did, but what each manufacturer believed and whether those beliefs were credible.  Allowing Regeneron's discovery could turn this matter into scores of separate investigations of other drug manufacturers.

4

Accordingly, the government submits this Statement to explain why information related to other manufacturers is irrelevant. Although the current dispute is centered on a single third-party subpoena, an opinion on the Motion could have a substantial impact on the scope of fact and expert discovery. The parties have ongoing disputes as to the relevance of materials relating to other drug manufacturers, and while neither party has yet sought judicial intervention concerning these disputes, a ruling on this Motion may inform the need for and scope of future filings. Further, at least some of the additional sixteen Rule 45 subpoenas Regeneron has sent to other drug manufacturers (as well as three subpoenas sent to drug distributors similarly demanding expansive industry practice information) are likely to lead to motions practice. This decision may streamline fact and expert discovery between the parties and clarify the appropriate scope of discovery on the non-party recipients of Regeneron's subpoenas, thereby limiting future motions and promoting judicial efficiency.

## FACTUAL AND LEGAL BACKGROUND

On March 28, 2024, the government filed an FCA Complaint alleging that Regeneron paid hundreds of millions of dollars in price concessions to its customers for its blockbuster drug, Eylea, and that Regeneron knowingly failed to incorporate these price concessions in its ASP reports to CMS, which inflated Medicare's payments for the drug and unjustly enriched the company. Specifically, Regeneron paid credit card processing fees incurred by its distributors so that doctors and retina practices that purchased Eylea could use credit cards at no additional cost. Among other reasons, doctors wanted to use credit cards so that they could reap the hundreds of millions of dollars in "cash back" rewards and other credit card benefits on their expensive Eylea purchases. But for Regeneron's subsidy, the distributors would have charged Eylea credit card customers more to cover the processing fees (alternatively, customers could forego purchase by

credit card, but in doing so, sacrifice the lucrative rewards). Regeneron then excluded these fees from its ASP reports to CMS. By failing to report these fees, Regeneron falsely inflated Medicare reimbursements for Eylea, costing the government money, and gave Eylea an unfair competitive advantage.

Eylea is a "buy-and-bill" drug, meaning that physicians and their practices incur an upfront expense to purchase Eylea that payors later reimburse.[2] Medicare Part B reimburses Eylea and other physician-administered drugs based on the drug's ASP—typically 106% of ASP, referred to as "ASP+6%"—less the applicable patient co-pay. *See* 42 U.S.C. § 1395w-3a(b). A drug's ASP is based on the average price for sales of that drug in the United States, minus price concessions. 42 C.F.R. § 414.804(a). A "price concession" includes anything "that would result in a reduction of the cost to the purchaser." 42 U.S.C. § 1395w-a(c)(3). For the purposes of ASP calculations, fees that meet the definition of bona fide service fees are not considered price concessions. 42 C.F.R. § 414.804 (a)(2)(ii); *see also* 42 C.F.R. § 423.501 (setting forth the four elements required for a fee to constitute a BFSF).

CMS requires drug manufacturers to report the ASP of each of their Part B drugs on a quarterly basis, 42 C.F.R. § 414.804(a)(5), and relies on manufacturers to truthfully and accurately report ASP. The difference between the Medicare reimbursement rate and the amount the physician practice pays to purchase the drug is referred to as the "spread," which is the physician practices' profit on the drug. An overstated ASP inappropriately increases the profit a

---

[2] Eylea is a physician-administered injectable drug that treats a form of macular degeneration called Neovascular Age-Related Macular Degeneration, commonly known as Wet AMD. Wet AMD is a prevalent, progressive retina degenerative macular disease that leads to gradual vision impairment and mainly affects the elderly. Physicians typically administer Eylea by injecting the drug into patients' eyes at the physician's practice on an outpatient basis.

physician practice receives for each claim it submits to Medicare.  In other words, a manufacturer's failure to report price concessions will increase the amount Medicare spends on each unit of the drug as well as the spread, or profit, physician practices receive on each Medicare claim.[3]

Instead of selling Eylea directly to physician practices, Regeneron had distribution arrangements with third-party drug distributors that purchased Eylea wholesale from Regeneron and then sold Eylea to physician practices.  Under the terms of these distribution agreements, Regeneron paid distributors a service fee for distribution services, like product storage and shipping.  Separate from the distribution fee, Regeneron also reimbursed the distributors for credit card processing fees charged by third-party financial institutions so that the distributors would not pass those fees on to the physician practices.  Because distributors incurred credit card processing fees when physician practices used credit cards, distributors typically charged practices a higher price to use credit cards for high-cost drugs like Eylea (and sold Eylea at a lower price when customers paid with cash).  Here, however, Regeneron paid its distributors for the credit card processing fees on the condition that the distributors would extend the lower cash price to all customers, even those who used credit cards, knowing that physicians wanted to pay the lower cash price while simultaneously reaping the benefits of cash back and other credit card rewards.  In so doing, Regeneron provided price concessions that it failed to report to CMS.

---

[3] As a quick shorthand: Regeneron's scheme increased the *reported* price to CMS and lowered the *actual* price to the customer.  The higher the *reported* price, the more Medicare reimburses for the drug and the more money the physician makes, as 6% of a higher price is always more money.  Simultaneously, however, physicians wanted to *pay* less for the product, which they did here because they were not charged the higher credit card price (and received cash back or other rewards on those credit card purchases).

Regeneron's fraudulent pricing scheme involved the submission of false ASP reports to CMS, which CMS relied upon to set payment rates for Eylea, thereby resulting in hundreds of millions of dollars of inflated payments in violation of the FCA.  The FCA, 31 U.S.C. §§ 3729-33, is a civil anti-fraud statute that imposes liability for anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" and/or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(A), (B).  To prove an FCA violation in this context, the government must show either that Regeneron (i) knowingly caused the submission of false claims that were materially false, or that Regeneron (ii) knowingly made or used a false record or statement that was material to a false claim.  *Id.*

## PROCEDURAL BACKGROUND

On April 29, 2025, the Court denied Regeneron's motion to dismiss.  Dkt. No. 173.  The parties are currently in fact discovery.  In connection with Regeneron's purported "industry standard" defense, Regeneron has propounded subpoenas on the following drug manufacturers:

- AbbVie
- Amgen
- ANI Pharmaceuticals
- Bausch & Lomb
- Bausch Health
- Biogen
- EyePoint Pharmaceuticals
- Fidia Pharma USA
- Genentech
- Janssen Biotech
- J&J Innovative Medicine
- Novartis
- Ocular Therapeutics
- Omeros
- ThromboGenics
- Tolmar
- Valneva

Each subpoena contains the same 15 broad requests—with numerous sub-parts—pertaining to the company's practices concerning credit card processing fees, its treatment of such fees in its calculations of ASP and two wholly distinct drug price reporting regimes (Average Manufacturer Price and Best Price), and information about practices in the industry and of physician customers related to credit card fees.  On March 20, 2026, EyePoint filed its Motion (ECF No. 295), which Regeneron opposed on April 10, 2026.

## ARGUMENT

Regeneron engages in revisionist history concerning the factual and procedural background of the case, but it makes no effort to articulate how third-party documents could be relevant to any element of the litigation.  Accordingly, for completeness, the government addresses the elements of falsity, materiality, and scienter in turn below.

**A.      Because Falsity is an Objective Inquiry, the Practices of Other Manufacturers Have No Bearing on Whether Regeneron Made False Statements to CMS or Caused the Submission of False Claims.**

Whether Regeneron submitted false ASP reports to CMS—and whether Medicare therefore paid Eylea claims at a falsely inflated rate—turns on whether credit card fees constitute price concessions under 42 U.S.C. § 1395w-3a(c)(3) and 42 C.F.R. § 414.804(a)(2).  Numerous courts have held that whether a manufacturer complied with drug price-reporting requirements is an objective inquiry.

For instance, in a case involving false drug price reporting in the Average Manufacturer Price ("AMP") context, the Seventh Circuit held that falsity, unlike scienter, is an objective analysis.  *United States ex. rel. Streck v. Eli Lilly & Co.*, 152 F.4th 816, 841 (7th Cir. 2025).  In *Streck*, the relator alleged that Eli Lilly falsely lowered the AMPs reported to the government for drugs covered by Medicaid, resulting in Eli Lilly paying less to Medicaid than it was obligated to

9

under the law.  The district court granted relator's motion for summary judgment as to falsity, finding that Eli Lilly's AMP calculations "and related certifications were factually and legally false" under the FCA.  *Streck*, 152 F.4th at 832 (quoting *United States ex rel. Streck v. Takeda Pharms. Am., Inc.*, No. 14 C 9412, 2022 WL 595308, at *14 (N.D. Ill. Feb. 28, 2022)).  The case proceeded to trial on the materiality of Eli Lilly's statements and the company's scienter, and the jury returned a verdict against Eli Lilly.  Following Eli Lilly's appeal of both the verdict and the district court's summary judgment ruling on falsity, the Seventh Circuit affirmed.  *Streck,* 152 F.4th at 826.

The Seventh Circuit rejected Eli Lilly's claim that its AMP reporting was not false because, in the defendant's view, the company's AMP certification was a reasonable interpretation of the relevant legal framework.  The court found that Eli Lilly's AMP reporting "was not objectively reasonable since it contradicted the plain text of the laws [and] regulations" and cautioned that "[t]urning the falsity question into a contest of reasonableness incurs additional costs."  *Id.* at 840.  These costs include the "incredible burden on government drafters to avoid any potential ambiguity in complex regulatory environments, or else forfeit its ability to recover against fraudsters," and "'incentiviz[ing] the intentional twisting of language in order to find profitable erroneous interpretations of the controlling text,'" *Id.* at 840–41 (quoting *United States ex rel. Chilcott v. KBR, Inc.*, No. 09-cv-4018, 2013 WL 5781660, at *7 (C.D. Ill. Oct. 25, 2013)).  The Seventh Circuit further reasoned that the Supreme Court's 2023 decision in *United States ex rel. Shutte v. SuperValu Inc.*, 598 U.S. 739 (2023), "essentially foreclosed the argument Lilly now forwards" because the Court's reasoning in *SuperValu* "implies that the Supreme Court sees falsity as a black-and-white, objective issue and considers state-of-mind at the scienter phase."  *Id.* at 841.

In another false drug price reporting case, the Fourth Circuit similarly rejected the defendant's argument that alleged statutory ambiguity can negate falsity, explaining that "falsity is an objective inquiry." *United States ex rel. Sheldon v. Allergan Sales, LLC*, 170 F.4th 227, 245 (4th Cir. 2026). The Fourth Circuit further concluded that, "[e]ven reasonable interpretations of a regulation can be false as a matter of law for purposes of the FCA." *Id.* Comparing the analyses of falsity and scienter, the court instructed that, "[u]nlike for purposes of the scienter analysis, ambiguity in a statute is not a defense to the falsity of the claim." *Id.* Instead, "[w]hen considering whether a plaintiff sufficiently alleges the element of falsity, the district court must determine whether the claims were objectively false by interpreting the relevant statute." *Id.*

An *objective* falsity determination with a *subjective* intent determination strikes a balance that protects the interests of both parties. As explained by the court in *Chilcott*, which focused on the proper interpretation of certain Army contracts:

> Contractors should not be permitted to escape liability for *knowingly* choosing a 'reasonable' but incorrect, interpretation of a contract or regulation. The requirement that the government or relator prove that the false claim was made knowingly is sufficient to protect contractors, while holding to a true standard of falsity protects the government from intentional fraud that knowingly takes advantage of an erroneous, but "reasonable" interpretation of a contract term.

2013 WL 5781660, at *8.

Accordingly, because falsity is an objective inquiry, how other manufacturers treated credit card fees for ASP reporting is irrelevant. Here, Regeneron's failure to account for credit card fees as price concessions in its ASP reporting rendered its ASP reports and the subsequent claims false because the relevant statute and regulation required that the fees be deducted as

11

price concessions.[4]  And, unfortunately for Regeneron, the Court *already* disposed of the issue in the government's favor when it denied Regeneron's motion to dismiss.  *See, e.g.*, ECF No. 173 at 17–20 (holding that the government plausibly alleged that credit card fees are price concessions and that credit card fees do not meet the definition of bona fide service fees).  In short, Regeneron's falsity argument is a dead letter, and Regeneron's attempts to assemble a *post hoc* industry standard should be rejected.

**B.    The Practices of Other Entities Do Not Impact Whether Accurate ASP Reporting Was Material to CMS' Payment Decisions.**

Further, false drug price reports that cause Medicare to overpay for a drug are material, and no amount of speculative discovery from third parties can change that.  Under the FCA, a statement is material if it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4); *United States ex rel. Zotos v. Town of Hingham*, 98 F.4th 339, 344 (1st Cir. 2024) ("A misrepresentation is material if it has 'a natural tendency to influence or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" (quoting *Neder v. United States*, 527 U.S. 1, 16 (1999)) (alteration in original)).

---

[4] Regeneron also mischaracterizes the documents that it argues show "that CMS employees themselves contemporaneously believed that credit card service fee reimbursements did not need to be deducted from ASP."  Regeneron Opp'n, at 4 (emphasis removed).  Although it is immaterial to the legal question before the Court here—namely, whether falsity is an objective inquiry—the three documents the government produced to Regeneron in discovery (one of which is a draft email never even sent within the agency) show that CMS did not have a full understanding of the credit card fee reimbursement arrangement and reporting practices at issue here.  Moreover, Regeneron fails to mention recent rulemaking from CMS emphasizing that credit card fees reimbursed by drug manufacturers are price concessions.  90 Fed. Reg. 49266, 49541 (Nov. 5, 2025).  Lastly, Regeneron had no knowledge of these documents before the government produced them in discovery, so they have no bearing on the analysis of Regeneron's scienter (addressed in Section C, below).

A drug price report is "inherently material under the language of the statute because, as part of the pricing calculation, it has 'a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.'" *United States ex rel. Hueseman v. Pro. Compounding Ctrs. of Am. Inc.*, 664 F. Supp. 3d 722, 748 (W.D. Tex. 2023) (quoting 31 U.S.C. § 3729(b)(4)) (discussing Average Wholesale Prices ("AWP")). As this Court noted in the complex MDL related to false AWPs, reporting "false [AWPs] had a natural tendency to influence the [Government's] actions, by inflating . . . the amount of the [Government's] payment." *United States ex rel. Ven-A-Care v. Actavis Mid Atl. LLC*, 659 F. Supp. 2d 262, 271 (D. Mass. 2009) (quoting *Massachusetts v. Mylan Labs.*, 608 F. Supp. 2d 127, 153 (D. Mass. 2008)) (alterations and omission in original). The Seventh Circuit similarly noted in *Streck* that "[n]oncompliance with the law resulting in large price differentials in how much the government owes" is strong evidence of materiality and that "AMPs are 'a foundational part' of the Medicaid framework, so artificially lowered numbers are not 'minor or insubstantial' violations." *Streck*, 152 F.4th at 847 (quoting *United States v. Luce*, 873 F.3d 999, 1007 (7th Cir. 2017)). Likewise, here, failure to accurately report price concessions in a manufacturer's ASP directly increases the amount that Medicare pays for the drug, rendering it material.

Because ASP is fundamentally "part of the pricing calculation" and, therefore, "inherently material," *Hueseman*, 664 F. Supp. 3d at 748, there is no third-party evidence that would change that analysis. Regeneron should not be allowed to dramatically expand the scope of discovery to obtain information that will not assist the parties or the Court in determining that Regeneron's misrepresentations were material to CMS' payment of claims.

13

**C.       Regeneron's "Industry Standard" Argument Is Irrelevant to Its Scienter Because Regeneron Lacked Contemporaneous Knowledge About Other Manufacturers' Practices.**

Regeneron admits that it had no contemporaneous knowledge of other drug manufacturers' ASP reporting practices; therefore, what other manufacturers did is not—and cannot be—relevant to Regeneron's scienter.  To incur liability under the FCA, a defendant must act "knowingly."  31 U.S.C. § 3729(a)(1).  Knowingly is broadly defined to include (i) actual knowledge, (ii) "deliberate ignorance of the truth or falsity of the information," or (iii) "reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1)(A).  The FCA does not require proof of specific intent to defraud.  31 U.S.C. § 3729(b)(1)(B).

In *United States ex rel. Schutte v. SuperValu Inc.*, the Supreme Court unanimously rejected the argument that scienter under the FCA is an objective standard, holding instead that scienter refers to a defendant's "knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed."  598 U.S. at 749.  The relevant analysis is "what the defendant thought when submitting the false claim—not what the defendant may have thought *after* submitting it."  *Id.* at 752 (emphasis in original).  As such, "the focus is not . . . on *post hoc* interpretations that might have rendered their claims accurate.  It is instead on what the defendant knew when presenting the claim."  *Id.*  And, even if a regulatory term "may be ambiguous on its face, such facial ambiguity alone is not sufficient to preclude a finding that respondents knew their claims were false."  *Id*. at 749.

Moreover, the Court already has addressed *SuperValu*'s import to this case.  In its motion to dismiss Order, the Court found it "unpersuasive" that Regeneron should escape liability by offering a "current interpretation" as to why credit card fee reimbursements do not constitute price concessions that is different from Regeneron's actual interpretation during the time period

at issue.  ECF No. 173 at 23.  Judge Saris confirmed that "[t]he Supreme Court in *SuperValu* made clear that the relevant inquiry under the FCA is Regeneron's subjective state of mind at the time of the alleged misconduct." *Id.* (citing *SuperValu*, 598 U.S. at 749).  The Court's conclusion that, "even if Regeneron's current interpretation is reasonable," it is not a defense, *id.*, is now the law of the case.  *See Agostini v. Felton,* 521 U.S. 203, 236 (1997); *see also, e.g.*, *Ellis v. United States*, 313 F.3d 636, 639 (1st Cir. 2002).

Here, Regeneron had no contemporaneous knowledge of the confidential ASP reporting practices of other drug manufacturers, and therefore such "industry practices"—if they even exist—have no bearing on what *Regeneron* knew or thought when it submitted false ASP reports.  In fact, the government propounded an interrogatory on Regeneron seeking "Regeneron's awareness of any information concerning any other manufacturer's ASP treatment of Credit Card Fee-Related Payments," to which Regeneron responded that "other than information provided by the government during the course of its investigation, it is not presently aware of specific manufacturer's ASP treatment of credit card processing fees."  Ex. 1.  And, once again, Regeneron itself concedes it lacks this information, stating: "To *develop* evidence of industry practice, Regeneron must be permitted to obtain information about how multiple companies understood credit card transaction costs from a price reporting standpoint." Regeneron Opp'n at 11 (emphasis added).  Regeneron should not be permitted to waste the time and resources of seventeen drug manufacturers, three drug distributors, the government, and the Court in an effort to "develop evidence" that has no bearing on whether Regeneron is liable under the FCA for submitting false ASP reports.

**CONCLUSION**

For the foregoing reasons, the Court should quash Regeneron's subpoena to EyePoint and

find that the practices of other drug manufacturers are not relevant to the elements of falsity,

materiality, or scienter in this case.


Dated: April 24, 2026                                    Respectfully submitted,

BRETT A. SHUMATE                                         LEAH B. FOLEY
Assistant Attorney General                              United States Attorney

JAMIE A. YAVELBERG                                      */s/ Lindsey Ross*
NATALIE WAITES                                          LINDSEY ROSS
KATHERINE J. DROOYAN                                    Assistant United States Attorney
DOUGLAS J. ROSENTHAL                                    1 Courthouse Way, Ste. 9200
DAVID M. FINKELSTEIN                                    Boston, MA 02210
YIFAN WANG                                              Phone: (617) 748-3100
Attorneys, Civil Division                              lindsey.ross@usdoj.gov
United States Department of Justice
175 N St. NE, Room 10.119
Washington, DC 20002
Phone: (202) 305-2073
katherine.drooyan@usdoj.gov
douglas.j.rosenthal@usdoj.gov
david.m.finkelstein@usdoj.gov
yifan.wang@usdoj.gov