**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA, *et al.*, *ex rel.* JULIANNE NUNNELLY and MATTHEW SHANKS,

Plaintiffs,

v.

REGENERON PHARMACEUTICALS, INC.,

Defendant.

No. 20-cv-11401-PBS

**ORAL ARGUMENT REQUESTED**

**Provisionally Filed Under Seal Pending Motion to Seal**

**DEFENDANT REGENERON PHARMACEUTICALS, INC.'S MEMORANDUM IN SUPPORT OF MOTION TO COMPEL GOVERNMENT REVIEW AND PRODUCTION OF CUSTODIAL FILES**

An important predicate for document discovery is ensuring that the party responding to a document request is searching the files of the right document custodians. That ensures that whatever document review and production takes place involves looking at the files of the people likely to have relevant information. Here, the government is refusing to search and produce responsive documents from the files of five individuals, whose role in connection with important underlying events makes obvious that they would have documents relevant to this case.

Four of the custodians in question are affiliated with the Department of Health and Human Services' Office of Inspector General ("OIG"), an agency the government *has excluded entirely* from its collection and review of custodial files. This is indefensible. OIG personnel were involved in a number of highly relevant topics. OIG conducted multiple surveys of manufacturers about the Average Sales Price ("ASP") and Average Manufacturer Price ("AMP") regulatory regimes on which this case focuses, concluding in each case that industry participants were

struggling to apply them (including the "bona fide service fee" test) and that CMS's oversight and guidance were severely lacking. OIG even learned, in approximately 2018, that a manufacturer was doing exactly the thing that the government claims Regeneron did in this case—not deducting reimbursed credit card fees from its price calculations. The four OIG custodians Regeneron identified played key roles in the OIG surveys and reports, and surely discussed the ambiguities in the ASP and "reasonable assumptions" frameworks in the course of reviewing surveys and preparing their reports. It is no surprise that the government does not want to produce such documents. They will prove Regeneron's point that the government's interpretations of the ASP statute and regulations are hopelessly ambiguous, and that a range of interpretations by manufacturers could qualify as "reasonable assumptions."

The fifth custodian whose files the government refuses to search is Carol Blackford, who worked at CMS. The government already has admitted in correspondence with Regeneron that she supervised the group at CMS that handles ASP policy. Ms. Blackford also supervised the ASP policy group that reviewed the content of CMS's ASP regulations, and that corresponded with external industry participants about application of the regulations. As described below, the handful of documents already produced from that group have been very damaging to the government's case; there is no basis for the government to refuse to review the files of another member of that group.

Production of relevant documents from the custodial files of these five individuals should have been included within the government's baseline efforts, not the subject of a motion to compel. Just as Regeneron has reviewed and produced responsive material, the government is obligated to do the same.

## BACKGROUND

This case involves Regeneron's reimbursement of credit card fees incurred by distributors that sell Regeneron's drug, EYLEA®. The government's fraud theory is that Regeneron misapplied the ASP statute, which requires that manufacturers deduct certain "price concessions" from ASP, 42 U.S.C. § 1395w-3a(c)(3), and its accompanying regulations, which declare that any bona fide service fees are not "price concessions" and thus should not be deducted from ASP, 42 C.F.R. § 414.804(a)(2)(ii); *see also id.* § 423.501. The government also alleges that Regeneron misapplied similar provisions of the AMP statute.

For decades, however, CMS has recognized the complexity of its drug-pricing regulations by making clear that it does ***not*** expect manufacturers to uniformly apply the ASP or AMP statutes and regulations. Instead, CMS directs manufacturers to "make reasonable assumptions in [their] calculations." 71 Fed. Reg. 48,982, 49,000 (Aug. 22, 2006); *see also, e.g.*, 81 Fed. Reg. 5,170, 5,209 (Feb. 1, 2016). And CMS has never issued any regulations about how to treat reimbursed credit card fees when calculating ASP or AMP, leaving manufacturers to make "reasonable assumptions." Despite this, the government asserts in this case that Regeneron's failure to deduct reimbursed credit card service fees from ASP and AMP was so unreasonable as to constitute a fraud on CMS. *See, e.g.*, ECF 58 ¶¶ 123–141; ECF 151 (Opp'n to Mot. to Dismiss) at 1–4.

The few documents the government has produced to date show that this cannot be true. Over a decade ago, CMS concluded that not deducting reimbursed credit card fees is not just reasonable, but the correct reading of the ASP regulatory regime. In a 2015 email, Edmund Kasaitis—an official in CMS's Hospital & Ambulatory Policy Group (the division responsible for ASP policy)—responded to an inquiry from a senior manager at a credit card company that a manufacturer's reimbursement of credit card fees paid by a distributor "does not appear to fit within the

price concessions or discounts described in section 1874A of the Social Security Act." Ex. 1 (US-DOJ-00551404). Mr. Kasaitis went on to draft an unsent email stating that reimbursed credit card fees are "possibly something like the bona fide service fee." Ex. 2 (US-DOJ-00571691).

Mr. Kasaitis's emails alone should foreclose this case. But there is plenty more. The ASP and AMP regulatory regimes that the government now claims Regeneron violated are so vague—and CMS's administration of them is so lacking—that OIG has twice investigated these issues and issued reports criticizing them. Those reports concluded, among other things, that:

(1) "[T]he use of reasonable assumptions is common practice among responding manufacturers" and "nearly two-thirds reported wanting additional guidance from CMS on assumptions-related issues," including specifically about "bona fide service fees." HHS-OIG, OEI-12-17-00130, Reasonable Assumptions in Manufacturer Reporting of AMPs and Best Prices at 2 (PDF) (Sept. 2019), https://oig.hhs.gov/documents/evaluation/3188/OEI-12-17-00130-Complete%20Report.pdf ("2019 Report").

(2) CMS was not helpful in the oversight of this framework: "CMS has provided little formalized oversight of the reasonable assumptions process, specifically instructing manufacturers [in the AMP context] *not* to submit their reasonable assumptions to CMS" because CMS "has limited authority to assess manufacturers' assumptions." *Id.* at 2 (PDF); *see also id.* at 20–21.

(3) "CMS should also give particular consideration to guidance regarding … determinations of bona fide service fees—[an] area[] where insufficient guidance may be leading to inconsistencies in manufacturer ASP calculations." HHS-OIG, OEI-BL-21-00330 at 2 (PDF), 3–4 (Dec. 2022), https://oig.hhs.gov/oei/reports/OEI-BL-21-00330.pdf ("2022 Report"); *see also id.* at 15–16.

(4) There are "broad regulations that allow manufacturers to make reasonable assumptions in the absence of specific guidance," and "the complexities of the pharmaceutical marketplace" may make "it difficult to determine how to treat certain sales practices when calculating ASPs." *Id.* at 3–4.

(5) CMS's lack of guidance "may be leading to inconsistencies in manufacturer ASP calculations." *Id.* at 15–16.

In the course of conducting the surveys that gave rise to those reports, [redacted]

[redacted] And the government has recently admitted that, after learning this, it continued to pay for that manufacturer's medications, using the manufacturer's submitted ASP, and did not even ask the manufacturer to change its ASP calculation methodology. Ex. 4 (RFA Responses) at 3–7.

In light of this body of material containing statements and information that are extremely helpful to Regeneron's defense, Regeneron has been pressing the government for months to produce documents from custodians who were plainly involved in reviewing and assembling this material, and whose internal comments and discussion are likely to contain statements that are even more damaging to the government's case. Unfortunately, the government has flatly refused to review the files of *any* OIG custodians and has rejected other custodians on the basis that they had "high-level managerial roles," despite the fact that they held roles that are clearly relevant to this case. After multiple rounds of meet-and-confer correspondence and discussion, Ex. 5 (Jan. 9, 2026 Ltr. to DOJ); Ex. 6 (Jan. 30, 2026 Ltr. to Regeneron); Ex. 7 (Mar. 13, 2026 Ltr. to DOJ); Ex. 8 (Apr. 3, 2026 Ltr. to Regeneron), Regeneron proposed as a compromise that the government review the files of just five additional individuals, including the four OIG officials who held central roles related to the 2019 and 2022 OIG Reports, and the CMS official who supervised the "ASP policy group." Ex. 9 (May 26, 2026 Ltr. to DOJ). The government refused that compromise proposal, as well. Ex. 10 (June 11, 2026 Ltr. to Regeneron). The government claims it would be too "burdensome" to collect and review the custodial files of the four OIG custodians, suggesting instead that Regeneron should just take the government's word for it based on reviews that two of the custodians have performed that their documents contain nothing of interest. Ex. 11 (June 16, 2026 Ltr. to DOJ). The government has refused, however, to explain what steps it has taken to

make that self-serving determination, Ex. 11 (June 16, 2026 Ltr. to DOJ); Ex. 12 (June 22, 2026 Email to Regeneron), and likewise has not even confirmed that its understanding of what would constitute a relevant and responsive document is the same as Regeneron's. Ex. 11 (June 16, 2026 Ltr. to DOJ). Based on the cramped positions on responsiveness the government previously has taken (seeking to limit its review to documents mentioning "credit cards," while excluding admissions that the bona fide service fee definition and reasonable assumptions frameworks are vague and unworkable), it seems safe to assume that its "review" has been less than comprehensive.

Because the government has refused to do or say more, claiming that providing additional information about its search methodology would be akin to answering "additional interrogatories," Ex. 12 (June 22, 2026 Email to Regeneron), court intervention is needed.

## ARGUMENT

### I. The Government Should Be Compelled To Review and Produce Documents from the Custodial Files of Carol Blackford, Louis Day, Adam Freeman, Michael Kvassay, and David Tawes.

Review of an additional custodian's documents is appropriate when it "is reasonably calculated to lead to relevant evidence that might not be captured if [the custodian] were excluded." *Fort Worth Emps. Retirement Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 106 (S.D.N.Y. 2013); *see also United States ex rel. Souza v. Embrace Home Loans, Inc.*, 732 F. Supp. 3d 177, 179 (D.R.I. 2024) (ordering collection of 91 additional custodians' files, directing parties to confer on which should be added for review, and noting that "added custodians should 'provide unique relevant information not already obtained'") (quoting *Fort Worth*, 297 F.R.D. at 107–08) (emphasis in original); *MariCal, Inc. v. Cooke Aquaculture, Inc.*, 2016 WL 9459260, at *2 (D. Me. Aug. 9, 2016) (ordering review of additional custodian upon finding that person's documents were likely to include relevant information and "the Court is not convinced that all of [the

custodian's] relevant information would be included within the electronically stored information maintained by the other designated custodians"). The five custodians Regeneron proposed as a compromise easily meet this standard.

***OIG Custodians***: Four of the five custodians whose documents Regeneron seeks are from OIG, an agency from which the government has refused to review a single custodial document. These individuals had roles in events that are not covered by the documents of any other custodians in the case, and their specific roles strongly suggest they would have relevant documents. The government acknowledges that Michael Kvassay and Louis Day were the principal authors of OIG's reports. Ex. 8 (Apr. 3, 2026 Ltr. to Regeneron, at 5). David Tawes supervised the surveys and reports and, according to the government, "was substantively involved in editing and producing the Reports." *Id.* And Adam Freeman was a "liaison[] between CMS and the study team." *Id.* These individuals participated in the review of survey results for and preparation of reports that contained findings relevant to this case, including, for example:

- That an overwhelming majority of manufacturers relied on "reasonable assumptions" because the ASP and AMP regimes were impossibly vague, including as to the bona fide service fee test. *See* 2019 Report; 2022 Report.

- That CMS did not provide adequate guidance as to ASP or AMP, including as to the bona fide service fee test. *See* 2019 Report; 2022 Report.

- That CMS "provided little formalized oversight of the reasonable assumptions process, specifically instructing manufacturers [in the AMP process] *not* to submit their reasonable assumptions to CMS." *See* 2019 Report at 2 (PDF).

The government's recent production of a single manufacturer's response to one of these surveys also shows that these individuals were aware, by approximately 2018, that at least one manufacturer other than Regeneron was not deducting reimbursed credit card fees from its reported prices. *See* Ex. 3 (US-DOJ-00579958). The custodial files of Day, Freeman, Kvassay, and Tawes will therefore include information about these OIG reports, the manufacturer survey

submissions, and OIG's correspondence with CMS about its findings and criticisms, filling a gaping hole in the government's existing document review, which has not encompassed a single OIG custodian to date.

Documents pertaining to the OIG reports will be relevant to the "falsity," "scienter," and "materiality" elements of the government's claim. OIG's statements about the scope of the "reasonable assumptions" standard and the difficultly in applying definitions such as "bona fide service fee" will bear directly on whether Regeneron's supposed statements about ASP could qualify as "false." *See, e.g.*, 71 Fed. Reg. 48,982, 49,000 (Aug. 22, 2006); ECF 403 (Gov't Opp'n to Mot. to Compel) at 4. As to scienter, OIG's examination of the rampant confusion over ASP and AMP calculations may further corroborate the reasonableness of Regeneron's belief that it was making a "reasonable assumption," *see, e.g.*, *United States ex rel. Patzer v. Sikorsky Aircraft Corp.*, 722 F. Supp. 3d 839, 854 (E.D. Wis. 2024),[1] and in all events lacked any reason to think there was a "substantial and unjustifiable risk that" it was wrong, *Omni Healthcare, Inc. v. MD Spine Sols. LLC*, 761 F. Supp. 3d 356, 364 (D. Mass. 2025), *aff'd*, 160 F.4th 248, 263 (1st Cir. 2025). Finally, OIG's investigation and consideration of the many ways in which CMS had failed to oversee, provide guidance on, or otherwise care about the ASP and AMP calculations and the reasonable assumptions that manufacturers were making will undermine the government's contention that divergences in manufacturers' reasonable assumptions were material. *See United States ex rel. Escobar v. Universal Health Servs., Inc.*, 579 U.S. 176, 193 (2016) ("Under any understanding of the concept, materiality look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.") (alteration in original).

---

[1] *See also United States ex rel. Kraemer v. United Dairies, L.L.P.*, 82 F.4th 595, 606 (8th Cir. 2023); *United States ex rel. Behnke v. CVS Caremark Corp.*, 2025 WL 1758623, at *34 (E.D. Pa. June 25, 2025).

The government cannot avoid its obligation to collect the custodial files of the OIG custodians and review all documents that hit on the parties' agreed-upon search terms by claiming to have conducted a secret "review" to conclude that those custodial files do not contain any relevant documents. To the extent the government relies on this supposed "review" to resist Regeneron's motion, the Court should ask the questions Regeneron posed (which the government ignored) to determine whether that "review" is entitled to any weight at all: (1) what documents and sources did the government review, (2) what search terms or limiters did the government apply to determine what to review, and (3) what responsiveness lines did the government apply in deciding that every document it reviewed was irrelevant, including whether these custodial files contain criticisms or recognition of ambiguities in the "reasonable assumptions" framework and in the meaning of "price concessions" and "bona fide service fees." Finally, with respect to Mr. Day and Mr. Kvassay, the government should be required to justify its apparent reliance on custodians' self-collection and review. Delegation of counsel's responsibility to review documents for responsiveness to the custodians themselves is "strongly disfavored" and counsel remains "responsible for directly overseeing, supervising and reviewing the discovery efforts taken." *Zhulinska v. Niyazov L. Grp., P.C.*, 2021 WL 5281115, at *3 n.2 (E.D.N.Y. Nov. 12, 2021) (internal citations omitted); *see also Lyman v. Ford Motor Co.*, 344 F.R.D. 228, 230 (E.D. Mich. 2023) ("[A]n attorney may not simply rely on custodian self-collection of ESI. Instead, counsel must test the accuracy of the client's response to document requests to ensure that all appropriate sources of data have been searched and that responsive ESI has been collected—and eventually reviewed and produced.").

***Carol Blackford***: Ms. Blackford's files are also uniquely relevant. As the government put it, she supervised CMS's ASP policy group. Ex. 8 (Apr. 3, 2026 Ltr. to Regeneron, at 4).

That is the same group of which Mr. Edmund Kasaitis was a member, and the same group that reviewed and discussed external communications with industry participants about price concessions and bona fide service fees, such as the email to American Express that credit card fee reimbursements "do[] not appear to fit within the price concessions or discounts described in section 1874A of the Social Security Act," Ex. 1 (US-DOJ-00551404), and are "possibly something like the bona fide service fee," Ex. 2 (US-DOJ-00571691). *See United States ex rel. Long v. Janssen Biotech, Inc.*, 2022 WL 488493, at *5 (D. Mass. Feb. 17, 2022), *aff'd in part, rev'd in part on other grounds*, 2022 WL 4124017 (D. Mass. Sept. 9, 2022) (allowing additional custodians as needed to "supplement[] existing discovery by adding mid-level and senior-level managers who developed, approved, reviewed, and oversaw the IOI services at issue"). The documents of individuals in that group thus have a demonstrated track record of containing material that is of crucial relevance to the facts at issue in this case. There is no justification for not searching her documents.

## CONCLUSION

The Court should compel the government to conduct a review of the custodial files of Carol Blackford, Louis Day, Adam Freeman, Michael Kvassay, and David Tawes, and produce the responsive documents in their files.

Dated: July 22, 2026

Respectfully submitted,

REGENERON PHARMACEUTICALS, INC.

By its attorneys,

/s/ Benjamin Hazelwood
Enu Mainigi (admitted *pro hac vice*)
Jennifer G. Wicht (admitted *pro hac vice*)
Ellen E. Oberwetter (admitted *pro hac vice*)
Andrew V. Trask (admitted *pro hac vice*)
Benjamin Hazelwood (admitted *pro hac vice*)
Miranda R. Petersen (admitted *pro hac vice*)
Dana B. Kinel (admitted *pro hac vice*)
Joseph Catalanotto (admitted *pro hac vice*)
Sarah S. Gallant (admitted *pro hac vice*)
Nicole Ratelle (admitted *pro hac vice*)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, D.C. 20024
(202) 434-5000
emainigi@wc.com
jwicht@wc.com
eoberwetter@wc.com
atrask@wc.com
bhazelwood@wc.com
mpetersen@wc.com

Paul D. Clement (admitted *pro hac vice*)
Matthew D. Rowen (admitted *pro hac vice*)
Kevin Wynosky (admitted *pro hac vice*)
CLEMENT & MURPHY, PPLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
matthew.rowen@clementmurphy.com
kevin.wynosky@clementmurphy.com

Gregory F. Noonan (BBO No. 651035)
Katherine B. Wellington (BBO No. 688577)
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA 02110
(617) 371-1000
gregory.noonan@hoganlovells.com
katherine.wellington@hoganlovells.com

Gejaa T. Gobena (admitted *pro hac vice*)
Mitchell J. Lazris (admitted *pro hac vice*)
Emily M. Lyons (admitted *pro hac vice*)
HOGAN LOVELLS US LLP
555 Thirteenth St. NW
Washington, D.C. 20004
(202) 637-5600
gejaa.gobena@hoganlovells.com
mitch.lazris@hoganlovells.com
emily.lyons@hoganlovells.com

**CERTIFICATE OF SERVICE**

I hereby certify that this document was filed through the Court's CM/ECF system on July 22, 2026 and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Nicole Ratelle*

**LOCAL RULE 7.1 CERTIFICATE**

I hereby certify on July 22, 2026, that counsel for Regeneron conferred with counsel for the United States and attempted in good faith to resolve or narrow this issue, reflected in the following correspondence: Ex. 5 (Jan. 9, 2026 Ltr. to DOJ); Ex. 6 (Jan. 30, 2026 Ltr. to Regeneron); Ex. 7 (Mar. 13, 2026 Ltr. to DOJ); Ex. 8 (Apr. 3, 2026 Ltr. to Regeneron); Ex. 9 (May 26, 2026 Ltr. to DOJ); Ex. 10 (June 11, 2026 Ltr. to Regeneron); Ex. 11 (June 16, 2026 Ltr. to DOJ); Ex. 12 (June 22, 2026 Email to Regeneron). The United States opposes this Motion.

*/s/ Benjamin Hazelwood*